Sylvester J. VAUGHNS, Jr., etc., et al.

v.

BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY, et al.

NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE, et al.

v.

BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY, et al.

Civ. Nos. 72–325–K, K–81–5297.

United States District Court,
D. Maryland.

June 20, 1983.

Order Sept. 20, 1983.

Richard V. Falcon, Baltimore, Md., Joseph M. Hassett, David S. Tatel, Elliot M. Mincberg, John C. Keeney, Jr., George H. Mernick, III, Nell Hoffman and Hogan & Hartson, Washington, D.C., Thomas I. Atkins, Michael Sussman and Teresa Demchak, NAACP Sp. Contribution Fund, New York City, William L. Robinson and Norman J. Chachkin, Lawyers' Committee for Civil Rights Under Law, William Taylor, Catholic University Law School, Washington, D.C., for plaintiffs.

Paul M. Nussbaum and Andrew W. Nussbaum, Mount Rainier, Md., and George D. Solter, Alfred L. Scanlan, Jr. and Gerson B. Mehlman, Baltimore, Md., for defendants.

FRANK A. KAUFMAN, Chief Judge.

The litigation in one of these two cases, *Vaughns v. Board of Education of Prince George's County*, commenced on March 29, 1972. A number of opinions and orders were thereafter filed in that case.[1] The facts and holdings set forth in those opinions and orders will not be repeated in this opinion. This court's December 29, 1972 order was "a final Order as to the issue of student attendance." *Vaughns v. Board of Education of Prince George's County*, 355 F.Supp. 1051, 1064 (D.Md.1972). That final Order, after review by the Fourth Circuit and, in January 1973, by the Supreme Court, was left without change. "Other issues pertaining to faculty, administration, school construction, and legal fees and reimbursable costs of plaintiffs and their counsel [were] reserved [on December 29, 1972] for subsequent determination by this Court. Additionally, [on December 29, 1972], this Court ..., for the time being, retain[ed] jurisdiction as instructed by the Supreme Court in *Raney v. Board of Education*, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968), with regard to the student attendance plan ... approved and decreed [on December 29, 1972], in order that this Court [might] supervise the implementation of the same." *Id.*

Between January 1973, and November 27, 1974, all of the non-student attendance issues were resolved by agreement among the parties. One of those agreements was embodied in a consent decree dated February 20, 1974, relating to faculty hiring and promotion. A copy of that decree is appended hereto as Appendix A. Also, during the January 1973—November 27, 1974 period, compliance reports, letters and memoranda were filed by both sides. On that latter date, this court filed a Memorandum and Order, a copy of which is appended hereto as Appendix B. On March 13, 1975, this court filed a further Memorandum and Order, a copy of which is appended hereto as Appendix C. In those two Memoranda and Orders, this court relinquished jurisdiction in *Vaughns* subject to

---

1. *Vaughns v. Board of Education of Prince George's County*, 355 F.Supp. 1034 (D.Md. July 25, 1972); 355 F.Supp. 1038 (D.Md. Aug. 31, 1972), *remanded for further proceedings*, 468 F.2d 894 (4th Cir. Oct. 12, 1972); 355 F.Supp. 1051 (D.Md. Dec. 29, 1972), *aff'd*, No. 73–1024 (4th Cir. Jan. 23, 1973), *cert. denied, Eller v. Board of Education of Prince George's County*, 410 U.S. 910, 93 S.Ct. 968, 35 L.Ed.2d 272 (1973).

the right of any party to seek to have this court again resume jurisdiction.

From March 13, 1975 until September 1, 1981, there were no developments in *Vaughns*. On September 1, 1981, certain (but not all) of the named plaintiffs in *Vaughns* moved to reopen that case, alleging violations by defendants of outstanding orders of this court in *Vaughns* and seeking appropriate relief. Defendants filed a motion Ne Recipiatur, which was denied by this court on September 28, 1981, in an order granting plaintiffs' motion to reopen. Thereafter, certain parties plaintiff were added and dropped.

■■■ On July 25, 1972, *Vaughns* was certified as a class action. Defendants challenge the viability, as of September 28, 1981 and presumably at all times thereafter, of the class certified in *Vaughns* under Fed.R.Civ.P. 23(b)(2). Although several named plaintiffs in *Vaughns* no longer have children in the Prince George's County schools, three named plaintiffs [2] do still have children in the school system. Even if this were not so, a class does not lose its status as a class in ongoing litigation simply because the claims of some members of the class have become moot, if the claims of all have not become moot. *See Sosna v. Iowa*, 419 U.S. 393, 399, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975), in which Justice Rehnquist held that a class acquires "a legal status" separate from its representatives. Even when class representatives no longer have a live stake in the continued litigation, a case is not moot so long as there are non-moot class issues. *Id.* at 399, 401, 95 S.Ct. at 557, 558. Under such circumstances, new class action representatives should be appointed.

It is firmly established that where a class action exists, members of the class may intervene or be substituted as named plaintiffs in order to keep the action alive after the claims of the original named plaintiffs are rendered moot. *See Rogers v. Paul*, 382 U.S. 198, 199 [86 S.Ct. 358, 359, 15 L.Ed.2d 265] (1965); *Rodriguez v. East Texas Motor Freight*, 505 F.2d 40 (5th Cir.1974), *cert. granted*, 425 U.S. 990 [96 S.Ct. 2200, 48 L.Ed.2d 814] (1976); *Bing v. Roadway Express, Inc.*, 485 F.2d 441 (5th Cir.1973). This procedure is deeply implemented in desegregation cases, where the mootness problem constantly arises because of protracted litigation and the eventual graduation of named plaintiffs.

*Graves v. Walton County Board of Education*, 686 F.2d 1135, 1138 (5th Cir.1982).

■■■ In *Vaughns*, although three named plaintiffs in the original suit still have children in the Prince George's County school system, plaintiffs moved under Fed.R.Civ.P. 21 to add as additional named plaintiffs to the reopened suit four sets of parents [3] and the Prince George's County Chapter of the NAACP. This court granted plaintiffs' motion. Rule 21 provides in pertinent part:

Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just.

A motion to add parties should be granted when, as in *Vaughns*, the parties to be added are members of the class represented and seek the same relief. *See Rogers v. Paul*, 382 U.S. 198, 198–99, 86 S.Ct. 358, 359, 15 L.Ed.2d 265 (1965) (per curiam). The four new sets of parents, who reside in Prince George's County, have children of school age in the Prince George's County school system, ask for the same type of relief sought by the original plaintiffs, and are acting on their own behalf and on be-

---

**2.** Reginald Jackson, Stanley Gilmore and John Williams.

**3.** Those four sets of parents added as parties are Mr. and Mrs. Thomas Newman, Mr. and Mrs. Robert Williams, Mr. and Mrs. Glenn J. Sterling and Mr. and Mrs. John Rosser. Also, upon plaintiffs' motion, original plaintiffs Wheatfall, Brooks and Ligon were dropped. Original

plaintiff Sylvester Vaughns, whom plaintiffs had originally asked to be dropped, later indicated that he wished to continue his participation in the suit as a named plaintiff. Accordingly, he has remained as a named plaintiff though not as a class action representative. *See* the discussion *infra* in the body of this opinion.

half of their school-age children. As to the Prince George's County Chapter of the NAACP, the latter is an unincorporated membership association of Prince George's County residents, the members of which include parents of black school-age children who attend Prince George's County schools. A membership association such as the NAACP is a proper party when either the association or its members have suffered injury. Local chapters of the NAACP have been held to be proper parties in school desegregation suits, as well as in other types of suits. *See, e.g., Tasby v. Estes*, 572 F.2d 1010, 1012 n. 2 (5th Cir.1978); *Boyd v. Gullett*, 64 F.R.D. 169, 172–73 (D.Md.1974) (Young, J.), and Supreme Court and other decisions cited and discussed thereat.

 In 1972 neither this court nor any of the parties realized that no order was filed by this court specifically naming any class action representatives. Seemingly, this court and the parties assumed that all named plaintiffs in *Vaughns* were the class representatives. After that 1972 error was discovered by counsel in 1981, plaintiffs' petition for entry of an order designating Reginald Jackson, Stanley Gilmore and John Williams, *nunc pro tunc*, representative plaintiffs on behalf of the class certified in *Vaughns* in 1972, was granted. That formal defect does not defeat the class certification herein. *See Graves, supra,* in which the Fifth Circuit held a desegregation case to be a class action although a formal order of class certification had erroneously *never* been entered. 686 F.2d at 1140. However, defendants' attack on this court's entry in 1981 of an order designating class representatives in *Vaughns* is not confined to the technical 1972 error. Rather, defendants contend that the class certified in *Vaughns* in 1972 no longer exists. Specifically, defendants assert that the requirements of Fed.R. Civ.P. 23 are not met in *Vaughns* because (1) persons who might join in plaintiffs' cause of action are no longer so numerous as to require or permit a class action; (2) there are no questions of law or fact common to the class, which consists of all

parents with black children in the Prince George's County public school system; (3) the claims of representative party plaintiffs are not typical of the claims of the parents of all black children in the Prince George's County school system; and (4) the party plaintiffs will not fairly and adequately represent the interests of all parents of black children in the Prince George's County public school system. Each of those contentions lacks merit. The number of black students (and also the number of their parents) runs in many tens of thousands. The very recital of the fact and law issues displays commonality and typicality. There never was any indication that the class action representatives would not fairly and adequately represent the interests of black parents and their children and the record in this litigation discloses that they in fact have so done. Even if some of the parents of black children had recently taken positions in opposition to the position of other such parents who desired to reopen this litigation in 1981, that does not destroy any of the factors calling for class certification in *Vaughns*.

Similarly unpersuasive is defendants' additional argument, addressed at least in part to the typicality requirement of Rule 23(a)(3) and in part to the adequacy-of-representation requirement of Rule 23(a)(4), that there may be conflicting interests within the class because some children may be happy with the present system, even assuming its discriminatory character. The fact that some members of the class may be personally satisfied with the existing system and may prefer to leave the violation of their rights unremedied is simply not dispositive of a determination under Rule 23(a). *Norwalk C.O.R.E. v. Norwalk Redevelopment Agency*, 395 F.2d 920, 937 (2d Cir. 1968).

*Wilder v. Bernstein*, 499 F.Supp. 980, 993 (S.D.N.Y.1980) (footnote omitted).

 Defendants further attack class certification in *Vaughns* on the grounds that plaintiffs lack any substantial likelihood of success on the merits, because black chil-

dren in the Prince George's County system are no longer, say defendants, suffering under a racially discriminatory educational system. However, pursuant to that contention, what defendants in essence are asking this court to do in the context of refusing class certification is to make a determination on the merits as a prerequisite to continuing class certification, a type of procedure which the Supreme Court specifically disapproved in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974).[4] In 1981, when this court granted plaintiffs' motions in *Vaughns* with regard to designating class representatives and adding and dropping parties, defendants were afforded by this court the opportunity timely to file at a later date a decertification petition with affidavits supporting their contentions that the *Vaughns* plaintiffs did not meet the requirements of Fed.R.Civ.P. 23. No such decertification petition has since been filed by defendants. This court also raised with counsel the possibility that any groups within the black community of Prince George's County who were hostile in 1981 to the claims asserted by plaintiffs in the within litigation might seek to form one or more classes or subclasses and intervene herein. No such group or individual has so sought to intervene.

Defendants have at all times since September 1981 challenged the subject matter jurisdiction of this court in *Vaughns*, contending that (1) all vestiges of the past racial discrimination which had led this court to issue its December 29, 1972 order had been eliminated by March 1975 and (2) defendants (a) did not intentionally violate any of their constitutional or other duties or (b) violate any outstanding order of this court, in the period subsequent to November 1974 or March 1975 or indeed at any time after December 29, 1972. After defendants contended that this court lacked subject matter jurisdiction to permit in 1981 the reopening of *Vaughns*, plaintiffs, while strongly disagreeing with defendants' contention, instituted, on October 8, 1981, a new case, *NAACP v. Board of Education of Prince George's County* (*NAACP*), which was not brought as a class action. *NAACP* was consolidated for all purposes with *Vaughns* on November 27, 1981 under Fed.R.Civ.P. 42(a), because those actions present common questions of both law and fact.

■ The Fourth Circuit has expressly recognized the desirability of consolidating separate lawsuits concerning desegregation of a particular school district. *See Allen v. State Board of Education of North Carolina*, 447 F.2d 960, 961–62 (4th Cir.1971), *cert. denied*, 405 U.S. 920, 92 S.Ct. 948, 30 L.Ed.2d 790 (1972). Consolidation is particularly appropriate when identical issues are raised against the same defendants. *Fields v. Wolfson*, 41 F.R.D. 329 (S.D.N.Y.1967) (Mansfield, J., then a district judge).[5]

**4.** While in *Eisen* it was plaintiff, not defendants as herein, who desired the district court to inquire into the merits before certifying a class, Justice Powell, in *Eisen,* noted (at 178) specific agreement with Judge Wisdom's rejection of the right of the defendant in *Miller v. Mackey International, Inc.,* 452 F.2d 424, 427 (5th Cir.1971), to cause the district court so to inquire.

**5.** After consolidation of *Vaughns* and *NAACP,* a motion of the original defendants to add as parties defendant Prince George's County, Maryland, the Maryland State Board of Education and the State of Maryland, pursuant to Rule 19, was granted. The Board desired those three additional defendants to be parties in this litigation in the event that the latter should be needed in order for this court to fashion an adequate remedy, if defendants were determined to be liable herein, a determination which of course

defendants contend should not be made. Rule 19(a)(1) provides, in pertinent part:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties. . . .

After the original defendants so moved, the court added those additional defendants so that during the discovery phase, they could each protect their due process rights and so that discovery would not have to be repeated during the relief phase, if any liability on the part of the original defendants was held to exist. However, after discovery with regard to liability issues was completed, and bifurcation of trial for purposes of liability and relief issues was or-

 This court concluded, early in the course of this litigation, that this court possessed, in September 1981 and thereafter, subject matter jurisdiction in both *Vaughns* and *NAACP* if only to take jurisdiction to determine relevant and material disputed questions of fact and of law underlying defendants' challenges to jurisdiction. In *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1945), Justice Black wrote:

> Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided *after* and *not before* the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.

(Citations omitted; emphasis added). An exception applies when the claim appears to be wholly insubstantial and frivolous; then the suit may be dismissed for want of jurisdiction. *Bell*, 327 U.S. at 682–83, 66 S.Ct. at 776. *See also Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 70–71, 98 S.Ct. 2620, 2628–29, 57 L.Ed.2d 595 (1978). A claim is insubstantial only if its unsoundness so clearly results from previous decisions so as to foreclose the claim and leave no room for the inference that the question sought to be raised can meritoriously be the subject of controversy. *Hagans v. Lavine*, 415 U.S. 528, 537–38, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974). Plaintiffs' allegations that defendants have not only failed to achieve desegregation, but have impeded desegregation are far from being so patently insubstantial or frivolous as to justify dismissal for lack of jurisdiction. The same is true of a number of other claims made by plaintiffs. In determining jurisdiction, a federal court must sometimes investigate and even decide the merits of an action. *Land v. Dollar*, 330 U.S. 731, 739, 67 S.Ct. 1009, 1013, 91 L.Ed. 1209 (1947).[6]

In this litigation, plaintiffs attack defendants' conduct of the Prince George's County school system in relation to faculty hiring, faculty assignments, special education for the handicapped and for talented and gifted students, student discipline, student classroom assignments and student assignments to schools. Each of those areas will be discussed *infra* in that sequence.

There are three overriding legal questions which require examination in connection with each of those areas within which plaintiffs seek relief in this litigation: (1) whether defendants have or have not eliminated all vestiges of the pre-January 1973 discrimination; (2) whether defendants have intentionally engaged in any discriminatory conduct since January 1973; and (3) whether defendants have violated any outstanding order of this court. If plaintiffs establish either (1) failure of defendants to eliminate such vestiges or (2) intentional racial discrimination whether related or unrelated to the pre-1973 system or (3) violation by defendants of any outstanding order of this court, then plaintiffs are entitled to relief with regard to such substantive area or areas in the within consolidated litigation.[7]

---

dered by this court, without opposition by any party, the State, State Board and county were dismissed from the case without prejudice to their later rejoinder in the relief phase of this litigation if the same should become appropriate. Each of those defendants asked to be, and has been, spared the expense of taking part in the lengthy trial held in this case with regard to the liability issues.

**6.** *See also Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 690, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1948); *Houston v. Murmansk Shipping Co.*, 667 F.2d 1151, 1154 (4th Cir.1982); *Eastern Kentucky Welfare Rights Organization v. Simon*, 506 F.2d 1278, 1283 (D.C. Cir.1974).

**7.** Plaintiffs originally asked this court to issue a preliminary injunction prohibiting defendants from disposing of or substantially altering twenty-two separate school buildings. That issue was settled by agreement among the parties pursuant to which defendants consented to the entry of a preliminary injunction with regard to seventeen school buildings, subject to their right to apply to this court at any time for relief from the provisions of the injunction with regard to

## I. FACULTY [8] HIRING

Paragraph 5 of the consent decree in *Vaughns* dated February 20, 1974 [9] provides, in pertinent part:

5. The Defendant school system's goal is to employ a percentage of blacks in all job categories which is generally reflective of the percentage of the black population of Prince George's County, or generally not less than 19%. [10]

In 1974, when the consent decree was entered, the black population of Prince George's County was approximately 19%, as was the percentage of black faculty employed by the school system. The percentage of black students in September 1974 was 30.8%. Today the black percentages of the county population and of the student population have jumped, respectively, to approximately 40% and 50%, [11] but blacks make up only 25% of the school system's faculty. Plaintiffs contend, and defendants deny, in that context, that defendants are in violation of paragraph 5 of the consent decree. Both the facts of this litigation and the case law are instructive with regard to those opposite positions.

*Morgan v. O'Bryant*, 671 F.2d 23 (1st Cir.1982), involved several appeals from an order of the district court (Garrity, J.) which had the effect of abrogating the "last hired, first fired" rule governing layoffs of teachers and administrators in the Boston public schools, so as to mitigate the adverse effect of that rule upon relatively recently hired black teachers in the event layoffs became necessary. That order was entered by the district court at the request of the school system, and over the objection of unions representing teachers and administrators. The purpose of the order was to protect black teachers and administrators who had been hired by the Boston public schools pursuant to the district court's desegregation decree. That decree had ordered the school system to hire blacks and whites on a one-for-one basis until the percentage of black teachers reached 20%, the approximate percentage of blacks in Boston at the time of the decree. Further, the decree called for affirmative recruitment to continue until the percentage of black teachers reached 25%. *See Morgan v. Kerrigan*, 388 F.Supp. 581, 582–83 (D.Mass. 1975), *aff'd*, 530 F.2d 431 (1st Cir.1976), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976). The desegregation decree with regard to faculty hiring was predicated upon the district court's conclusion that the school system was discriminating in that area. *See Morgan v. Hennigan*, 379 F.Supp. 410, 463–66 (D.Mass. 1974), *aff'd*, 509 F.2d 580 (1st Cir.1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). By early 1981, the percentage of black teachers had reached 19.09%; that of black administrators had reached 20.53%. A budget crisis encountered by the school system in that year raised the possibility of massive teacher layoffs, and prompted the district court's directive with regard to the formula for layoffs of teachers and administrators.

Writing for the First Circuit, Judge Campbell upheld the district court's order, noting (at 26) that the Supreme Court had held in *Milliken v. Bradley*, 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745

---

specific school buildings. In fact, during the course of this litigation, four such buildings have been released by order of this court with the agreement of plaintiffs as well as defendants.

8. The term "faculty" as used herein includes not only classroom teachers but all professional staff, including principals, vice-principals, librarians and guidance counselors.

9. *See* Appendix A hereto.

10. Defendants argue that those words only obliged them to employ "not less than 19%" black faculty in the system. However, both witnesses

who testified for the defendants in the faculty area acknowledged that they always assumed that the system's goal was to employ a rising percentage of black faculty as the countywide black population rose. (Tr. 4125–26).

11. The 1980 census put the black population of Prince George's County at about 37%, but Mr. George Grier, defendants' expert witness on demography (*see* note 68 *infra*), testified that the percentage in May 1982 was approximately 40%.

(1977) (*Milliken II*), that, "like all other equitable remedies, the nature of the de-segregation remedy is to be determined by the nature and scope of the constitutional violation. The remedy must therefore be related to 'the *condition* alleged to offend the Constitution....'" (Citations omitted; emphasis in original). Judge Campbell further commented:

It is plain that the present order, aimed at preserving a goal concerning the percentage of black teachers and administrators, is directly related to the unconstitutional conditions earlier found by the district court. This court has twice upheld the underlying district court orders concerning the percentage of black faculty as part of the desegregation remedy. *Morgan v. Kerrigan*, 509 F.2d 599 (1st Cir.1975); 530 F.2d 431 (1st Cir.1976). In 1975, we said that, having "found pervasive violations of the constitutional rights of black school children in the Boston schools," the district court had an "obligation ... to rectify those violations," and we concluded that orders related to the percentage of black faculty "are directed toward the objective of eradicating the segregated system that has prevailed in the Boston schools, and [are] clearly within [the district court's] power in the context of this case." 509 F.2d at 600–01. We further held in 1976 that the 20 percent goal was a valid part of the effort "to eliminate segregation and its effects 'root and branch,'" 530 F.2d at 432, citing *Green v. County School Board*, 391 U.S. 430, 438 [88 S.Ct. 1689, 1694, 20 L.Ed.2d 716] (1968). The 20 percent formula is thus clearly a part of the remedy earlier approved in this case to rectify the unconstitutional condition found to exist. The purpose of the order under review is to safeguard the progress toward desegregating the faculty and administrative staff—and thus the progress toward dismantling the dual school system—already made.

Judge Campbell wrote that, although progress in the direction of desegregation in faculty hiring had been made, "[t]he ... desegregation remedial goals have not been fully achieved," *id.* at 27 n. 5, and concluded (at 22): "The elimination of the vestiges of a segregated school system cannot be accomplished until the effects of past hiring discrimination have been eradicated." *Id.*

Herein, plaintiffs assert that the goal set forth in paragraph 5 of the February 20, 1974 consent decree has not been met, and that defendants have therefore failed to eliminate all vestiges of the dual system with respect to faculty hiring. However, while the remedial orders with regard to faculty hiring entered by the district court in the Boston school desegregation case were predicated on a finding of unconstitutional discriminatory action by the defendants therein, at no time in the within litigation has this court or any other court adjudicated the question of whether or not the Prince George's County school system has discriminated in faculty hiring. Indeed, the February 20, 1974 consent decree explicitly stated (*see* p. 6) that it "... [did] not constitute an admission by Defendants of any violation of any provision of the Constitution or laws of the United States or of the State of Maryland." Moreover, no evidence has been presented showing that the Prince George's County school system did in fact discriminate in faculty hiring in the pre-1972 period. By 1974, the percentage of black faculty employed by the school system equaled the percentage of black population in the county generally.[12]

Plaintiffs also claim that defendants intentionally have failed to live up to the hiring goal established by the February 20, 1974 consent decree and have violated it. The reality, however, as disclosed by the record, is that between 1973–74 and 1981–

---

**12.** In contrast with the situation in Prince George's County, the percentage of black faculty in the Boston public schools in 1972–73, the school year prior to the one in which Judge Garrity found that discrimination in faculty hir-

ing existed, was only 5.4%, while the black population in the city was 16%. In 1970–71, blacks filled only approximately 3.5% of all administrative positions in the Boston school system. *See Morgan v. Hennigan*, 379 F.Supp. at 463.

82, a period of declining enrollment and, thus, declining numbers of faculty and staff, both the absolute number and the percentage of blacks increased in each and every specific job category within the general category of "faculty," save one. Even in that one specific job category in which a very slight black percentage decrease was experienced (librarians), the absolute numerical decrease of blacks was less than that of whites. The following chart is illustrative:

| Position | 1973–74 | | | | 1981–82 | | | |
| | Total | Black | White & Other | % Black | Total | Black | White & Other | % Black |
|---|---|---|---|---|---|---|---|---|
| Principal | 234 | 31 | 203 | 13.2 | 198 | 47 | 151 | 23.7 |
| Vice-Principal | 158 | 36 | 122 | 22.8 | 101 | 41 | 60 | 40.6 |
| Elementary Classroom Teachers | 2691 | 571 | 2113 | 21.5 | 2066 | 616 | 1450 | 29.8 |
| Secondary Classroom Teachers | 3185 | 577 | 2608 | 18.1 | 2675 | 637 | 2038 | 23.8 |
| Other Classroom Teachers | 374 | 66 | 308 | 17.6 | 924* | 203 | 721 | 22.0 |
| Librarians | 205 | 51 | 154 | 24.9 | 178 | 43 | 135 | 24.2 |
| Guidance | 212 | 38 | 174 | 17.9 | 211 | 55 | 156 | 26.1 |
| Other Professional Staff* | 1041 | 215 | 826 | 20.7 | 323 | 81 | 242 | 25.1 |
| Total | 8100 | 1592 | 6508 | 19.7 | 6676 | 1723 | 4953 | 25.8 |

Change in Size of Staff

| | 1973–74 | 1981–82 | Net Change | % Change |
|---|---|---|---|---|
| Total | 8100 | 6676 | – 1424 | – 17.6 |
| Black | 1592 | 1723 | + 131 | + 8.2 |
| White & Other | 6508 | 4953 | – 1555 | – 23.9 |

* As of 1975–76, a number of Other Professional Staff were reclassified to Other Classroom Teachers.

Thus, the facts require the conclusion that since the entry of the February 20, 1974 consent decree, the school system has made good faith efforts to hire black faculty.[13] Those efforts include recruitment of blacks at schools with both majority white and majority black student populations, and advertisements in black publications. Nevertheless, it is undeniable that the system has experienced difficulty in hiring black faculty.

Part of that difficulty is seemingly caused by factors common to all of the neighboring public school jurisdictions: the

13. Faculty hiring in Prince George's County is the responsibility of five Personnel Assistants in the Office of Professional Personnel, who operate under the direction of the Director of Professional Personnel. The Personnel Assistants are responsible for the recruitment, screening, employment and assignment of faculty. Two of the Personnel Assistants are black, including Mr. Edward Broadnax, who testified at trial.

high cost of living in the Washington, D.C. metropolitan area and areas close to it, keen competition among school systems in that region for qualified black faculty, the fact that many qualified black teachers and educators are seeking positions and skills in professions other than teaching, and the fact that changing social values have made it easier for blacks from the deep south to find satisfactory employment close or closer to their homes.

In some respects, however, the problems which the Prince George's County school system are experiencing arise from the fact that that county's system is in decline, in terms of pupil enrollment, whereas some other nearby school systems are increasing their enrollments and expanding their facilities. Thus, during the period from 1976–77 to 1980–81, while the Fairfax County school system in northern Virginia not far across the Potomac from Prince George's County had a net increase of 159 in the level of its black faculty, Prince George's County was able to register a net black increase of only 27.[14] Not only did Fairfax so expand, but its salary structure was much more attractive than that of Prince George's County. Further, because the Fairfax system was in an expansion phase, it was less likely that a newly hired teacher would soon have to face the possibility of layoff.

 In sum, the evidence shows that despite the fact that the Prince George's County school system has not met the black faculty hiring goal set forth in the February 20, 1974 consent decree, it seemingly has done as well as it could do. Recent patterns of faculty hiring in Prince George's County not only disclose no link with pre-1974 discrimination, if in fact the same did exist with relation to faculty hiring, but also are free of indication of any intentional discrimination since 1974 or of any action or lack of action constituting

violation of the 1974 consent decree. Accordingly, plaintiffs are entitled to no relief herein with regard to faculty hiring.

## II. FACULTY ASSIGNMENTS

Faculty assignments were not an issue in the pre-1973 stage of the within litigation. Paragraph 47 of the joint stipulation of facts filed by the parties on July 6, 1972 states:

That however, on March 25, 1971, the defendant Board of Education of Prince George's County adopted a Resolution entitled "Teacher Staffing" pursuant to which Resolution each and every public school operated by defendant will have a racial balance of the teacher staff generally consistent with and reflective of the countywide racial composition of all of the teachers employed by the Board of Education prior to the commencement of school opening, September, 1972; that said Resolution phased into operation faculty integregation [sic] over a two year period, with one-half of the attainable goal accomplished as to the opening of school, September, 1971, with the remaining one-half to be completed as aforestated. That as of this date, and for the past preceding months, teacher assignments have been issued by defendant Board of Education, notifying teachers of their transfer to new schools commencing September, 1972, in accordance with the Resolution of the Board of Education. The goals to be attained pursuant to the Resolution aforestated call for no individual school in Prince George's County to contain less than 10%, nor more than 25% black faculty.[15] That attached hereto, as Exhibits 14 and 15, are photostatic copies of the Resolution of the Board of Education of Prince George's County, and its qualified acceptance by HEW.

---

14. Nevertheless, the percentage increase in black faculty in Fairfax County was only 1.8%; in Prince George's County, it was 3.4%, a figure second (in the Washington-Baltimore area) only to the 3.5% registered by the Baltimore City

public schools during the same period. (Defendants' Exh. 163).

15. That apparently is a typographical error; the actual percentage shift is 11% (not 10%)—25%.

Paragraph 47 is a restatement of an obligation to desegregate faculty assignments undertaken by the school system as a result of directives issued by the then federal Department of Health, Education and Welfare (HEW). The policy of the Prince George's County Board of Education with regard to faculty assignments was formulated in 1971. Its objective was to accomplish the integration of teaching staff through a phased-in set of reassignments. Phase I, which was to be completed by September 1971, required that blacks would not comprise less than 5% or more than 40% of the total professional staff at any school; Phase II set the 11%–25% guidelines.

The school system no longer adheres to the 11%–25% formula. That formula was chosen because it represented a plus or minus seven percent spread from the county black population and the percentage of black faculty at that time, both of which were approximately 18%. As the percentage of black staff increased as a consequence of the school system's efforts to hire additional black staff members pursuant to the February 20, 1974 consent decree, it became unrealistic to maintain the 11%–25% guidelines. Thus, the guidelines were shifted upward in 1978 to 21%–35%, a plus or minus seven percent spread from the 1978 countywide black population of 28%. HEW was made aware of that shift when it was made, and indicated no objection to it.

Plaintiffs contend in this litigation that while a change in 1978 was necessary, it should not have been to 21%–35%, since the black percentage of faculty in the school system was nowhere near 28%. Rather, say plaintiffs, since the black percentage of faculty in 1978 was approximately 23%, the guidelines should have been shifted to 16%–30%. Taking that view, plaintiffs have calculated the number of schools which are outside of a plus or minus seven percent spread centered on today's black proportion of faculty (25%), and assert that 84 of the 182 schools open during the 1981–82 school year had "racially identifiable faculty."

Plaintiffs rely on the Supreme Court's opinion in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971), in which Chief Justice Burger wrote:

In *Green*, we pointed out that existing policy and practice with regard to faculty, staff, transportation, extracurricular activities, and facilities were among the most important indicia of a segregated system. 391 U.S., at 435 [88 S.Ct., at 1692]. Independent of student assignment, where it is possible to identify a "white school" or a "Negro school" simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown.

The situation in *Swann*, however, which required relief, was very different from that in Prince George's County. In *Swann v. Charlotte-Mecklenburg Board of Education*, 300 F.Supp. 1358, 1370 (W.D.N.C. 1969), Judge McMillan found:

e) *Faculty Desegregation.*—The Board employs over 2,600 white teachers and over 900 black teachers. New teachers hired last year numbered 700. Technically their contracts are with the Board of Education to teach where assigned. The Board makes no sustained effort to desegregate faculties. The choice where to teach is a matter between the principal and the prospective teacher. The Board assumes white teachers will tend to choose white schools and black teachers black schools.

The results of this passive selection policy are obvious. Of the thirteen all-black schools in the system serving 8,840 students, only four have any white teachers. Those four have ten white teachers and 161 black teachers for 3,662 students. Few predominantly black schools have any substantial number of white teachers, except a few schools which serve areas rapidly turning from white to

black. Eight other schools 99% or more black had only six white teachers among them for 5,246 black and 24 white pupils. Second Ward and West Charlotte High Schools, with 2,700 black students and three white students, have 131 black teachers and only nine white teachers.

All of the white elementary schools have at least one and in a few cases as many as three or four black teachers. The proportions of black teachers in the junior and senior high schools run slightly higher. The system has not operated, however, to produce any substantial teaching of black students by white teachers.

In *Swann,* the necessity for faculty reassignment was predicated upon those findings. *See United States v. Montgomery County Board of Education,* 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969), *cited in Swann,* 402 U.S. at 19–20, 91 S.Ct. at 1277–78, for the proposition that faculty reassignment is a permissible remedy to alleviate faculty segregation. In *Montgomery,* then District Judge Johnson found that among the indicia of the dual system which existed in Montgomery County, Alabama was the fact that

Negro teachers are assigned only to schools attended by Negro students and white teachers are assigned only to schools attended by white students.

395 U.S. at 229, 89 S.Ct. at 1672, *quoting Carr v. Montgomery County Board of Education,* 232 F.Supp. 705, 707 (M.D.Ala. 1964). Similarly, in the Boston school desegregation case, Chief Judge Coffin wrote on appeal:

The district court found that most of the black teachers in the Boston school system were teaching in schools whose student population was over 50 percent black. In 1972–1973 68 percent of the black teachers were concentrated in the 59 schools (29 percent of the total) which were majority-black. 379 F.Supp. at 459. Further, 81 schools (40.3 percent) had never had a black teacher, and 35 others (17.4 percent) had had only one black teacher in any year since 1967–1968 (the earliest year for which figures were put in evidence). All 19 black administrators were assigned to nine majority-black schools during 1972–1973, and the five black principals were assigned to schools ranging from 66 percent to 97 percent black. While no school had a faculty which was more than 50 percent black, that fact is hardly significant in light of the fact that blacks constituted only 5.4 percent of the permanent teaching staff.[23]

[23] Defendants argue that when the Supreme Court said in *Swann* "... where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staffs ... a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown," 402 U.S. at 18 [91 S.Ct. at 1277], it referred only to school systems in which some faculties were majority-black. We think defendants misread *Swann.* If the Court had intended to establish a mathematical rule it could have done so explicitly. The passage quoted calls for us to determine what the numbers mean in the context of the case before us. Such an approach is entirely consistent with that established by the Court in [*Keyes v. School District No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973)] for the analogous determination whether a student body is segregated, 413 U.S. at 196 [93 S.Ct. at 2691].

Even if we accepted defendants' reading of the *Swann* language, it would be of little avail, for *Swann* simply states one basis on which a constitutional violation may be found. It is silent as to the impact of findings such as the district court has made in this case, that the concentration of most of the system's black teachers in the small minority of schools which are dominantly black has resulted from segregatory policies knowingly pursued by defendants.

*Morgan v. Kerrigan,* 509 F.2d 580, 595 (1st Cir.1974).

█ Thus, a racially identifiable faculty can be said to exist when black faculty is concentrated in black schools. But that is simply not the case in Prince George's County. Indeed, taking the term "racially identifiable black school" as plaintiffs have defined it with respect to student population (*i.e.,* a school in which the black student population is more than 20 percentage points higher than the systemwide black student percentage, which was 52.1% black

in September 1981),[16] the record discloses that in 1981–82 black faculty in the Prince George's County school system was spread out among the entire system and was not concentrated in certain schools. In 1981–82, there were 390.5 [16A] black faculty members in the county's senior high school system; there were then three senior high schools which were racially identifiable black schools by plaintiffs' definition, *i.e.*, with black student populations of over 72.1%;[17] and in those three schools there were 80 black teachers or only approximately 20% of the total number of senior high school black faculty. In 1981–82, there were 427.2 black faculty members in the county's junior high school system; there were then six junior high schools with black student populations of over 72.1%;[18] and in those six schools there were 101 black teachers or only approximately 23.6% of the total number of junior high school black faculty. In 1981–82, there were 799.5 black faculty members in the county's elementary school system; there were then thirty-six elementary schools with black student populations of over 72.1%;[19] and in those thirty-six schools, there were 254.4 black teachers or only approximately 31.8% of the total number of elementary school black faculty.

Accordingly, the facts require the conclusion that with respect to faculty assign-ments, there presently are no vestiges of past racial segregation, no indications since 1973 and indeed before 1973 of any discriminatory actions or lack of actions, and no violations of any order of this court.

## III. SPECIAL EDUCATION, TAG AND DISCIPLINE

 Plaintiffs contend that statistical evidence shows that racial imbalances exist in the Prince George's County special education and talented and gifted (TAG) education programs, and with regard to suspension and the disciplining of students, and that such imbalances are a vestige of the pre-1972 unconstitutional system and, in addition, have resulted from purposeful discriminatory actions and inactions on the part of defendants. There are no outstanding orders of this court which specifically relate to special education, TAG and discipline.

In *Milliken II*, 433 U.S. at 279–83, 97 S.Ct. at 2756–58, Chief Justice Burger held that a federal district court has the authority to order the implementation of ancillary programs beyond the adjustment of student attendance zones, faculty assignment and the like if such implementation is necessary to cure the continuing adverse effects of the school system's unconstitutional status.[20] A district court's authority so

---

16. See the discussions *infra*.

16A. Fractional figures are caused by not all faculty members being full-time.

17. Fairmont Heights, Potomac and Suitland High Schools (Plaintiffs Exh. 16; Plaintiffs' Exh. 102).

18. Andrew Jackson, Benjamin Stoddert, Francis Scott Key, G. Gardner Shugert, Suitland and Walker Mill Junior High Schools (Plaintiffs' Exh. 16; Plaintiffs' Exh. 102).

19. Apple Grove, Barnaby Manor, Berkshire, Bradbury Heights, Capitol Heights, Carmody Hills, Chillum, Columbia Park, Concord, Cooper Lane, District Heights, Dodge Park, Doswell E. Brooks, Edgar Allen Poe, Flintstone, Forest Heights, Glassmanor, Green Valley, Hillcrest Heights, John Carroll, John Bayne, Kenmoor, Kentland, Longfields, Matthew Henson, Oakcrest, Overlook, Owens Road, Patuxent, Phyllis E. Williams, Rogers Heights, Sandymount,

Shadyside, Thomas Claggett, Valley View, and William Paca Elementary Schools. This list of thirty-six elementary schools does not include special education centers, about which plaintiffs seemingly make no claims of discrimination (Plaintiffs' Exh. 16; Plaintiffs' Exh. 102).

20. The programs discussed in *Milliken II* dealt with remedial reading and communication skills. The district court ordered implementation of programs relating to such skills for the purpose of reducing disparity in achievement between black and white students. In the within litigation, no evidence has been presented of any disparity in achievement between black and white students. Rather, plaintiffs' arguments focus upon the message transmitted to black students as a result of the disproportionately high numbers of blacks in special education classes, disproportionately low numbers of blacks in talented and gifted classes, and disproportionately high numbers of suspensions among black students. According to plaintiffs'

to do continues even after the school system in question has achieved unitary status with regard to student assignment and other so-called core elements of a desegregated condition,[21] so long as the need for such programs is causally linked to the prior unconstitutional condition. *Oliver v. Kalamazoo Board of Education*, 640 F.2d 782, 787 (6th Cir.1980).[22] However, in such a context, the burden of proving the causal connection between the prior unconstitutional condition and the need for ancillary relief is upon those who attack. *Id.* at 810–11.

The statistical evidence in this litigation shows that in the Prince George's County system a greater percentage of blacks and a lesser percentage of whites are enrolled in special education classes, and that a lesser percentage of blacks and a greater percentage of whites are enrolled in talented and gifted programs than is reflected by racial percentages in the school system as a whole. That statistical evidence also reveals that the percentage of blacks who are suspended is greater than the percentage of blacks in the school system as a whole.

### A. *Special Education*

The special education programs in the Prince George's County school system are designed to serve the educational needs of handicapped children. Although the school system maintained special education programs in one form or another prior to 1972, the current practices and procedures followed by the system result from the enactment by Congress of the Education of All Handicapped Children Act of 1975, 20 U.S.C. § 1400 *et seq.,* and rather similar provisions in Maryland law, Md.Educ.Code Ann. § 8–401 *et seq.*

The federal legislation defines "handicapped children" to mean

mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, or other health impaired children, or children with specific learning disabilities, who by reason thereof require special education and related services.

20 U.S.C. § 1401(1). Each of those categories is referred to in the special education field as a "handicapping condition."

Maryland law provides for six levels of special education services. The levels are defined in terms of the number of hours of special education services which the handicapped child receives—the higher the level of the handicapping condition, the greater the intensity of the service provided. In Level I, the special education program is delivered to the student in his regular classroom, with consultative services provided by the student's regular classroom teacher and with the student being provided, if appropriate, with special materials and equipment. A Level II child receives up to one hour a day of special education instruction, with a total of not more than five hours per week. In Level III a child receives one to three hours of special education instruction per day, but no more than fifteen hours of such instruction per week. Level IV calls for direct special education instruction from three to six hours a day.[23] Level V is an all-day program in which the student is placed in a separate school or separate wing of a regular school. Finally, Level VI is a 24-hour-a-

---

expert witnesses, the message which is transmitted to blacks by those statistics is that black children are inferior to white children.

**21.** *See* the listing in *Swann,* 402 U.S. at 18, 91 S.Ct. at 1277, of student assignment, faculty, staff, transportation, extracurricular activities, and facilities.

**22.** *See Tasby v. Estes,* 643 F.2d 1103, 1107–08 (5th Cir.1981), quoted *infra,* in which the court makes a distinction between disparate treat-

ment of black students in the "core" elements of a school system's segregated condition and the disparate treatment of blacks in discipline.

**23.** The average school day in the Prince George's County elementary schools lasts six hours. The average day in the secondary schools is six and a half hours. Thus, a student in Level IV could spend all or most of a day in special education instruction.

day program in which the student resides at the special education facility.[24]

The level of services provided an individual handicapped child depends upon that child's specific needs. There is no direct relationship between the level of service provided and a child's handicapping condition.[25] Federal and state law require, however, that in determining the level of special education services which a child is to receive, the school system must make every effort to place each handicapped child participating in the system's special education programs in the least restrictive environment possible under the circumstances. *See* 20 U.S.C. § 1412(5). In the Prince George's County school system, the philosophy of providing special education services in the least restrictive environment predated the enactment of the Education For All Handicapped Children Act of 1975.

Special education services in Prince George's County are delivered to handicapped students in a variety of settings, depending again upon the needs of each individual child participating in the program. The settings include the regular classroom, a resource room, and a self-contained classroom.[26] To some extent, the level of service is related to the setting in which it is provided. Level I services, for example, are always given in the regular classroom and Level V services are always self-contained. Level II and III programs will most likely be found in the regular classroom or in a resource room, while Level IV services will most likely be provided in a resource room or in a self-contained classroom.

There is statistical evidence showing that the percentage of black students in the special education programs is much higher than the percentage of black students in the system as a whole. In addition, the statistics indicate that the percentage of black students in the most restrictive levels of the special education programs with which plaintiffs are seemingly principally concerned (*i.e.*, Levels IV and V) also is in excess of the percentage of black students as a whole. Finally, the statistics reveal that black children are overrepresented relative to their numbers in the entire system in those special education programs involving a cognitive or emotional handicapping condition, such as mentally retarded, emotionally disturbed or learning disabled, as opposed to physically disabled. On the other hand, in those special education programs involving a readily identifiable physical condition, such as the deaf or visually impaired, the percentage of black children is not disproportionately high. For example, in the 1979–80 school year, when blacks comprised 47.4% of the student population in the Prince George's County schools, the racial compositions of the special education programs were as follows:

| Special Education Program | Students Assigned As of February, 1980 | Number and Percentage of Black Students Assigned |
|---|---|---|
| Educable Mentally Retarded | 811 | 549 (67.7% ) |
| Trainable Mentally Retarded | 86 | 56 (65.1% ) |

24. Few students are served by a Level VI program. Programs on that level are apparently not criticized by plaintiffs. A seventh level is also provided, whereby students who, in the opinion of a physician, are unable to attend school due to either a physical or emotional illness, are provided with home teachers.

25. Although no direct relationship exists, it is unlikely that a student would participate in a Level VI program unless he were severely retarded or physically or emotionally handicapped.

26. A "resource room" student is one who is placed in regular education in a regular classroom but spends part of his day in special education classes in the "resource room." A "self-contained" student is one who is based in a special education classroom, which has a smaller number of students than a regular classroom. He may or may not spend part of his day in a regular classroom.

| Special Education Program | Students Assigned As of February, 1980 | Number and Percentage of Black Students Assigned |
|---|---|---|
| Seriously Emotionally Disturbed | 332 | 159 (47.9% ) |
| Specific Learning Disability | 9,757 | 6,224 (63.8% ) |
| Speech Impaired | 2,322 | 897 (38.6% ) |
| Deaf/Blind | 1 | 0 ( 0% ) |
| Orthopedically Impaired | 253 | 81 (32.0% ) |
| Visually Handicapped | 78 | 39 (50.0% ) |
| Deaf | 113 | 50 (44.2% ) |
| Hard of Hearing | 134 | 48 (35.8% ) |
| Other Health Impaired | 271 | 117 (43.17%) |
| Multihandicapped | 848 | 361 (42.6% ) |
| Total | 15,006 | 8,581 (57.18%) |

Plaintiffs contend that they have shown intentional racial discrimination on the part of defendants with regard to placement of black students in special education programs on the strength of (1) the statistical disparities, (2) testimony by their expert witness, Dr. Wylamerle G. Marshall, that there is no educational reason for those disparities,[27] and (3) evidence of allegedly inadequate special education placement procedures followed by defendants.

As to Dr. Marshall's testimony, it was given in extremely conclusory terms, and must be read together with the testimony of defendants' expert witness, Dr. Rita Ives[28]—testimony apparently representative of the weight of expert opinion in the field—that it can reasonably be expected that more black children will require special education programs than white children because statistically black children experience more health problems, receive fewer health services and less prenatal care, and are subject to less well-developed family structures than are white children. (Tr. at 2254–56).

Plaintiffs rely heavily on the fact that a report prepared for the Office of Civil Rights by a private consulting firm ranked Prince George's County as the 14th worst school system in the nation with regard to the overrepresentation of minorities in special education programs. *See* Plaintiffs' Exh. 72, I Killalea Associates, Inc., *Analysis of Selected Civil Rights Issues*, at 56 (1980) (Report submitted to the Office of Civil Rights under Contract HEW–100–78–0063) [Killalea Report], which listed the

27. Dr. Marshall received a doctorate degree in Administration, with a concentration in special education, from the University of Florida in 1977, and is currently employed by the Dade County school system as the Director of Exceptional Student Program Coordination. In that capacity, she is responsible for the development of policies and procedures *for screening, identification, placement and programming of exceptional students*, including not only special education students but also talented and gifted students. Dr. Marshall, however, has not visited Prince George's County and has no first-hand knowledge of its school system.

28. Dr. Ives received a doctorate in Special Education from George Washington University in 1971, and is currently the Chairwoman of the Department of Special Education at George Washington University and Coordinator of the Department's Doctoral Programs/Inservice Training unit. As part of her duties she supervises graduate students who teach as special education interns in various school districts surrounding Washington, D.C., including Prince George's County. She also has been a consultant for various school districts around the nation, including, again, Prince George's County, although she is not doing any consultant work with Prince George's County at the present time.

"100 [school] districts in the nation which most appear to warrant investigation for discrimination in the overrepresentation of minorities in ... special education programs." *Id.* at 54.

■ Herein, however, the evidence demonstrates that the procedures followed by the Prince George's County school system in placing children into special education programs do not discriminate against black children. Dr. Ives stressed that, given the lack of basic knowledge concerning the art of placing students in special education programs, "[t]he only way [for a school system] to assure to the best of our knowledge at this point in time proper assessment [of children for referral to special education] is the process itself." (Tr. at 2256).

Testimony with regard to that process was given at trial by both Dr. Ives and by Mr. Robert T. Coombs, Director of Special Education in the Prince George's County school system. A student initially is referred for placement in a special education program in Prince George's County by a teacher, a parent, or someone in the medical community. The referral is made to a multi-disciplinary team which exists in each school and is known as the School Instructional Team (SIT). A SIT is constituted to review not only special education referrals, but also the program of any student who is experiencing problems in school, including health, academic performance, discipline and the like. The makeup, in terms of personnel, of a SIT varies, but it usually is composed of the school principal, one or more reading teachers, one or more special education teachers, one or more regular education teachers, the school psychologist, and a speech therapist. Each school's SIT meets at least twice a month to discuss problems brought to its attention, and, after studying the same, attempts to remedy them. In dealing with a given problem, a SIT is often supported by a Supplemental Services Team (SST), which essentially is the SIT supplemented with supporting staff from the administrative area office in which the school is located.

If the particular problem with which a SIT or a SST is grappling concerns a suspected handicapping condition, the SIT or SST transforms itself into an Admission, Review and Dismissal (ARD) committee, the body which under Maryland law is charged with placing and reviewing students in special education. Functioning as an ARD committee, the SIT or the SST reviews data already on hand concerning a student referred to it and sets out to seek additional data about that student in order to determine if the student can appropriately be admitted into a special education program.

Plaintiffs especially rely on the black/white disproportion in the Prince George's County school system's Specific Learning Disability (SLD) program.[29] Children with an SLD are defined in the Education For All Handicapped Children Act of 1975 as

[C]hildren who have a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations. Such disorders include such conditions as perceptual handicaps, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. Such term does not include children who have learning problems which are primarily the result of visual, hearing, or motor handicaps, of mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage.

20 U.S.C. § 1401(15).

The Prince George's County school system has developed a checklist which each of its ARD committees uses as a guide in making its determination as to whether or not a child is suffering from an SLD. Since the definition of an SLD child essen-

---

**29.** The Killalea Report ranked the Prince George's County school system as the second worst in the nation in overrepresentation of minorities in SLD programs.

tially entails eliminating other possibilities for the child's problem, the checklist provides for consideration and elimination of those other possibilities. Thus, one section of the checklist concerns physical (*i.e.,* visual, hearing, or motor) problems. Such problems are ruled in or out by the use of visual and hearing tests and physical examinations, as well as inspection of the student's health records.

Another section of the checklist concerns social-emotional problems, and directs the ARD committee to consider other cognitive and emotional factors which could be causing the student's learning problem. For example, mental retardation is ruled in or out through the use of various intelligence tests.[30] The determination of whether "environmental, cultural, or economic disadvantage" is the primary reason for the child's learning problem is principally accomplished through dialogue and assessment within the ARD committee, to which all committee members bring their expertise and perspectives to bear.

Finally, other sections of the checklist refer to the child's academic performance and the relationship of that performance to the child's chronological age and grade level, the child's intellectual ability level as measured by an I.Q. test,[31] and the child's perceptual skill level, *i.e.,* his mastery of perceptual skills essential to the learning process. As with each of the other sections on the checklist, the members of an ARD committee do not simply run down the checklist making off-the-cuff determinations with regard to any given student. Rather, the evidence reveals that the committee members carefully evaluate on an individual basis each and every potentially handicapped student. The checklists are used as guides to channel discussion among those who determine who are the potentially handicapped students. The decision to place or not to place a student in special education is made by the group. No one individual, and no one test, makes that placement. Further, the parents of any student referred to an ARD committee are invited to participate in the committee's deliberations with regard to their child.

Once a handicapping condition is verified by the ARD, the next step in the process is the formulation of an Individualized Education Plan (IEP). The IEP is, essentially, a prescription for the child affected by a handicapping condition. It is formulated by a multidisciplinary committee, and parent participation is invited. The committee assesses the child's needs and strengths, and attempts to devise a program which fits those needs and strengths. The IEP upon which the committee decides delineates the type and level of special education services which the child will receive. Once the IEP is developed, the parents of the child involved must give their approval to the program. If they do not approve, the child is not placed in special education.

Each IEP is reviewed sixty days after it has been implemented, and thereafter is reviewed annually, and more often if re-

---

**30.** Plaintiffs contend that two of those tests, the Slossen Intelligence Test and the Peabody Picture Vocabulary Test, are culturally biased against black children. Even so assuming, *arguendo* only, the tests are used not to place children in any special education program, but to determine whether a child is mentally retarded. If a child scores within the average range on one of those tests, the possibility of mental retardation is virtually precluded. If a child scores below average, the child is not automatically deemed mentally retarded, although the ARD committee may look into that possibility. In that regard, much depends on the person administering the test. If, in that person's clinical judgment, the child has the potential for average intelligence or has average intelligence, then mental retardation is ruled out.

The school system has apparently developed another checklist for mental retardation. Each ARD committee goes through much the same process with a potentially mentally retarded child as it does with a child potentially suffering from an SLD. Verification of mental retardation must, however, be made by a psychiatrist or psychologist. No placement with regard to mental retardation is made on the basis of any single test instrument; rather, the same group decision-making process utilized in the determination of an SLD handicap is followed.

**31.** Once again, however, it is to be noted that no placement into an SLD program is made on the basis of any particular test.

quested by the parents involved. At each annual review, the level and content of services are examined to determine whether modification is required and also whether or not the student is ready to leave special education. The review is always conducted with parental input and by a multidisciplinary team.

If a parent is dissatisfied with any part of the process of identification, diagnosis, formulation of an IEP, or review, that parent may appeal the decision to an impartial hearing officer certified by the State of Maryland. If the parent is dissatisfied with the decision of the hearing officer, a further appeal to a panel of three other hearing officers is permitted. In that connection, the record reveals that the Prince George's County school system has never received a complaint from any parent that its procedures for special education identification or placement were biased or discriminatory against any black child.

The school system is monitored by the State Board of Education of Maryland and the U.S. Department of Education, and has been found by both bodies to be in compliance with federal and state law. Dr. Ives, in her testimony, stated that the system's special education programs are not only in compliance with state and federal law, but also presently incorporate "the best of the state of the art" with regard to both assessment of students for handicapping conditions and delivery of special education services. (Tr. at 2264).

Taken as a whole, the Prince George's County school system's special education identification procedures emphasize three important features:

1. Group decision-making by a multidisciplinary team;

2. Parental involvement at every step of the process; and

3. Lack of reliance upon any single test instrument to place a child in any special education program.

On cross examination, Dr. Ives testified:

Q. [by counsel for plaintiffs] [B]ased on your investigation of Prince George's County, did you see evidence that cultural differences and economic differences were being taken into account to make sure that black children were not being inappropriately placed in special education?

A. Yes.

Q. And could you tell us a little more about that?

A. I certainly can. I think I have alluded to the checks and balances that exist in the assessment procedure. Part of the assessment procedure is teacher observation, it is psychologist observation, it is anecdotal records. There are many ways to assess a child that fall in the realm of informal assessment, so that there are ways that you observe creativity, that you observe intelligence in children that are not documented in standardized tests, those things are taken into consideration. If a cultural expression or a language pattern that is cultural—that is indicative of cultural difference and not intellectual difference is used, it is very naive to think that a series of people are not going to recognize that for what it is. That is evermost in assessment people's minds.[32]

(Tr. at 2307–08).

The total record in this litigation, showing the emphasis upon parental involvement and the lack of any parental complaints of discrimination, outweighs the

---

**32.** While a recent report to Congress by the General Accounting Office noted (at p. iv) that "[b]iases in child referral and assessment procedures are thought to account for much of the over-and underrepresentation of children in special education," it further stated (at p. 68) that "Group decisionmaking and prereferral screening ... [are] believed to reduce bias in determining who gets special education." Defendants' Exh. 214, Comptroller General, *Disparities Still Exist In Who Gets Special Education* (1981) (Report to the Chairman, Subcommittee on Select Education, Committee on Education and Labor, House of Representatives of the United States).

suggestion of the statistical evidence that racial discrimination has been present in the administration of the special education programs. Further, while no one can be entirely certain in any school desegregation case that prior unconstitutional segregative practices with respect to school assignments have no lingering effects upon current practices relating to special education, one can be rather certain of that in this litigation. In sum, the evidence requires the conclusion that as to special education, there are no vestiges of past segregation, no intentional discrimination, and no violation of any order of this court.

## B. TAG

The Prince George's County school system operates a program for academically and intellectually talented and gifted students known as the TAG (talented and gifted) program.[33] The purpose of that program is to identify students who have educational needs above and beyond what is offered in the regular curriculum, and then to provide instruction for them beyond that which is offered at their normal grade or age level.

With respect to children who have educational needs which differ from the norm, the decade of the 1960's was the decade of "special education." The emphasis of educators, educational administrators, and the academic community was placed on handicapped and disadvantaged children. In 1970, however, Congress mandated that the Commissioner of Education undertake a study of the status of programs for talented and gifted students in the nation and report his findings to Congress.[34] The report generated by that study was submitted to Congress in 1972. See Defendants' Exh. 293, U.S. Commissioner of Education, Education of the Gifted and Talented (1972) (Report to the Subcommittee on Education of the Committee on Labor and Public Welfare of the U.S. Senate) [Marland Report].[35] The report focused attention on the fact that very little was being done to meet the particular educational needs of talented and gifted students.

The Marland Report was given careful consideration in Prince George's County. A review of programs for gifted and talented students undertaken by certain members of the staff of the school system revealed that while some individual schools had at least some programs for such students,[36] their development and implementation were decentralized and haphazard. Thus, Prince George's County schools were in a state similar to that of most other school systems in the nation with regard to TAG programs. In an effort to systematize and encourage the development of TAG programs in Prince George's County, two administrators in that system, Dr. Lewis Wheat, the Coordinating Director of Instructional Services and Dr. Robert Shockley, the Assistant Superintendent for Instruction and Pupil Services, formed in 1972 within the system's staff a Committee

33. Although the focus of the TAG program in Prince George's County is on talented and gifted students in basic study areas, the system is currently engaged in exploring the feasibility of developing programs for students with TAG level ability in the visual and performing arts.

34. Section 806(c) of Pub.Law 91–230, 84 Stat. 121 states:
(1) The Commissioner of Education shall:·
(A) determine the extent to which special educational assistance programs are necessary or useful to meet the needs of gifted and talented children,
(B) show which existing Federal educational assistance programs can be more effectively used to meet the needs of gifted and talented children,

(C) evaluate how existing Federal educational assistance programs can be more effectively used to meet these needs, and
(D) recommend which new programs, if any, are needed to meet these needs.
(2) The Commissioner shall report his findings, together with his recommendations, to the Congress not later than one year after the enactment of this Act.

35. The report is called the Marland Report after then-Commissioner of Education S.P. Marland.

36. A creative photography program existed at some schools, a special reading program at others, a journalism project at still another.

for the Gifted.[37] (Tr. at 842–43). That Committee spent considerable time reading literature about TAG programs and consulted with experts in the field such as Dr. Joseph Renzulli of the University of Connecticut and Dr. Irving Sato of the California State Department of Education, both of whom had served on an informal panel which had aided the federal Office of Education in preparing the Marland Report. The result of that study and consultation was that the Committee for the Gifted recommended that a pilot TAG program be instituted in Prince George's County during the 1973–74 school year. The nine schools in Cluster B of the Northern Area[38] were chosen to implement the program, money was budgeted for its formulation, and a TAG coordinating staff was selected.

The 1972–73 school year was spent in planning the TAG pilot program, which got underway on schedule in Cluster B during the following year. The pilot program continued until 1977, although it was expanded outside of the Cluster B schools into each of the three administrative areas during the 1975–76 school year. The program continued to progress and expand, and in 1978 the school system directed that all schools begin to plan and implement TAG programs. TAG became available systemwide for the first time in the 1980–81 school year. Talented and gifted students at the elementary and junior high school levels in Prince George's County presently receive special instruction outside the regular classroom for only two hours per week. At the senior high school level, the classes which offer the talented and gifted programs are open to all students on an elective basis. Accordingly, the TAG program does not appear to contribute significantly to the racial composition of classrooms.

The development of TAG in Prince George's County has paralleled its development in the nation generally. However, according to defendants' TAG expert, Dr. Carolyn M. Callahan,[39] the TAG program in Prince George's County has been in the forefront, when compared with similar programs across the country, in terms of as-

---

**37.** Two members out of the twelve members of the Committee were black.

**38.** The schools in Cluster B of the Northern Area are, as plaintiffs point out, predominantly white schools. Plaintiffs suggest that the school system's decision to implement the TAG pilot program in such schools is another indication of the perpetuation of racial discrimination. However, the evidence shows that the schools in Cluster B were selected for the pilot program because their principals indicated an interest in participating in the experiment, and does not, in this court's view, disclose any intent to discriminate. Nevertheless, looked at from the vantage point of hindsight, it would appear that defendants, in the factual context of this case, should have recognized the need to have kept more in mind the factor of racial balance when they established programs such as the TAG program. Indeed, perhaps, the basic lesson to be learned from the within litigation is that need as it relates to the establishment and the operation of each and every program within the Prince George's County school system. That is not to say that racial balances should be achieved at the expense of meeting other educational needs. To put it another way, racial balance is not the only appropriate criterion. But it is one criterion which should be examined in the light of the history of and developments in Prince George's County. By way of contrast, *see* the discussion, *supra* and *infra,* re faculty hiring, faculty assignments, suspensions, classroom assignments, overcrowding changes, secondary school reorganization, school openings, school closings, certain post-1975 miscellaneous changes, and the 1980 busing changes.

**39.** Dr. Callahan is an Associate Professor in the Department of Foundations of Education at the University of Virginia. Within that department, Dr. Callahan's primary assignment is with the Educational Psychology program. Her primary teaching responsibilities are working with graduate students who are training to be teachers or administrators in programs for TAG students. She also teaches courses in tests and measurements. Like Dr. Ives in the special education area, she supervises graduate students who have secured field placements teaching TAG students in the central Virginia area. She has familiarity with the TAG programs of a number of school systems, including the Prince George's County system, through her supervisory work as well as her consulting work, which she has pursued on a nationwide basis. In June 1982, Dr. Callahan became President of the Association for the Gifted, a national professional organization made up of college and university faculty members, and teachers and administrators of programs for TAG students.

sessment of the needs of TAG students and the delivery of TAG instruction. Nevertheless, plaintiffs' statistical analysis of the racial composition of the students enrolled in the Prince George's County TAG program shows that black children are underrepresented in the program relative to their population in the school system as a whole:

### Percentage of Black Students in the Prince George's County TAG Program [40]

| Type of School | 1977–78 | 1978–79 | 1979–80 | 1980–81 | 1981–82 |
|---|---|---|---|---|---|
| High | 4.7% | 6.4% | 9.2% | 11.5% | 11.1% |
| Junior High | 7.0% | 8.7% | 11.8% | 13.0% | 15.6% |
| Elementary | 10.6% | 12.8% | 16.1% | 15.9% | 17.9% [41] |

Plaintiffs have attacked the assessment procedures employed with respect to the Prince George's County TAG program on the ground that those procedures entail the use of culturally biased intelligence tests. It is true that the school system at one time used the Slossen Intelligence Test, which, according to Dr. Callahan, is a potentially biased test.[42] However, during the time that the Prince George's County Public Schools used the Slossen test for TAG identification, i.e., from the inception of the TAG pilot program in 1973 until 1978, it was a widely used instrument. The issue as to the Slossen's freedom or lack thereof from cultural bias was seemingly debated by the experts as early as 1973–74, but it was not until 1977 and 1978 that the experts became strong in their recommendations that the test not be used in connection with the screening of minority children for TAG programs. Dr. Callahan recommended to the Prince George's County school system that it cease general use of the Slossen in 1978, which recommendation was implemented.[43]

The tests primarily used today in Prince George's County for TAG identification are the California Achievement Test and the Cognitive Abilities Test. Dr. Callahan testified that both of those test instruments, along with the other instruments currently in use in the school system for TAG identification,[44] are generally accepted in the field of talented and gifted instruction as reliable tests which provide valid data, provided they are correctly used. (Tr. at 3919–21). There is no evidence in this case that any of the tests administered for the purpose of identifying TAG students in Prince George's County are incorrectly administered or interpreted.

Dr. Callahan did testify that all paperpencil tests, including the ones in use in Prince George's County today, possess some elements of cultural bias by virtue of certain cultural differences in orientation toward achievement and in motivation to

**40.** Compare this table to Appendix D, which sets forth the racial composition of the student body as a whole in each of the school years from 1972–73 to 1981–82. (Appendix D was deleted for purposes of publication.)

**41.** Precise figures of the racial breakdown in the Prince George's County TAG program prior to the 1977–78 school year are unavailable.

**42.** Dr. Callahan testified that the Slossen test is a highly verbal instrument. Thus, students who perform well on the test must have an average or normal level of language experience prior to the taking of the test. The potential cultural bias of the test arises from the fact that minority group children of lower socio-economic status "are likely not to have had that language experience." (Tr. at 3909).

**43.** Dr. Callahan testified that the Slossen could appropriately be used, as it is used in Prince George's County today, see n. 30, supra, to rule out the possibility of mental retardation as a cause for a potential learning problem. (Tr. at 3911–12).

**44.** The other tests include the Metropolitan Readiness Test, the Iowa Test of Basic Skills, and the Otis-Lennon Test. (Tr. at 3920–21).

take those kinds of tests.[45] That is the reason why she recommends that any identification procedure not rely solely on paper-pencil tests. (Tr. at 3922). The Prince George's County school system has accepted that recommendation and employs a variety of other ways for selecting children for its TAG program, the most important of which are referrals by parents and teachers.[46] Those referrals are reviewed by a multidisciplinary team. Children who are placed in the TAG program through the referral process remain in the program for a one-semester trial period. At the end of the trial period, the multidisciplinary team reassembles in order to review the child's progress and to make recommendations as to the desirability of his continuance in the program.[47] As the referral option depends in great part upon the informed participation of teachers, the school system has made an intense effort to provide teachers with sufficient in-service training with regard to the characteristics of TAG children. That effort concerns not only white children, but children of different cultural backgrounds as well.[48] Dr. Callahan testified that the assessment process in the Prince George's County Public Schools is probably more comprehensive than that utilized in 75% of the jurisdictions with which she has worked, and that the identification procedure used in Prince George's County "comes very close to what is described as the ideal identification procedure in the literature." (Tr. at 3919).

The major thrust of plaintiffs' arguments in the TAG area is that not enough has been done by the school system to draw black students into the Prince George's County TAG program. The statistics do indicate that black children are not represented in TAG in numbers reflective of their numbers in the school system as a whole. However, the record in the within litigation discloses that since the inception of TAG, there has been a constant effort on the part of the staff of the school system to include greater numbers of black children in the TAG program.[49] Those ef-

45. While Dr. Callahan indicated that there are a number of tests other than the ones used today in Prince George's County the advocates of which claim them to be culturally unbiased, she testified that those other tests are still regarded in the field as experimental instruments which are not yet recommended for screening and placement of individual children in TAG programs. She reiterated on redirect examination that the test instruments used in Prince George's County "are as a good a set of instruments as you will find in terms of their reliability and validity with the least amount of culture bias." (Tr. at 3946). That testimony, plus the fact that the test scores are not the sole criteria for entrance into the Prince George's County TAG program, distinguish this case from *Larry P. v. Riles,* 495 F.Supp. 926 (N.D.Cal.1979), in which Chief Judge Peckham enjoined the use of certain I.Q. tests in California for placement in classes for Educable Mentally Retarded (EMR) children. In *Larry P.,* Judge Peckham's decision was based in part on the ready availability of alternative devices for placement into EMR classes, which were not employed by the state. *See* 495 F.Supp. at 973-74.

46. The parent/teacher referral mechanism is for the benefit not only of black children, but also of any child, regardless of his cultural and socio-economic background, who does poorly in a paper-pencil test setting.

47. Students who pass a test are admitted into TAG for a one-year trial period after which a similar review is instituted.

48. Dr. Louise Waynant, the Coordinator of Instruction in the Prince George's County public schools, testified that very often uninformed teachers have difficulty with identification of TAG students because they are looking for a "model child" who loves to study, who comes to class prepared every day, who never is a discipline problem, etc. In fact, TAG students often display highly disruptive character traits which evidence their boredom and frustration with the normal routine of classroom activities. (Tr. at 876-77).

49. On September 13, 1972, during the planning period before the TAG pilot program was implemented, Ms. Jane Hammill, who was then and is still the Coordinator of the program, wrote to Dr. Ives at George Washington University:

Prince George's County Public Schools is presently developing a comprehensive pilot program for gifted children. Whereas it is easy enough to identify the verbal, white middle class youngster, a real problem exists in discovering those children who might qualify but whose background or mode of functioning differs from the norm. In discussing this dilemma with several people ... your name has surfaced several times.

forts culminated with the introduction, in the 1981–82 school year, of the Strategies for Targetting Early Potential (STEP) program, a pilot program in nine elementary schools. The STEP program's primary aim is to identify black children who are potentially TAG material at a very early age.[50]

Although the STEP program did not formally begin until the 1981–82 school year, it had been on the planning boards in the Prince George's County Public Schools since the 1979–80 school year, when money to fund an early identification project was granted to the school system by the Maryland State Department of Education.[51]

No paper-pencil testing is used to identify potential TAG students in the STEP program. Rather, children in every kindergarten and 1st grade class in each of the schools participating in STEP are involved in a set of activities designed to demonstrate their talents. The activities seek to discover characteristics of the potential TAG child in five areas—learning, motivation, leadership, creativity, and adaptability. Teachers observe the reactions of each potential TAG student to those activities and, utilizing specially designed checklists,

relate the children's responses to TAG characteristics.[52]

The role of race was crucial in the development of the activities and their related checklists. Both were formulated by the school system staff with the aid of Dr. Callahan, who had previously done extensive work with techniques for the identification of minority TAG students, particularly very young children.[53] Dr. Callahan advised the staff about the types of characteristics upon which focus should be concentrated and about the design of activities needed to bring out those characteristics which would be exhibited by minority children. (Tr. at 916–17).

Critical to the success of the STEP program is in-service training of teachers, since it is the teachers who must select and organize the activities, observe the children, and identify the pupils who exhibit TAG characteristics. To that end, the Prince George's County school system has spent a great deal of time on in-service training of teachers connected with the STEP program, beginning in December

---

If you have the time and/or the interest I wonder whether we might get together to examine what might be done. Somehow I have a real commitment to trying to "crack this nut!"
(Defendants' Exh. 306).

**50.** *Of the nine schools chosen to participate in the program, all but one have student populations which are over 50% black, and five have a population which is over 81% black. The one school which is under 50% black—Baden Elementary, which had, as of September 1981, a black population of 48.1%—has a large number of rural poor children of both races. The rural poor child is another target of the STEP program.* (Tr. at 914–15).

**51.** The Prince George's County school system had attempted to implement early identification procedures in connection with its kindergarten registration process as early as the 1977–78 school year. That attempt apparently failed because not enough time for observation of the children was allowed.

**52.** For example, in one activity involving all five of the areas, a teacher puts the following question to the children: "How can we organize ourselves to clean up our classroom at the end

of each day?" From the children's responses, the teacher observes various characteristics associated with learning, such as verbal proficiency in small group problem-solving tasks and the ability to plan steps or events in sequential order. The teacher can observe whether and how given children have a tendency to organize people, things or situations, showing something of their motivations. A child's self confidence with peers, acceptance of responsibility, tendency to dominate in a group, and initiative with regard to the problem posed show something of leadership ability. Creativity is demonstrated by the ideas or solutions which the child generates to solve the problem. Finally, the child's flexibility and resourcefulness in solving problems, the child's maturity, and the child's ability to transfer learning from one situation to another may also be shown, giving evidence of the child's adaptability.

**53.** Dr. Callahan explained that minority students are more likely to exhibit their TAG characteristics when they first start school because, in general, they are less inhibited and more spontaneous at that age and because in later years they experience cultural and peer pressures when they do not succeed in traditional school areas. (Tr. at 3937–38).

1980.[54] In October 1981, for example, Dr. Phyllis Hines, a black educator from Washington, D.C., came to Prince George's County as a consultant. During her visit she conducted an in-service workshop for teachers in the county about the characteristics of black TAG students.[55]

Since the STEP program only recently began in the 1981–82 school year, its results are not known at this time. However, Dr. Callahan fully expects the numbers of black TAG students to rise in the years to come. Whether those numbers do or do not rise, it simply cannot be said, as plaintiffs contend, that the Prince George's County Public Schools have not in the recent past paid sufficient attention to the problem of black underrepresentation in TAG programs. Nor would there appear to be much more to be done at this point in time than is being done.

In sum, this court finds that the Prince George's County school system has not intentionally discriminated and does not presently intentionally discriminate against black students in TAG placement, and in fact has taken and is taking affirmative steps to remedy the problem of underrepresentation of black students in the TAG program. Nevertheless, it is to be noted that Dr. Waynant did testify that during the *planning stages* of the school system's TAG program, "a lot of teachers were under the impression that TAG students were only found in affluent areas of the population and foreign students." (Tr. at 893). However, through intensive in-service training of teachers, the record discloses that the school system has attempted to eradicate such views and assumptions. Seemingly, such affirmative focus on racial balance could and should have surfaced earlier than it did with regard to TAG. But even assuming that more could have been done earlier by defendants, their TAG program, if not perfect insofar as racial conditions are concerned, presently is fairly and adequately structured. Further, there is no evidence that any present shortcomings which may exist within the Prince George's County TAG program are connected with the pre-1973 segregation or that there has been, on the part of defendants, any purposeful discriminatory act or failure to act or any violation of any order of this court.

### C. *School Discipline*

The administration of discipline in the Prince George's County school system is governed by the Code of Student Conduct, which was adopted by the Board of Education in November 1974. The Code was drafted by a number of committees consisting of members of the community as well as of school officials. Both black and white persons served on those committees. After the Code was drafted, it was distributed to all residents of Prince George's County, and reaction and comment from each recipient was requested.

In the 1974–75 period the discipline and suspension policies of the Board of Education were the focus of litigation in two cases before this court, although neither of those cases was technically part of the *Vaughns* litigation itself. Those cases were *Towler v. LePine*, Civil No. K–74–808 (D.Md.), instituted on July 30, 1974, and *Davis v. Board of Education of Prince George's County*, Civil No. K–74–1212 (D.Md.), instituted on November 4, 1974. *Towler* was brought by two black students individually, alleging, *inter alia*, that the Prince George's County school system's disciplinary practices violated due process of law as guaranteed by the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983 in that those practices permitted summary punish-

---

**54.** In-service training has focussed not only on regular classroom teachers, but on principals, other school administrators, and resource room teachers as well.

**55.** The implementation of the STEP program in the 1981–82 school year generated a tremendous amount of interest in other TAG programs in Maryland, so that teachers and administrators from other Maryland school districts attended, at the invitation of the Prince George's County TAG staff, the workshop given by Dr. Hines.

ment of students without the right to a hearing in connection with the charges against the student being disciplined. *Davis* was brought as a class action on behalf of all black children of school age residing in Prince George's County alleging, *inter alia*, that black children in the Prince George's County schools were suspended in numbers disproportionate to their numbers in the system as a whole, and that that disproportionate impact was the result of discriminatory policies and actions of the school system.[56]

Both cases were settled by the parties in 1975 in the light of the newly implemented Code of Student Conduct and an administrative bulletin issued by the Superintendent on March 13, 1975 (Administrative Procedure No. 5144). That bulletin was issued for the purpose of clarifying the school system's policy regarding suspension of students as expressed in the Code and apparently included the suggestions made by counsel for plaintiffs in *Davis* and *Towler*. The bulletin stated, *inter alia:*

POLICY: The basic policy of the Board of Education relative student discipline is found in the entire text of the Code of Student Conduct, adopted for implementation in the school system effective November 4, 1974.

In clarification of that policy it should be understood that suspensions, both short and long term ... are penalties of the last resort which may be imposed only after all possible alternate forms of punishment have been attempted and have proved to be unsuccessful in resolving the problem, or when it is reasonable to assume such alternate forms of punishment will not solve the problem in question. ...

Therefore administrators who seek to impose a suspension ... shall be able to document, if necessary, that they have exhausted and/or reasonably found inappropriate the alternate forms of punishment prior to resorting to suspension. ...

On April 16, 1975 this court entered a joint Memorandum and Order in both *Davis* and *Towler* specifically approving Administrative Procedure No. 5144. That order provided that the files in the two cases would be closed subject to a motion to reopen filed by plaintiffs therein or any member of the class which they represented. No such motion has ever been made.

The record shows that since the implementation of the Code of Student Conduct and the promulgation of Administrative Procedure 5144, the school system has taken seriously the premise that suspensions are to be penalties of last resort, to be imposed only after alternative methods of discipline have been attempted and proven unsuccessful. The disciplinary procedures short of suspension utilized by the school system were testified to in detail by Mr. George Brown, the system's current Supervisor of Pupil Personnel Services.[57] In so

---

**56.** Among the specific allegations in the complaint in *Davis* were the following:

16. At the time of court-ordered desegregation in January, 1973, about 22.4% of the approximately 160,000 thousand students attending school under the jurisdiction of defendant Board of Education of Prince George's County were black. However for the period from January 29, 1973 to June, 1973, black students received 46% of the total suspensions of under five days and 51% of the total suspensions in excess of five days. This disproportionate imposition of punishment on black students has continued to the present time.

17. Black students have been and continue to be suspended for minor violations of school rules, however, white students are not treated in a similar manner. This fact is exacerbated by the vague and over broad nature of the prohibitions contained in the rules and regulations of the Prince George's County school system.

18. Black students have been suspended for violations which did not amount to a violation of the rules and regulations.

19. Black students have been suspended for longer periods of time than white students.

20. Black students have been suspended for substantial periods of time (often exceeding five days) without notice of the charges and without receiving hearings. This practice is supported by the rules and regulations of the Prince George's County school system.

**57.** Pupil Personnel Services is the department of the school system charged, *inter alia*, with coordinating the efforts of parents, school staff personnel and community leaders in remedying

doing, Mr. Brown dwelt at some length upon one instance involving a student who had engaged in disruptive classroom behavior.

Normally (particularly if the student is a "first offender") the teacher who witnesses the disruptive behavior tries to resolve the matter. In so doing, the teacher may confer with the student, the student's parents, a guidance counselor, or any combination of student, parents or counselor. If a teacher believes that he cannot deal with the situation alone, he can refer the problem to a school administrator—either the principal, a vice-principal, or an administrative assistant.[58] The school administrator can take a number of different actions depending upon the type of incident, the student's record and any other pertinent factors. The administrator's actions may include, once again, conferences involving various combinations of student, parents, teacher, and guidance counselor. The administrator can also provide for a "Student Program Adjustment," i.e., a modification in the student's program of instruction, such as a change in teachers.

Additionally, the student may be kept after school in a detention hall, or may be referred to a Supervised Discipline Center. The Center is designed so that students, instead of being away from school during a period of suspension, are able to continue the educational process in a different environment removed from the regular classroom. The administrator may also opt for "behavioral probation" for a wayward student, i.e., deny the student the privilege of participating in extracurricular activities, sports, or the like. In addition, in a situation in which the administrator determines

that the school has exhausted its resources in dealing with a disciplinary problem, he can refer the student to the Pupil Services department.

Only after the above-described options short of suspension have been followed does the school system resort to suspension. There are two types of suspension in the Prince George's County system: short term suspension, which lasts from one to five days, and long term or extended suspension, which lasts for any period greater than five days.

Only a school administrator, and not a teacher, may invoke the short term suspension sanction. Before so doing, the administrator conducts an investigation of the incident of alleged student misconduct. As part of the investigation, the administrator notifies the student of the charges pending against him and discusses the matter with anyone who has knowledge of the incident. The student has the right to take part in the investigation and present his side of the case. Once the administrator has decided to suspend the errant student, the student's parents are notified of the action being taken and a conference among the parents, the student and the administrator is scheduled. The notice to the parents contains an indication of the alternative actions short of suspension used prior to the proposed suspension with respect to the student. A copy of the notice to the parents is sent to the Pupil Personnel Worker for that school; another copy is placed in the student's permanent file.

At the parent-student-administrator conference, the incident which resulted in the suspension is discussed. If the student's

difficulties which a student may experience at school, and with implementing the Code of Student Conduct. Pupil Personnel Services is itself a part of the Department of Pupil Services, which is headed by the Director of Pupil Services.

The bulk of Pupil Personnel Services's casework is handled by Pupil Personnel Workers. There are currently forty such Workers. Each is assigned to service approximately five schools. Mr. Brown, after entering the Prince George's County school system in 1962 as a junior high school teacher, became a Pupil Per-

sonnel Worker in 1969, was promoted in 1973 to the position of Assistant Supervisor for Pupil Personnel in the Central Area, and assumed his current position as Supervisor in 1980. As such, he has had extensive experience with the problems faced by the Prince George's County school system in the discipline field.

58. In general, however, before an administrator becomes involved with a disciplinary problem, the teacher must have taken some steps in an effort to deal with the situation.

parents are not satisfied with the conference or the way in which the entire matter or any part of it has been and is being handled, they may request through the Director of Pupil Services a review of the suspension. Such a review is then conducted by a Pupil Personnel Worker, who forwards the information gathered by the investigation to the Director of Pupil Services. The Director then decides whether or not the suspension should stand.

A long term or extended suspension can only be invoked by the Superintendent or his designee, not by a teacher or a school administrator. If the administrator, after conducting an investigation, concludes that the student's conduct warrants a long term suspension, the administrator may recommend that one be imposed. A Pupil Personnel Worker must then conduct a preliminary review of that recommendation within five days of its receipt and determine whether or not the recommendation should be followed. In making a decision, the Pupil Personnel Worker looks at the incident which gave rise to the threatened action, the student's prior disciplinary problems and other relevant circumstances. In addition, the Worker discusses the matter with the Assistant Supervisor of Pupil Personnel Services in his administrative area. If the recommendation for a long term suspension is approved by the Supervisor, the student's parents are notified as they would be were the suspension only of short term duration, and a conference between the student, his parents and the Pupil Personnel Worker is scheduled. As with the short term suspension process, if the parents are dissatisfied with the results of the conference, they may appeal the decision of the Pupil Personnel Worker. That appeal, with regard to a long term suspension, lies to a committee composed of the Director of Pupil Services, the Supervisor of Pupil Personnel Services, and the Administrative Assistant to the Area Assistant Superintendent. The committee meets with the parents and the student to review the suspension and makes a decision as to whether or not the suspension becomes effective. Mr. Brown testified that neither the initial decision by the Pupil Personnel Worker nor the review by the committee is a mere *pro forma* affair, and that he is aware of situations in which a school administrator's recommendation for an extended suspension has been rejected by the Pupil Personnel Worker, and also aware of other situations in which the review committee has overturned a Pupil Personnel Worker's recommendations.

A decision of the committee adverse to the parents can be appealed to the Superintendent himself. If such an appeal is taken, the Superintendent conducts a hearing attended by the parents, the student and the Director of Pupil Services. A final appeal can be taken to the Board of Education, whose decision is binding.

Nevertheless, despite the efforts of the school system to hold down suspensions and to handle them fairly, the following statistical analysis demonstrates that the percentage of black students who are suspended is much greater than the percentage of black students within the system:

Suspensions during School Year 1979–80

| Type of School | Number of suspensions | Number of black suspensions | Percentage of black suspensions | Percentage of black students enrolled |
|---|---|---|---|---|
| Senior high schools | 4,905 | 3,006 | 61.28% | 42.4% |
| Vocational high schools | 78 | 66 | 84.61% | 67.8% |
| Junior high schools | 4,380 | 2,800 | 63.92% | 48.7% |
| Elementary schools | 1,027 | 731 | 71.17% | 49.2% |

| Type of School | Number of suspensions | Number of black suspensions | Percentage of black suspensions | Percentage of black students enrolled |
|---|---|---|---|---|
| Special education centers | 35 | 22 | 62.85% | 45.1% |
| Total | 10,425 | 6,625 | 63.5 % | 47.4% |

■ Such statistical disparities require the most careful scrutiny. However, they do not, in and of themselves, establish racial discrimination in the suspension area. *See Tasby v. Estes,* 643 F.2d 1103, 1108 (5th Cir.1981), in which the court held that school discipline is a unique area in relation to other features of a potential dual school system:

Student discipline is fundamentally unlike student assignment and transfer, faculty hiring and discharge, the allocation of economic resources, and the like. In those cases, decisions by school officials which bear more heavily on one race than another may reflect disparate treatment that cannot be ·explained on grounds other than race. It is therefore appropriate in these cases to place the burden on defendant to show that the disproportionate racial consequences of the decision were not the product of a racially discriminatory purpose.

However, no inference of discriminatory intent is warranted from the facts presented by plaintiffs, for their statistical evidence fails to account for the many variables at work in the process of disciplining school children. Too many legitimate, non-racial factors are involved to permit an inference of discriminatory purpose from a showing of disproportionate impact, even when it occurs in the context of on-going desegregation efforts. Black and white students in the DISD [Dallas Independent School District] may not commit disciplinary infractions at the same rate or of the same seriousness, and this differential may be accounted for in non-racial terms. In addition, school administrators and teachers are properly concerned with balancing numerous competing considerations when deciding how properly to discipline a student, including the personal history and individual needs of a student, the flagrancy of his offense, and the effect that the misconduct may have on other students. Thus, the aggregate effect of individual disciplinary decisions independently made is not as convincing as the disparate racial impact that results from decisions rendered by a single governing body. Accordingly, absent a showing of arbitrary disciplinary practices, undeserved or unreasonable punishment of black students, or failure to discipline white students for similar misconduct, the plaintiffs have not satisfied their burden of proving that the disproportionate punishment of black students in the DISD is the product of a racially discriminatory purpose.

■ In the within litigation, the statistical analysis discloses that the disproportionate suspension of black students is particularly concentrated in five areas detailed in the Code—disruption, disrespect, insubordination, loitering and fighting. During the 1980–81 school year, black students received 69.9% of student suspensions for all offenses during that year as opposed to the slightly higher rate of 72.1% for those five offenses. Plaintiffs assert that the definitions of those five offenses in the Code are vague,[59] and permit school faculty

59. Those offenses are defined as follows:

*Disruption*—To be repeatedly involved in ac-

and staff members impermissibly to apply subjective judgments and that, in contrast, the five offenses with the lowest ratios of black to white student suspensions are accompanied by definitions which require little or no subjective evaluation in determining whether a student's conduct runs afoul of the Code.[60] Of the 753 suspensions meted out during the 1980–81 school year for those five offenses, black students received 300, or 39.8%.

The offenses in the first grouping of five would appear inherently more difficult to define precisely than the offenses in the latter grouping of five. However, even assuming, *arguendo* only, that the definitions in the first grouping are more vague than they need to be, there is little evidence in this litigation that the attitudes of white school administrators caused disproportionate disciplining of black students. Two of defendants' witnesses, Mr. George Brown and Mrs. Parthenia Pruden—Mrs. Pruden is currently the Assistant Superintendent

for the Southern Area and was from 1976–80 the Director of Pupil Services—both of whom are black, testified flatly that no such pattern of behavior and occurrences has taken place within the school system while they have been employed by it. In that connection, it is to be noted that during the 1981–82 school year, 47 of the 198 (23.7%) principals in the school system and 41 of the 101 (40.6%) vice-principals were black.

Plaintiffs further assert that defendants did not pay enough attention to the problem of racial imbalance with respect to discipline. In so arguing, plaintiffs contend that the school system has never made a systemwide study of the problem of disproportionate disciplining and the causes of the problem. However, the evidence shows that, in fact, the problem has not been ignored. Dr. Feeney testified that when he became Superintendent of the county schools in 1976 one of the things

---

tions which disrupt the educational process of the other students in a classroom, activity, or other organized function of the school.
*Disrespect*—To willfully intimidate, insult, or in other manner abuse verbally or in writing any member of the school staff or student body.
*Insubordination*—The willful failure to respond or carry out a reasonable request by authorized school personnel, excepting failure to comply with directions based on reasonable opinions, held in good faith, that such directions were unauthorized or detrimental to some proper interest.
*Loitering*—Willful presence in a school building or restricted area of same at unauthorized times, and in such a manner as reasonably may cause disruption to some activity or function, or pose a threat to the safety and well-being of the student, or a disruption to his educational process. This provision specifically includes students who skip classes and remain on the school campus.
*Fighting*—The act of hostile bodily contact among two or more students in or on school property, including Board of Education owned vehicles, or while in attendance at any Board of Education sponsored and supervised activity, which act is likely to result in physical harm and/or a substantial disruption of the educational environment. Neither self-defense nor action undertaken on the reasonable belief that it was necessary to protect some other person, shall, upon investigation, be considered such an act.

60. Those five offenses, and their definitions, are as follows:
*Arson*—The willful and malicious burning of, or attempt to burn any part of any building or any property of the Board of Education of Prince George's County.
*Possession of Fireworks or Explosives*—The act of unauthorized possession, use or threatened use of any fireworks, explosives, or other such instruments capable of inflicting bodily injury.
*Cheating*—To deliberately and deceitfully use unauthorized materials, or to utilize the materials or data belonging to another student during the taking of an examination, test or quiz. To copy or to duplicate, in whole or in part, the work product of another student, data contained in a printed publication or having obtained the assistance or collaboration of any person in the preparation of materials, and claiming said new work product as original work or design. To cause the alteration of any student's grade or records.
*Forgery*—The act of falsely using, in writing, the name of another person, or falsifying times, dates, grades, addresses, or other data on school forms, or correspondence directed to the school.
*Smoking*—The act of smoking tobacco on school property in areas other than those provided by regulations.

about which he was most concerned was the high rate of black suspensions, especially at the junior high school level. One of his first appointments was of Mrs. Parthenia Pruden as Director of Pupil Services. He asked her to pull records at random, look at them, and ascertain if suspensions were in any way keyed to racial discrimination. Dr. Feeney testified that Mrs. Pruden's investigation as well as his own revealed that racial considerations were not evident in the suspensions which they examined, and that, in fact, he found good reason for each suspension which he examined. Dr. Feeney also stated that he and Mrs. Pruden found certain common factors in the suspension cases which they studied, including low achievement and family problems. Dr. Feeney stated that he continued to monitor suspensions because he was not satisfied that everything was being done which could be done to reduce the number of black suspensions; that he met with all of the principals of the junior high schools in an effort to impress upon them his continuing concern in that area; and that he has continued to keep an ear to the ground with regard to the handling of suspensions and racial considerations with respect to them. (Tr. at 4277–88).

The interest exhibited at the highest level of the school staff with regard to racial imbalances in suspensions also was reflected at lower levels. Mr. Brown testified that when he was Assistant Supervisor in the Central Area, the Assistant Superintendent for that area, Dr. Ferguson, initiated an inquiry similar to that initiated by Dr. Feeney. (Tr. at 1040–41). Both Mr. Brown and Mrs. Pruden testified that they had received complaints with regard to racial bias in discipline from parents and students. Both testified that upon investigation of each given case, no bias was found, and that the suspension investigated was fairly imposed because of the suspended student's behavior. (Tr. at 1078–81, 1193–94).

Plaintiffs' Exhibit 194 is a report of the United States Commission on Civil Rights, entitled *A Long Day's Journey Into Light*, published in March 1976, concerning school desegregation in Prince George's County. That report notes that there was a substantial increase in disciplinary problems after the 1973 desegregation decree in *Vaughns* and that there was evidence in some instances of both favoritism and racial discrimination by both white and black teachers and administrators toward black students.[61] However, defendants, through the testimony of Dr. Feeney, Mrs. Pruden and Mr. Brown, and the entire record in this litigation with respect to later time periods, have established that at present and in the recent past the administration of student disciplinary measures within the system has been nondiscriminatorily oriented and appropriately aimed at seeking to prevent discrimination against black students. In that regard, the multi-level approach, with its checks and balances, affords considerable protection against the always present possibility that an individual teacher, black or white, may, whether intentionally or not, act on the basis of bias or favoritism toward a particular student or group of students because of race. Continued and even increased careful scrutiny and supervision of the type engaged in by Dr. Feeney, Mrs. Pruden and Mr. Brown will be needed if disciplinary policies and practices in the Prince George's County school system are to remain racially neutral. But, as of this date, despite statistical suggestions to the contrary, defendants have established that suspensions of students do not involve discriminatory actions, causal connection with the pre-1973 segregation, or any violation of any order of this court.

## IV. STUDENT CLASSROOM ASSIGNMENTS

Plaintiffs contend that students are assigned to classrooms in a way which makes a large number of Prince George's County

---

**61.** *See* Plaintiffs' Exh. 194 at 400–06.

classrooms racially identifiable.[62] Plaintiffs assert that even in schools in which the overall student population is not racially identifiable,[63] recent statistics reveal segregation within regular classrooms.

"[C]lassrooms which are segregated by race are proscribed regardless of the degree of overall school-wide desegregation achieved." *McNeal v. Tate County School District*, 508 F.2d 1017, 1019 (5th Cir.1975). If the rule were otherwise, school districts would be permitted to resegregate students within the confines of integrated school buildings and to undermine at least part of the basic purpose of *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

The general method of assigning students to classrooms in Prince George's County was described by Mr. Clark Estep, Executive Assistant to the Superintendent of Schools, who testified that on the elementary school level, placement of an individual student is decided at a conference between the principal and the teacher on the grade level. Although there are no written procedures for classroom assignment, except with regard to "combination classes," *i.e.*, classes with a mixture of students on two or more grade levels, assignments generally reflect the educational needs of students and take into account their achievement in individual subject areas. Assignments comport with the philosophy that individuals should be placed in classrooms in which they will be most successful in their learning programs, develop a better self-image, and make maximum progress. (Tr. at 4151–56).

On the junior high school level, a feeder form is completed by the sending elementary school which indicates to the receiving junior high school the general level of functioning of the student in each subject area

on the elementary level. Those "Feeder Information Forms" include California Achievement Test scores as well as information as to what instructional level the student has reached. For example, the forms state whether the student is reading on a sixth grade level, or a fifth grade level, or a seventh grade level, etc. The form also includes general placement indications with regard to each subject, such as above average, below average, having marked deficiencies, etc. Such information is provided by teachers' evaluations. The Feeder Information Forms are used to establish initial groupings of students within junior high school classes. Thereafter, adjustments are expected to be made on a case-by-case basis, initiated by junior high school personnel, the student, or the student's parent, as necessary. On the junior high level, there are a small number of courses which students may self-select.

On the high school level, there is a wider range of elective courses available to students, and, therefore, more self-selection of classes. Also, on the high school level, students with marked deficiencies in grades 9 through 12 are grouped in special sections so they can concentrate on their individual deficiencies in the areas of mathematics, language, and reading. A student's scheduling choices may also be limited at the senior high level by selection of courses which meet during only one period of the day, and by participation in work experience and college study programs. Each of the above factors may influence the racial composition of a given classroom, so that it is somewhat difficult to establish with regard to senior high schools that students have or have not been deliberately assigned by race to certain classrooms.

At all levels, racial and sexual balances within each classroom are considered

---

**62.** Plaintiffs suggest the utilization of two different measures of racial identifiability with regard to classrooms: (1) if the percentage of blacks and whites is outside the range of 25–75% in nonracially identifiable schools (*see* n. 63 *infra*); (2) if classrooms vary more than ten percent plus or minus from the racial ratio of all students in that grade level in the school.

**63.** A racially identifiable school, according to plaintiffs, is one in which the racial proportion varies by more than plus or minus 20 percent from the countywide school attendance average. What constitutes a racially identifiable school in Prince George's County is mentioned and discussed in more detail *infra* in Part XIII of this opinion.

with regard to classroom assignments only *after* such evaluations of the individual students are made. The only written policy statement relating to racial balances in classrooms is with respect to "combination" classes within elementary schools, where a written procedure advises each elementary school that such classes should be balanced in terms of race and sex, preferably reflecting the balance in the total population of the school. Plaintiffs emphasize the lack of any other specific, written policy directives relating to racial balance in classrooms, and the lack of any organized program by the school administration for monitoring racial balance in classrooms. However, the statistical and other evidence presented in this litigation does not demonstrate that the method of assignment of students, combined with the lack of policies or programs, has resulted in any pattern of racial imbalance in the classroom.

Plaintiff's expert with regard to classroom assignment was Dr. Gordon Foster, a Professor in the School of Education at the University of Miami. Dr. Foster adopted the measure of classroom segregation used by the Office of Civil Rights (OCR) of the U.S. Department of Education, i.e., if a classroom varies in its racial composition by plus or minus ten percent from the racial average of the sections of that grade level or course within a school, then that is a racially disproportionate classroom. Thus, if the racial composition of all fourth graders in four classes of a school is 50 percent, then fourth grade classes under 40 percent or over 60 percent black are racially identifiable. At the elementary level, Dr. Foster took a group of 38 Prince George's County elementary schools and within that group found 55 racially disparate classrooms. The greatest disparity which Dr. Foster calculated from the racial average for a grade level in any one school was 25 percent. (Tr. at 667–68). However, the survey data utilized by Dr. Foster was gathered some time after the beginning of

the school year, when initial classroom assignments are made. (Tr. at 707–09). There is a great deal of movement of pupils within the Prince George's County school system. During the school year 1980–81, 42.04% of all elementary students changed schools. (Tr. at 706). The movement of a handful of students in mid-year seemingly can change the racial balance sufficiently to trigger a finding of the existence or lack of racial disparity under the plus or minus ten percent factor.[64] The statistics used by Dr. Foster do suggest that sufficient attention to the goal of racial balance at the inception of the classroom assignment process may have been lacking. However, it is also to be noted that Dr. Foster testified that any review of the racial composition of classrooms must proceed in a two-step process: (1) statistical review; (2) a site visit to talk with teachers and administrators involved with the classes identified as racially disparate to learn whether there are valid educational reasons for any facially disparate grouping. Dr. Foster testified that he did not make any site visit to any Prince George's County school and that therefore he could not form a judgment as to whether there were educational justifications for the existence of some racially identifiable classrooms. (Tr. at 693–94).

Dr. Foster's opinion testimony regarding secondary schools, as opposed to elementary schools, was even more circumscribed because the data available to him was insufficient to enable him to make a determination as to whether one-section, elective and advanced courses were listed in the mix of basic courses, such as physical science and language arts, which he compared for classroom racial composition. Thus, by OCR guidelines, Dr. Foster could not make a valid comparison of course sections. (Tr. at 720–25).

Even if the method of classroom assignment utilized by the Prince George's County system is arguably akin to so-called abil-

---

**64.** Hypothetically, if two black students in a class of 28 move and two white students on that grade level transfer to the school and are placed in the section which has the two vacancies, those movements in the middle of the school year are sufficient to disturb the racial balance of the class so as to render it racially identifiable by the OCR standards. (Tr. at 701–02).

ity grouping, plaintiffs have failed to prove that that method discriminated against black students. *See, e.g., Castaneda v. Pickard*, 648 F.2d 989 (5th Cir.1981). In *Castaneda*, the school district grouped students at the elementary and junior high levels. "based on achievement test scores, school grades, teacher evaluations and the recommendation of school counselors." *Id.* at 996. Commenting upon the same, the court wrote:

> [I]n a case where the ability grouping practices of a school system are challenged, the court must always consider the history of the school system involved. If the system has no history of discrimination, or, if despite such a history, the system has achieved unitary status and maintained such status for a sufficient period of time that it seems reasonable to assume that any racially disparate impact of the ability grouping does not reflect either the lingering effects of past segregation or a contemporary segregative intent, then no impermissible racial classification is involved and ability grouping may be employed despite segregative effects. However, if the district's history reveals a story of unremedied discrimination, or remedies of a very recent vintage which may not yet be fully effective to erase the effects of past discrimination, then the courts must scrutinize the effects of ability grouping with "punctilious care." *McNeal v. Tate County School District*, [508 F.2d 1017] at 1020 [5th Cir.1975]. Even under these circumstances, however ability grouping is not always impermissible. If the statistical results of the ability grouping practices do not indicate "abnormal or unusual" segregation of students among racial lines, the practice is acceptable even in a system still pursuing desegregation efforts. *Morales v. Shannon*, [516 F.2d 411] at 414 [5th Cir.1975].

*Id.* at 996–97.

Plaintiffs point to what plaintiffs contend are a number of racially identifiable elementary school classrooms. However, no evidence has been produced in this litigation that ability or performance levels are different in those racially identifiable elementary school classrooms than in the great majority of other elementary school classrooms. Nor is there any evidence that present or recent classroom assignment practices and groupings are related to the pre-1973 segregation. Further, the statistical evidence does not demonstrate that the method of assigning students or the arguable lack of policy directives relating to racial balance in the classroom, has resulted in such "abnormal or unusual" segregation of students "as to justify an inference of [racial] discrimination." *Morales v. Shannon*, 516 F.2d 411, 414 (5th Cir.1975). *See also Castaneda* at 997. In *United States v. Gadsden County School District*, 572 F.2d 1049, 1051 (5th Cir.1978) (per curiam), the Fifth Circuit affirmed the decision of the district court, which held that ability grouping in a 78 percent black school district which caused some groupings to be all black, did not, in and of itself, establish race discrimination. 572 F.2d 1049, 1051 (5th Cir.1978). However, the court did, in *Gadsden*, find a constitutional violation because, in five elementary schools, upper ability sections were heavily white, while lower ability sections were virtually all black. In one school which was 68% black, "20 of 29 students enrolled in the first section of the first grade were white, [while] only one of the 24 students enrolled in the fourth section of the first grade was white. At the sixth grade level, 20 of 30 students assigned to the first section were white, while only three of 24 students assigned to the fourth section were white." *Id.* at 1051. The number of whites in class sections in those schools ranged from 0 to 24 and the number of blacks, from 9 to 25.

In a 1980 survey of classrooms completed by Prince George's County for OCR, out of a total of 1542 classrooms in schools which were not racially identifiable by plaintiffs' plus or minus 20% standard, there were 15 in which there were either no blacks or whites, or a total of less than one percent. (Plaintiffs' Exh. 213). In schools racially identifiable by plaintiffs' standards, there were only 54 classes out of 1561 with

either no whites or blacks, although in some of those schools the minority race was represented by only a token number in any grade level. (Plaintiffs' Exh. 214).

Below is a chart of the racial composition in 1981 of the first and sixth grades at five of the schools in Prince George's County identified by Dr. Foster as containing one or more racially identifiable classrooms.

### Andrews Air Force Base Elementary
### 68% White

| Grade | Total Black | Total Other * | Total |
|---|---|---|---|
| 1 | 8 | 18 | 26 |
| 1 | 11 | 19 | 30 |
| 1/2 | 9 | 17 | 26 |
| 6 | 8 | 21 | 29 |
| 6 | 7 | 22 | 29 |

### Baden Elementary
### 53% White

| Grade | Total Black | Total Other | Total |
|---|---|---|---|
| 1 | 15 | 14 | 29 |
| 1 | 11 | 16 | 27 |
| 5/6 | 13 | 13 | 26 |
| 6 | 18 | 10 | 28 |
| 6 | 13 | 16 | 29 |

### Cooper Lane Elementary
### 78% Black

| Grade | Total Black | Total Other | Total |
|---|---|---|---|
| 1 | 23 | 7 | 30 |
| 1 | 26 | 4 | 30 |
| 5/6 | 24 | 6 | 30 |
| 5/6 | 21 | 5 | 26 |
| 5/6 | 20 | 8 | 28 |
| 6 | 17 | 11 | 28 |
| 6 | 23 | 4 | 27 |

### Fort Foote Elementary
### 67% Black

| Grade | Total Black | Total Other | Total |
|---|---|---|---|
| 1 | 10 | 12 | 22 |
| 1 | 17 | 5 | 22 |
| 1 | 15 | 6 | 21 |
| 6 | 19 | 15 | 34 |
| 6 | 25 | 8 | 33 |
| 6 | 25 | 9 | 34 |

### University Park Elementary
### 72% White

| Grade | Total Black | Total Other | Total |
|---|---|---|---|
| 1 | 8 | 17 | 25 |
| 1/2 | 7 | 17 | 24 |

| Grade | Total Black | Total Other | Total |
|---|---|---|---|
| 5/6 | 14 | 18 | 32 |
| 5/6 | 11 | 22 | 33 |
| 5/6 | 5 | 27 | 32 |

\* "Other" technically denotes non-black students; however, for practical purposes, those students are almost all white students, as the number of Prince George's County residents who are not either white or black is very small.

(Plaintiffs' Exh. 61).

Those statistics do not establish that the method for grouping elementary students used by the Prince George's County school system has caused classroom segregation. In fact, in the overwhelming majority of elementary school classrooms in Prince George's County, students are *not* clustered by race into one section at any grade level. For example, at Hillcrest Heights Elementary School, where in 1981 there were 532 black pupils and only 57 white, there was not a single classroom with no white students, and the 19 white students in the fifth and sixth grades were dispersed rather uniformly among the total of eight sections in those two grades.

In sum, there is neither evidence in this litigation of any contemporary or recent segregative intent by defendants to separate races by classrooms nor any evidence that any lingering effect of the pre-1973 segregation is presently or has recently been producing unequal achievement by blacks who are then being grouped into separate classrooms for low achievers,[65] or that in connection with classroom assignments defendants have violated any order of this court.

## V. POPULATION AND SCHOOL DEMOGRAPHICS [66]

The racial composition of Prince George's County has changed dramatically since this court's 1973 desegregation decree. There was a sharp acceleration in

**65.** It is to be noted, however, that defendants have applied for funding from the Federal Government for a specialist to study such concerns as "ability grouping resulting in racially identifiable classes." Such efforts by defendants to pursue measures to safeguard racial balance in classrooms suggests that in the future racial balance should become one of the explicit criteria to be used by school principals in grouping students. The fact that such a course might, from today's vantage point, be deemed desirable does not mean, however, that defendants have violated any of their constitutional or other lawful duties under this court's outstanding 1973 decree.

**66.** The map attached hereto as Appendix E is included for reference purposes. (Appendix E was deleted for purposes of publication.)

black population growth in the decade of the 1970's, involving the addition of 155,000 black citizens and changing the black population percentage from 14% in 1970 to 37.3% in 1980.[67] Defendants' demographics expert, Mr. George Grier,[68] attributed that gain to movement out of Washington, D.C. by predominantly middle class blacks seeking better quality and lower priced housing and desegregated schools for their children. (Tr. at 3486, 3620–21). That type of movement is sometimes called "black flight." Prior to 1970, most black population concentration and growth in Prince George's County had occurred immediately adjacent to the District of Columbia, approximately where the District line makes a 90-degree turn, the so-called Central Avenue corridor, which contains a large amount of low-priced housing.[69] As a consequence of that black suburbanization, 54 of the 116 census comparable areas[70] in the county increased by 1,000 or more black residents between 1970 and 1980; and 29 out of the 116 increased by 2,000 or more black residents. (Tr. at 3509). The black increase was generally heaviest in the southwest quadrant of the county. (*See* Defendants' Exh. 344, Geographic Change of Black Population in Prince George's County, 1970–1980, at 5).

During the 1970's, the white population of the county declined. Prince George's County lost 170,000 white residents between .1970 and 1980, accounting for an overall slowing of population growth. During the decade the net gain in the population of the county was approximately only 4,000 inhabitants. However, growth and loss patterns have been uneven within the county and have differed from area to area. Thus, the population has increased somewhat outside the Capital Beltway, while declining inside the Beltway.

In 1980, the percentage of black students in the county's schools was 49.9%, 12.6% above the countywide black population percentage of 37.3%. Mr. Grier testified that the disproportionately high number of minority children in the schools is due to the younger age of the new black parents of the county who have more school age children on the average than the white residents; to the incentive for white homeowners to sell their older existing houses to the incoming black families and to move to more expensive homes, within and without Prince George's County; and to a loss of whites from the schools because of the pendency of *Vaughns* in 1972 and this court's 1973 decree (sometimes called "white flight"). (Tr. at 3623–26).[71] In all, the number of white students declined by 65,809 from 1970 to 1980, while the system experienced an increase of approximately 20,000 black students from 1972 to 1981.

**67.** Ranking second in the nation in terms of numbers of black residents for a major suburban county, Prince George's County had 247,860 black residents in 1980, as compared to 156,954 in that year for all other Washington area suburbs combined.

**68.** Mr. Grier has a bachelor's degree in psychology and a master's degree in social psychology with an emphasis on survey research and statistical analysis, from the University of Pennsylvania. He is currently a partner in The Grier Partnership, which conducts a variety of studies and reports for both public and private clients, covering a wide range of topics, basically statistical in nature. In the past, he was vice-president for a nonprofit research organization in Washington, D.C. known as the Washington Center for Metropolitan Studies and a senior staff member of the Brookings Institution.

**69.** The socioeconomic status of some black families moving into that area for a number of years had been lower than that of black families migrating into other areas of Prince George's County, according to Mr. Grier. (Tr. at 3621). Historically, poorer blacks had also lived in pockets on the eastern side of the county, the so-called "ex-plantation areas." (Tr. at 3740).

**70.** Census comparable areas are coordinated areas developed by the Prince George's County Planning Board to enable comparison between the 1970 and 1980 census. The Census Bureau made many changes in the boundaries of census tracts between 1970 and 1980. (Tr. at 3500–01). The average population of a census comparable area in Prince George's County was 5733 in 1980. (Tr. at 3509).

**71.** Thirteen percent of the children in Prince George's County attended private schools in 1980. Those students were predominantly white. (Tr. at 3498).

The growth in black population as well as the decline in white population among public school students of the county since the implementation of the 1973 desegregation plan has coincided with the development of growing racial imbalances in certain of the county's schools. Defendants contend that there has been an uneven concentration of black children in areas into which there has been a rapid movement of black families. Mr. Grier testified that in 1980, 61 out of the 116 census comparable areas varied by more than 20 percentage points from the countrywide black population average (Tr. at 3511), and that in his opinion the variation in the racial mix of schools may be even larger than in the residential areas which they serve. On the other hand, plaintiffs' demographics expert, Dr. Karl F. Taeuber,[72] concluded that housing has become more integrated countywide since the plan was put into effect, yet the racial composition of the schools has become increasingly more unbalanced. (Tr. at 4519–21). Dr. Taeuber prepared a desegregation index for both the school system and housing in Prince George's County. On his school desegregation index, a value of 100 represents a situation in which all schools are uniracial, *i.e.*, each school is 100% segregated, and a value of 0 represents a situation in which all schools are completely integrated, *i.e.*, each school has a racial composition identical to that of the black-white countywide school population. The index assigns a value summarizing the deviations of each school from the district-wide percentage of black school population. Dr. Taeuber's elementary school desegregation index for 1973, after the institution of the desegregation plan, was 27, while the index for 1981 had risen to 40. On the other hand, housing segregation in the 1970's declined. Dr. Taeuber's housing index dipped from 62 in 1970 to 50 in 1980.[73] (Tr. at 4492–94).

Although the two experts, Mr. Grier and Dr. Taeuber, do not agree with respect to the causation for the current racial imbalances in certain of the county's schools, the evidence reveals that the ranges of racial percentages in the school system as of September 1982 varied widely:[74] from 16.7% to 86% black in senior high schools; from 12.4% to 92.5% black in the junior high and middle schools; and from 8.8% to 94.3% black in the elementary schools. In September 1982, eight senior high schools out of a total number of 20 senior highs in the county were what plaintiffs contend are racially identifiable, *i.e.*, schools which vary by more than 20% from the school systemwide racial average. Four of those

---

**72.** Dr. Taeuber has a bachelor's degree in sociology from Yale University and a master's degree and Ph.D. from Harvard University in sociology. He is a professor in the Department of Sociology at the University of Wisconsin. He is a Fellow of the Institute for Research on Poverty at the University of Wisconsin and is on the Steering Committee of the Center for Demography and Ecology at that institution. He has been a social scientist with the Rand Corporation and a research associate with the Population Research and Training Center of the University of Chicago. He has served as a consultant to the United States Bureau of The Census and to the National Academy of Sciences, in addition to publishing numerous articles in the fields of migration and black population studies.

**73.** The housing index assigns a value summarizing the deviations of each census comparable area from the countywide average of black population, with 0 being complete integration of housing and 100 being complete segregation. (Tr. at 4491).

**74.** The 1982 statistics are set forth in a report published by the Department of Pupil Accounting and School Boundaries, October 1982, of the Prince George's County school system. They were submitted by plaintiffs after the record was closed, in July 1982, in this case. Defendants object to their consideration by this court apparently on the ground that they were untimely submitted and not subject to development by way of examination and cross-examination of witnesses, but apparently do not controvert the authenticity and accuracy of their own statistics. There seemingly is no good reason why this court should not take such information into account. *See generally Zenith Radio Corp. v. Hazeltine Research,* 401 U.S. 321, 331, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Calage v. University of Tennessee,* 544 F.2d 297, 301 (6th Cir.1976); *Arthur Murray, Inc. v. Oliver,* 364 F.2d 28, 34 (8th Cir.1966). *See also* 6A J. Moore, Moore's Federal Practice § 59.04[13] (2d ed. 1983).

schools were, on that basis, identifiably white and four identifiably black. The four white senior highs had historically been white schools (schools less than 10% black at the time of the desegregation plan are considered in this opinion to have been historically white schools);[75] one of the four identifiably black senior highs had been a majority black school in 1972 before the plan (schools more than 50% black at the time of the plan are considered herein to have been historically black schools)[76] and is located in the Central Avenue corridor. Out of a total of 32 junior high and middle schools, eight were, by plaintiffs'

standards, racially identifiable in 1982. Only one junior high which is currently identifiably black was historically black in 1972.[77] Two middle[78] schools were historically white junior highs and continue to be more than 20 percentage points below the systemwide racial average.[79] Among the 121 elementary schools, 36 were more than 20% above the systemwide racial average of 53.9% in September 1982. Of those 36, 18 had historically been black schools.[80] Of the 26 schools which in September 1982 were more than 20% below the systemwide racial average, 17 had been less than 10% black in September 1972.[81]

75. Laurel Senior High School was 9.0% black in September 1972 and 16.7% black in September 1982; Bowie was 6.8% black in September 1972 and 17.4% black in September 1982. High Point Senior High School was 2.5% black in September 1972 and 33.4% black in September 1982; Surrattsville Senior High School was 6.1% black in September 1972 and 31.1% black in September 1982.

76. Central High School was 92.3% black in September 1972 and 76.3% black in September 1982.

77. Walker Mill was 84.1% black in September 1972 and 78.3% black in September 1982. The other junior high and middle schools which were racially identifiable as black in September 1982 and their percentages are: G. Gardner Shugart at 92.5% black; Andrew Jackson at 79.4% black; Benjamin Stoddert at 88.5% black; Francis S. Key at 84.1% black.

78. See the discussion at Part VIII, infra.

79. Martin Luther King Middle School was 3.1% black in September 1972 and 14.8% black in September 1982; Samuel Ogle Middle School was 7.2% black in September 1972 and 12.4% black in September 1982. Those two schools were junior highs in 1972.

80. The 18 schools are: Barnaby Manor, 58.3% black in September 1972 and 92.4% black in September 1982; Bradbury Heights, 56.3% black in September 1972 and 88.8% black in September 1982; Capitol Heights, 74.4% black in September 1972 and 81.2% black in September 1982; Carmody Hills, 96.8% black in September 1972 and 83.6% black in September 1982; Columbia Park, 88.3% black in September 1972 and 74.9% black in September 1982; Doswell E. Brooks, 71.6% black in September 1972 and 79.8% black in September 1982; Edgar Allen Poe, 58.3% black in September 1972 and 74.3% black in September 1982; Glassmanor, 56.0% black in September 1972 and 92.3%

black in September 1982; Green Valley, 65.8% black in September 1972 and 94.3% black in September 1982; John Carroll, 97.2% black in September 1972 and 84.4% black in September 1982; John Bayne, 77.8% black in September 1972 and 91.6% black in September 1982; Kenmoor, 80.9% black in September 1972 and 92.4% black in September 1982; Kentland, 69.5% black in September 1972 and 93.3% black in September 1982; Matthew Henson, 97.9% black in September 1972 and 78.3% black in September 1982; Oakcrest, 99.3% black in September 1972 and 85.8% black in September 1982; Overlook, 59.3% black in September 1972 and 87.7% black in September 1982; Owens Road, 66.3% black in September 1972 and 89.2% black in September 1982; William Paca, 98.0% black in September 1972 and 79.6% black in September 1982.

The remaining 18 schools, which were not historically black, and their September 1982 racial percentages are: Apple Grove at 75.6% black; Berkshire at 83.2% black; Concord at 86.0% black; Cooper Lane at 80.6% black; District Heights at 75.8% black; Dodge Park at 89.1% black; Flintstone at 81.2% black; Forest Heights at 85.2% black; Hillcrest Heights at 89.5% black; Lewisdale at 74.3% black; Longfields at 83.7% black; Patuxent at 75.9% black; Phyllis E. Williams at 78.3% black; Rogers Heights at 75.8% black; Sandymount at 91.9% black; Shadyside at 77.6% black; Thomas Claggett at 75.7% black; and Valley View at 91.5% black.

81. The 17 historically white schools and their percentage black in September 1972 and September 1982 are: Beltsville, 0.0% in 1972 and 14.6% in 1982; Bond Mill, 4.8% in 1972 and 8.8% in 1982; Chapel Forge, 1.0% in 1972 and 11.9% in 1982; Francis T. Evans, 9.9% in 1972 and 29.5% in 1982; Harmony Hall, 5.5% in 1972 and 32.9% in 1982; Heather Hills, 4.8% in 1972 and 10.2% in 1982; Hollywood, 0.5% in 1972 and 8.8% in 1982; Hyattsville, 1.6% in 1972 and

Plaintiffs point out that the rapid turning from white to black of certain schools was evident in status reports to this court before this court relinquished jurisdiction in 1974 and 1975 and should have been more affirmatively and effectively combatted by the School Board during those years and thereafter. (Tr. at 4546–47). Mr. Jon Peterson, who has worked in the Pupil Accounting and School Boundary Office of the Prince George's County school system since 1969 and has been Director of that office since 1979, testified that racial balancing alone never provided a basis, in and of itself, for any boundary change after 1975. Mr. Peterson stated that in his opinion the Board would have had to make annual or at least periodic changes to keep the black-white populations of the schools more balanced in the face of the rapidly rising black population. (Tr. at 2106). Defendants' position is that it would have been and continues to be detrimental to students to change school assignments too often.[82] Further, defendants state that the Board did not believe that after this court relinquished jurisdiction in *Vaughns,* the Board had any legal obligation to keep any specific racial mix within individual schools. (Tr. at 2108). Indeed, the Board's position in this case is that, at least after March 1975, it had no duty to change attendance areas if a school tipped on its own outside the 10% to 50% guidelines established by the 1973 desegregation plan, whether or not those percentage guidelines are adjusted upwards to reflect increases in black student population within the school system. Further, defendants assert that with

a declining pool of white students and with increasingly integrated neighborhoods, it would have been necessary to send more students to "off area" [82A] schools in order to have effected substantial change in the racial composition of any one school. (Tr. at 2095).[83] Thus, only when the Board had a nonracial reason for a boundary change, such as overcrowding or the opening or closing of schools, did the Board, after 1975, address the issue of rising black percentages in many schools. (Tr. at 2086). On the other hand, until September 1981, Mr. Peterson states that the board did not make any boundary change if the school system's projections showed that such change would cause a school to move outside of this court's 10%–50% guidelines. Additionally, according to Mr. Peterson, until September 1981, if a school had moved outside the guidelines on its own, no further change was made if the projection was that such change would significantly affect the black percentage at the school. (Tr. at 2075–76).

## VI. ASSIGNMENTS OF STUDENTS TO SCHOOLS

Since January 29, 1973, when the desegregation plan ordered by *Vaughns* went into effect, there have been numerous changes made by defendants in school attendance areas in the Prince George's County public schools. For the most part, post-1973 changes in any given school's attendance boundaries have been made because the general decline in enrollment resulted in underutilization of space in some schools, necessitating the closing of

20.4% in 1982; James H. Harrison, 3.2% in 1972 and 25.2% in 1982; Kenilworth, 2.9% in 1972 and 17.2% in 1982; Melwood, 9.6% in 1972 and 31.4% in 1982; Montpelier, 5.1% in 1972 and 30.3% in 1982; Pointer Ridge, 6.7% in 1972 and 19.6% in 1982; Rockledge, 3.7% in 1972 and 10.6% in 1982; Tulip Grove, 0.2% in 1972 and 14.8% in 1982; University Park, 2.7% in 1972 and 28.2% in 1982; Yorktown, 1.4% in 1972 and 18.8% in 1982.

The remaining nine white schools and their percentage black in September 1982 are as follows: Deerfield Run at 19.6%; Henry G. Ferguson at 12.8%; High Bridge at 25.1%; Laurel at 12.5%; Margaret A. Edmonston at 12.6%; Marl-

ton at 26.1%; Mattaponi at 17.7%; Oaklands at 22.2%; and Paint Branch at 26.1%.

**82.** The Board cites two mobility studies for the proposition that the greater number of schools a student attends, the lower the level of achievement. (Tr. at 2082).

**82A.** *See* note 84.

**83.** It also may have been quite difficult to have caused such substantial changes within the thirty-five minute busing limit which underlay the 1973 desegregation plan. *Vaughns,* 305 F.Supp. at 1056.

schools. However, the general decline in enrollment did not affect all areas of the county evenly. Indeed, some areas experienced population increases resulting in overcrowding at some schools. The overcrowding was alleviated either by building new schools or by a shift in attendance boundaries resulting in the movement of students from one school to another.

Also, in 1980, the school system made a series of changes designed to eliminate some of the "off areas" and some of the busing from those areas created by this court's December 29, 1972 decree.[84] The Board of Education stated in connection with those 1980 changes that its purpose was to eliminate only those "off areas" which, in its view, were no longer essential to achieving racial balance at the affected schools. Accordingly, the Board in 1980, without seeking any order of this court, cancelled portions of the busing ordered by this court's 1973 decree which the Board considered "unnecessary." (Tr. at 2874).

Changes in attendance areas on the secondary level were also made necessary because of the secondary school reorganization program which went into effect on a pilot basis during the 1980–81 school year and on a full-scale basis beginning in 1981–82. That reorganization, which is still going on, will result in the high schools being converted from three-year programs (tenth, eleventh and twelfth grades) to four-year programs with the addition of the ninth grade. Junior high schools, which had housed ninth grades, will be converted into middle schools, composed of only the seventh and eighth grades. The reorganization is being undertaken for educational reasons, *i.e.*, because the school system believes that the ninth graders belong in a high school setting.

The normal process by which boundary changes are made is for the staff of the Office of Pupil Accounting and School Boundaries to develop a proposal, which considers the criteria of closest school with space and racial impact,[85] and to submit the proposal to the Superintendent. The Superintendent, if he approves the proposal, submits it to the Board of Education. The Board, if it decides the proposal is meritorious, holds a public hearing with regard to the proposal. Public hearings are held in connection with all boundary changes, no matter how small the number of students affected by the change. At those hearings, the school staff explains the proposal to those members of the public who appear and comments are received from such persons. After the hearing, the Superintendent and the staff determine if any modifications are needed as the result of such citizen input. The proposed change is then sent back to the Board of Education for final approval or rejection. In addition, in connection with the 1977 and 1979 school closings, citizens' task forces were formed to study and recommend which schools to close and the potential reassignment of students. In 1980, a Citizens Advisory Committee was formed specifically to consider the elimination of "unnecessary" busing.

When making a change in a given school's attendance area and reassigning the students affected by the change, the school system tries to place students in the school with the requisite space closest to their homes. However, it also attempts to predict the effect of the proposed change on the racial balance in both the sending and receiving schools. (Tr. at 2071–72).

**84.** Under that decree, there are two types of areas within a school's attendance zone: (1) a "contiguous area" surrounding the school, and (2) an "off area" or "noncontiguous area" physically removed from a school. Students from an "off area" are bused to their school. Students living within the contiguous area may or may not be bused, depending upon their homes' distances from the school. However, the elimination of "off areas" almost necessarily eliminates some of the busing ordered by the December 29, 1972 decree. That decree caused about an 8% increase in busing in a school system which was already in 1972–73 substantially on wheels. *Vaughns,* 355 F.Supp. at 1058.

**85.** The school system has kept, since 1973, a boundary change book in which there are, *inter alia,* predictions of racial percentage changes anticipated by each boundary change. (Defendants' Exhibit 87).

(Those schools to which students are transferred are receiving schools; those schools from which students are reassigned are sending schools.) The method of projection used by the school system is the "cohort survival method." Under that method, a projection is generally made with regard to the next school year by subtracting the number of students who will be leaving the school due to graduation, expected movement from elementary to junior high, or junior high to senior high, adding expected incoming students, and then determining the number of students affected by the change. (Tr. at 3592).

Plaintiffs argue that the School Board should have at all times factored in the annual black increase in enrollment when projecting the racial impact of planned school boundary adjustments since, plaintiffs say, the changing racial composition within the populations of the county and of the schools was discernible, at least from the mid-1970's. The average annual increase in the black percentage in the school system was slightly over 3.1% from September 1972 to September 1981. (Tr. at 3600). That overall increase, however, did not affect all schools uniformly, making individual predictions difficult. Defendants point out that because of the mobility of the population in the county, exact projections were not possible, and that neither the school staff nor anyone else knew how fast or to what degree a given change would take place. For example, in a heavily rental area undergoing demographic change, racial turnover could be expected to be faster than in a homeowners' area but the extent of that turnover was very difficult to predict.

With regard to the sum total of all boundary changes made by the Board since the inception of the desegregation plan in 1973, defendants' demographer, Mr. Grier, calculated that the average black percentage increase in schools affected by boundary changes was 3.3%, *i.e.*, say defendants, almost the same average percentage by which the schools would have increased as a result of demographic change alone. (Tr. at 3535–36). Finally, using a scatter plot analysis, defendants' demographer attempted to demonstrate that the Board did not intentionally manipulate school boundaries to increase segregation.[86]

 Statistics are of course valuable. But in the forest of statistical averages, the trees must not be overlooked. Each change in student attendance area made by the Prince George's County Board of Education since this court relinquished jurisdiction in 1975 therefore requires individual examination and assessment. Such examination and assessment should take into account the racial impact upon the individual school and the alternative changes which defendants might have considered in order to achieve more racial balance or less racial imbalance.

## VII. OVERCROWDING CHANGES

Boundary adjustments after 1975 occasioned by school overcrowding generally furthered integration, although there were a few exceptions. The chart set forth in Appendix F outlines those overcrowding changes, the bulk of which occurred in the first few years after 1975. (Appendix F was deleted for purposes of publication.)

In particular, the secondary school overcrowding changes in the fall of 1975 promoted desegregation, as exemplified by the case of Gwynn Park Senior High School. Gwynn Park had been newly renovated and enlarged to accommodate students from

---

**86.** Mr. Grier identified a scatter plot as "a widely used tool for analyzing statistical data.... It literally shows you every change relative to every percentage black in every school that was changed. So by looking at the scatter plot, you can very readily discern any patterns." Mr. Grier testified that if the Board of Education had acted so as to make white schools whiter and black schools blacker, a clustering of dots would have been observable. Clusters of dots would have appeared in the upper right-hand corner of the chart representing black schools which were intentionally made blacker and clusters of dots would have appeared in the lower left-hand corner representing white schools which were intentionally made whiter. (Tr. at 3528–31).

three overcrowded senior high schools. On receiving the new, mainly white students from the overcrowded schools, Gwynn Park decreased from 44.1% black to 32.5% black and approached the countywide racial average for senior high schools in that year (28.5%).

With two of the overcrowding changes, the Board deliberately created new "off areas" in order to enhance racial balance. In 1976, faced with overcrowding at G. Gardner Shugart Junior High School, the school system took predominantly black areas out of Shugart, which was 67.8% black in September 1975, and reassigned them to schools with black enrollments below 30%. Shugart is a school in the southwest section of the county inside the beltway which was experiencing rapid black population gain. All three receiving schools were outside the Capital Beltway where black population concentration was sparser. The racial balance at those receiving schools was thus improved: John Hanson went from 20.9% in September 1975 to 26.3% black in September 1976; Roger B. Taney, from 28.8% to 36.5% black; Stephen Decatur, from 27.5% to 36.3% black. The countywide racial average for junior highs in 1976 was 37.5%. Shugart itself, in spite of transferring 219 predominantly [86A] black students and receiving only 100 predominantly black students from Stoddert, increased its black percentage to 73.2%. However, Shugart experienced an increasing black percentage of students in years when no boundary changes were made, because of a continuing change in the racial makeup of its neighborhood.

The 1976 assignment of part of the attendance area of Barnaby Manor Elementary School to Tayac Elementary School improved the racial balance at Tayac. The 90 predominantly black students sent from Barnaby Manor, a black school inside the Beltway, became part of the noncontiguous or "off area" for Tayac, which went from 21.3% to 33.7% black in a year when the

countywide average for elementary schools was 39%. In the process, the racial average of J. Frank Dent Elementary School was also improved when 47 predominantly black students were sent from Tayac to Dent, which increased from 27.7% black in September 1975 to 37.1% black in September 1976.

On the other hand, to relieve overcrowding at Edgar Allen Poe/Woodley Knoll Elementary Schools in 1976, parts of those schools' attendance areas were reassigned to Allenwood Elementary and Middleton Valley Elementary. Poe, an inside-the-Beltway school, thereby lost 90 white students and only 7 black students and increased from 63.6% to 64.9% black. Plaintiffs object to that transfer as an alleged dismantling of one part of the desegregation plan, and contend that children from the predominantly black "off area" of Poe could have been sent to Morningside Elementary School or Skyline Elementary School to relieve the overcrowding, instead of transferring the 90 white students. Defendants stated on the record that that was a feasible alternative, being within the 35-minute busing guidelines established by the 1973 desegregation plan. (Tr. at 3393; testimony of Mr. Peterson).

Plaintiffs also complain that a proposed overcrowding change for the school year 1976–77 involving the Dodge Park Elementary School was not made. The change, plaintiffs state, should have been made in order to have improved the racial balance at that school, but was not made because of the complaints of black parents who did not want their children bused out of the neighborhood. Instead, the fifth and sixth graders at Dodge Park were housed in 1978 at two nearby black schools in what was labelled a temporary solution. The temporary housing arrangement is still in effect. The proposed change, which was not made, would have moved 120 students from Dodge Park, an inside-the-Beltway school which was 70.1% black in 1975 and

---

**86A.** "Predominantly" refers in this context to a group of students transferred, the racial composition of which is more than 75% one race.

Until a few years ago, the Board generally did not keep statistics on exact numbers of students of each race transferred by boundary changes.

which was rapidly gaining in black population, to Kenilworth Elementary School, a Bowie school which was only 17.1% black at the time. Kenilworth's racial balance would have improved to 29%. After the predominantly black group was housed at the two nearby black schools, Columbia Park Elementary School and Kenmoor Elementary School, the racial average at Columbia Park moved up by about 4%, but the average at Kenmoor went up by almost 10%, to 75.6% black. Those changes were noted by defendants as having aggravated the racial tipping of the two receiving schools. (Tr. at 1330).

*In toto*, in the opinion of this court, the overcrowding changes do not reveal purposeful intent to segregate or to resegregate on the part of defendants or constitute any violation of any order of this court since the changes, even those which increased racial imbalance, were rooted in and motivated by the need to cope with overcrowding. The overcrowding changes, however, fall somewhat short of maximum possible movement away from pre-1973 segregation.

## VIII. SECONDARY REORGANIZATION

The secondary school reorganization which occurred in the 1980–81 and 1981–82 school years created excess capacity at the junior high schools, as ninth grades were added to senior high schools and junior highs were converted to middle schools. Four junior highs were closed as a result of the secondary reorganization and there were some additional attendance area changes made in order to provide room at the senior highs for the incoming ninth graders.

The four junior high schools closed at the end of the 1980–81 school year were Mount Ranier, 49% black; Frederick Sasscer, 47.8% black; Beltsville, 21.2% black; and Belair, 27.1% black.[87] The reassignments at the times of the closings of those schools are shown on the chart at Appendix G.

(Appendix G was deleted for purposes of publication.)

The reassignment of Belair Junior High's students, at the time of that school's closing, to Benjamin Tasker Junior High School continued the pattern of the 1973 desegregation plan, *i.e.*, students in Belair's "off area" continued to be transported to the Bowie area. Students from that predominantly black "off area", who were reassigned to Tasker, lived closer to Kenmoor Junior High, and could have been reassigned there, but were not so reassigned because Kenmoor was 72.3% black in September 1980.

There were still other reassignments stemming from the secondary school reorganization in 1980 and 1981 which require examination. In September 1981, 80 black students and 5 white students were reassigned from Fairmount Heights Senior High School to Eleanor Roosevelt Senior High. Fairmount Heights was 71.1% black in September of 1980 and the area reassigned to Eleanor Roosevelt was not adjacent to that school's contiguous area, though it was adjacent to its "off area." There were high schools with space closer to Fairmount Heights than Eleanor Roosevelt, but those other schools had larger percentages of black students than Eleanor Roosevelt. (Tr. at 2176–80). In the year of the transfer, Eleanor Roosevelt's black percentage rose from 31.6% in 1980 to 34.0% in 1981, approaching the countywide black student racial average for senior highs in that year of 48.0%.

The transfer of 132 black students and 1 white student from Largo Senior High School to Bowie Senior High School in 1981 is another example of a change which promoted integration. The area reassigned from Largo to Bowie was not the closest area to Bowie within the Largo contiguous zone. But the closest area was predominantly white, and if students had been selected from it rather than from the assigned area, the racial average at Bowie would not have improved, as it did, from 12.1% to 15.8% black. (Tr. at 2165–67).

---

**87.** Those percentages are as of September 1980.

There were a series of changes involving Roger B. Taney Junior High connected with the secondary reorganization. A total of 120 black students and 7 white students were transferred from Taney to two schools: Stephen Decatur and Thomas Johnson Junior High Schools. In exchange, Taney received 21 black students and 59 white students from John Hanson Junior High. Hanson rose in the year of the change almost 6% to 62.4% black. Hanson is located in the southwest section of the county just outside the Beltway and had been steadily rising in black population since the 1973 desegregation plan. The overall effect on Taney was to help bring its racial percentage down from 59.0% black in September of 1980 (above the countywide average) to 36.8% black in September of 1981. The black racial percentage at Stephen Decatur shifted less than 2% in the year it received the Taney students. However, Thomas Johnson Junior High, which also received 73 black and 4 white students on the closing of Beltsville Junior High in the same year, rose almost 9% with the additional transfer of 78 blacks and 6 whites from Taney and became 66.6% black in 1981. The previous year, 17 black and 36 white students had been transferred from Johnson to Benjamin Tasker in a secondary reorganization-related change, and Johnson had increased from 48.5% to 57.4% black. (Johnson had been 58.8% black before the implementation of the 1973 desegregation plan.)

Of all the secondary reorganization-related changes, plaintiffs complain principally of two. First, they point to the undoing of the pattern of the desegregation plan at Thomas Johnson Junior High School, which was noticeably tipping by the year of the changes. Mr. Peterson admitted that a less resegregative alternative would have been to transfer the 73 black students transferred to Thomas Johnson on the closing of Beltsville to Martin Luther King Junior High School instead; Martin Luther King was only 15.8% black the year before the Beltsville closing. Second, as to Green-

belt Middle School, plaintiffs note that it was made 16.6% whiter by secondary-reorganization related changes, dropping to 28.5% black in September 1981. However, what actually occurred with regard to Greenbelt was that during the year 1982 the closing of another school, and the reassignment of black students from that school to Greenbelt brought the racial percentage at Greenbelt back toward the countywide average.[88]

In sum, there is no indication in this litigation that the secondary reorganization was motivated by any intent to resegregate or discriminate on racial grounds or significantly aggravated any pre-1973 vestiges of discrimination or was administered in violation of any order of this court.

## IX. OPENINGS OF SCHOOLS

Seven public schools were opened during the period after 1973:

(1) Marlton Elementary, opened for the 1974–75 school year, with 28.3% black enrollment; 26.1% black in 9/82;

(2) Indian Queen Elementary School, opened for the 1974–75 school year, with 27.2% black enrollment; 64.2% black in 9/82;

(3) Deerfield Run Elementary School, opened for the 1975–76 school year, with 15.9% black enrollment; 19.6% black in 9/82;

(4) Eleanor Roosevelt Senior High School, opened for the 1976–77 school year, with 28.3% black enrollment; 36.6% black in 9/82;

(5) Phyllis E. Williams Elementary School, opened for the 1976–77 school year, with 52.1% black enrollment; 78.3% black in 9/82;

(6) Kettering Junior High School, opened for the 1977–78 school year, with 37.7% black enrollment; 59.4% black in 9/82; and

(7) Potomac Landing Elementary School, opened for the 1977–78 school year, with 26.3% black enrollment; 58.0% black in 9/82.

**88.** Thus, Greenbelt became 45.4% black in September 1982.

Each opening required some adjustment in the school attendance zones of neighboring schools. Of those changes, those involving the openings of Marlton and Indian Queen Elementary Schools were set forth in the reports to this court prior to November 1974 and were not objected to by the court nor by plaintiffs. Four of those schools (Eleanor Roosevelt, Kettering, Deerfield Run and Phyllis E. Williams) were given "off areas" at the times at which they were opened to ensure that they would open within the 10–50% guidelines established by the 1973 desegregation decree. In each of those cases except one, the "off areas" did indeed ensure that their schools opened within the guidelines. The only exception was Phyllis E. Williams, which opened at 52.1% black.

Defendants state that the new schools were constructed in areas in which they were needed in order to relieve overcrowding at neighboring schools. The facts would generally appear to support that statement. However, whether defendants should, in certain of those instances, have utilized other alternatives requires individual analysis of the impact of each opening. The pattern of school attendance zone changes as a result of the school openings is indicated by the chart set forth in Appendix H. (Appendix H was deleted for purposes of publication.)

Plaintiffs contend that the new facilities which were opened in the southern and eastern portions of the county facilitated white growth and question whether such openings constituted racially neutral acts. (Tr. at 124–25). Plaintiffs argue that the overcrowding at white schools should have been relieved by transporting white students to increasingly underutilized black schools inside the Beltway. However, plaintiffs supplied the court with no information as to the feasibility of such transportation in terms of busing times and distances. (Tr. 128–29).

Plaintiffs point out that three of the seven schools which were opened became ra-

cially identifiable, by plaintiffs' definition, within a few years of opening: Marlton Elementary, Deerfield Run Elementary and Phyllis E. Williams Elementary. As to Marlton, that school opening occurred before 1975 while this court had continuing active jurisdiction and was agreed to by plaintiffs.

Phyllis E. Williams had been projected to open at 36% black, but its attendance zone included an area of brand new housing which the school system had thought would be mostly white. However, between the end of the 1975–76 school year and September 1976 when Phyllis E. Williams opened, many more black families moved into the new housing than had been anticipated. Plaintiffs specifically challenge the opening of Phyllis E. Williams because there was excess space in schools surrounding it and therefore, say plaintiffs, there was no necessity for a new school in that particular location. Plaintiffs cite the pulling away of white students from John Bayne Elementary, now an identifiably black school, as one of the undesirable consequences of the opening of Phyllis E. Williams. John Bayne "tipped" or became more identifiable as a black school as a result of the sending of 206 majority [88A] white students to Williams on its opening. By 1982, John Bayne had become 91.6% black. Also, plaintiffs argue that it would have been more in keeping with promotion of desegregation for the Board to have placed Williams in a more central location, so as to have facilitated the equal sharing of burden between the predominantly white end of the school sector in the desegregation plan and the predominantly black end of that sector in which Williams was located; and that the opening of a 50% black school near to a 25% black school (Kettering Elementary) could have been predicted not to enhance racial balance. (Tr. at 67–76). While there may be reason to question the location of Williams and the failure to guard against the tipping which occurred at Bayne, the unexpected developments in

**88A.** The term "majority" in this context indicates the transfer of a group of students over 50%, but not over 75% of whom are black. *See* note 86A *supra*.

connection with the new housing played a major role in causing the problems at Williams itself.

The opening of Potomac Landing Elementary, built at the south end of Harmony Hall's attendance boundary (in the southwest corner of the county), defeated desegregation, plaintiffs suggest, by taking a small black enclave out of Harmony Hall's attendance area and ensured that Harmony Hall would be an identifiably white school. (Harmony Hall was 32.9% black in September of 1982.) Further, plaintiffs assert that the Board rejected an option to transport students from overcrowded Harmony Hall to Owens Road Elementary, which was already 73.7% black in September 1976 and underutilized. (Tr. at 120–21). That move would have enhanced desegregation. However, the record does not establish that the road patterns and other factors made possible transportation to Owens Road within the 35-minute time limitation. Further, as to Harmony Hall, it is presently a relatively integrated school.

Finally, as for Deerfield Run, located in South Laurel, an area which had experienced a great deal of growth in the late 1960's and early 1970's, it was opened in order to relieve overcrowding at the other South Laurel schools: James Harrison, Montpelier, Oaklands, and Samuel F.B. Morse Elementary Schools.[89] (Tr. at 2580). Since the South Laurel area is over thirty-five minutes by school bus from the heavily black schools to the south, it would not have been feasible within the busing guidelines of the 1973 plan to transport white students from those Laurel schools to the black schools to the south in order to relieve them of overcrowding. The changes in the attendance zones in the South Laurel area resulted primarily in other schools sending students to Deerfield Run. However, the school staff looked at the total situation in the South Laurel area with two objectives in mind:

(1) Relief of overcrowding.

(2) Adjustments in order to bring one of the schools (Montpelier) within the 10–50% guidelines, to ensure that Deerfield Run opened within those guidelines, and to bring about an increase in the black percentage at James Harrison (12.5% before the change).

(Tr. at 2581–84). To that end, the Board created an "off area" for Deerfield Run, which area was taken from Samuel F.B. Morse's attendance zone, and also sent black students from Morse to Montpelier and white students from James Harrison to Morse. Morse was projected to decrease to 31% black, although it in fact increased to 44.2% black. The black percentages at both Montpelier and James Harrison were projected to increase to 13% and 15%, respectively. In fact, the schools were 12.5% and 18.4% black in September, 1975. Thus, the school system attempted with the opening of Deerfield Run in 1975, not only to ensure that Deerfield Run would open within the 10–50% guidelines, but also to spread the available black students in the South Laurel area in a more even fashion.

In sum, on balance, the openings in question appear to have largely been designed by the Board to promote integration within the constraints of reasonable transportation times.

## X. CLOSINGS

The public school population has declined from approximately 162,000 in 1972 to 116,000 in 1981, a drop of 46,000 students. That decline brought about the need to close certain underutilized schools and to consolidate others. In 1977, 1979 and 1981, the school system closed a number of elementary schools. In addition, five junior high schools were closed after 1974; four of those closings have been discussed, *supra*, in Part VIII, in relation to secondary reorganization. Despite closings between

---

**89.** In the year prior to the opening of Deerfield Run (*i.e.*, 1974–75), James Harrison had a capacity of 720 students and a population of 737; Montpelier had a capacity of 720 and a popula-
tion of 735; Oaklands had a capacity of 700 and a population of 677; and Samuel F.B. Morse had a capacity of 720 and a population of 661.

1974 and 1980, there remained excess student capacity within the Prince George's County school system, in 1980, of 21,000. (Tr. at 3259).

The 1977 and 1979 elementary school closings were accomplished with the assistance of community task forces appointed by the Board to study geographic areas with declining enrollments and to recommend schools to be closed and details of student reassignments. Each school in each area had five persons on its task force, the principal, a teacher, one P.T.A. officer and two parents, one from the contiguous area of the school and one from the "off area." (Beginning in 1979, principals and faculty members were no longer given voting membership on such task forces.) (Tr. at 2632–39, 2699–700). In 1981, no citizens' task forces were appointed in connection with the school closings because the Board had come to the conclusion that such task forces pitted communities against one another. Also, by 1981, the Board was operating under a State of Maryland mandate which required school districts to draw up comprehensive plans for closing and consolidation of schools.

Plaintiffs complain that defendants made no attempt to correspond the school closing study areas with desegregation sectors and that reassignments of students as schools closed were in fact not correlated with the existence of desegregation sectors. (Tr. at 3353–55). Plaintiffs also criticize defendants' school closing policies because defendants specifically rejected the racial composition of the schools as a factor to be considered in selecting which schools should be closed. Of the 45 schools closed between 1975 and 1981, 29 or 67% were within 20% plus or minus of the system-wide racial student enrollment average. The charts included within Appendix I illustrate the range of racial percentages of schools closed by the system since 1975, as well as the schools to which students were transferred as a result of those closings and the effects on racial balances of those schools.

The Board specifically utilized four criteria when selecting schools for closing: (1) student enrollment as related to school capacity; (2) transportation distance to school, reduction of the number of students transported; (3) physical facilities, including need for renovation and/or modernization; and (4) operating cost savings. The Board's witnesses stressed consistently in their testimony that the Board chose to close small schools, usually also older schools built in the 1940's and 1950's, and tried, for instructional program purposes, to keep open schools with an enrollment capacity greater than 300. (Tr. at 3360–61). The Board's position is that such criteria were and are consonant with good educational administration because, for example, a school with a larger (but presumably not too large) enrollment provides more educational options in grouping students.

Plaintiffs point to the fact that schools which were not kept open, such as Glenn Dale Elementary School and Thomas Addison Elementary School, could have served as bridge schools between primarily black and white communities. The condition of the physical plant and the large number of students being transported, however, were the principal factors in the closing of Glenn Dale. The Board considered that closing that school would reduce rather lengthy busing distances and permit some pupils to walk. Plaintiffs nevertheless note that the closing of Glenn Dale, which was a bridge between largely white Bowie and the heavily black areas inside the Beltway, reversed parts of the desegregation plan and sent white students back to Bowie. (Tr. at 3381). That decision, furthermore, was in conflict with the community task force recommendation that no schools be closed in the Glenn Dale area because of their potential for growth. (Tr. at 3380). As for Thomas Addison, which was close to the Beltway and which, plaintiffs assert, could have continued to act as a bridge school between the interior part of the county and the part of the county outside the Beltway, the Board stated that it closed that school because of its small capacity and consolidated it with a neighboring, full capacity

school, Fort Foote Elementary School. (Tr. at 3363–64). Plaintiffs have also suggested that certain racially imbalanced schools, located in the same vicinity as integrated schools, should, in the alternative, have been closed, *i.e.*, Flintstone Elementary School instead of Thomas Addison Elementary School (Tr. at 3364–65); Kentland Elementary School instead of Palmer Park Elementary School (Tr. at 3353–54); Cooper Lane Elementary School instead of Parklawn Elementary School (Tr. at 3362).

Although racial balance was apparently not a factor in selecting schools to be closed, race was definitely a factor used by the school system in reassigning students who had attended closed schools. Most often, students from noncontiguous or "off areas" were reassigned to schools near the original receiving school which was being closed, rather than to schools closer to the "off areas." A prominent example of this was the closing of Beaver Heights Elementary School in 1981. Its "off area," located in Hyattsville, was reassigned to Seat Pleasant Elementary School, which was 64% black before the change. That was done in spite of the protests of parents of the children who wanted the predominantly white area reassigned to its closest school, Hyattsville Elementary, which was only 18.9% black in September 1980. The Board's decision rested on the fact that Seat Pleasant's black population would have risen sharply if students from the white "off area" had not been transferred to it. Another example was the assignment in 1981 of the closed Buckingham Elementary's predominantly black student "off area" population to Tulip Grove Elementary School, a Bowie elementary school which was only 18.9% black the year before the change. That was done in spite of the fact that the "off area" was across the street from another elementary school and students from the "off area" were subjected to one of the longest bus rides required by the desegregation plan. That other elementary school was, however, 74.8% black in September 1980. Also, when Meadowbrook Elementary School closed in 1981, students from its predominantly black "off

area" went to Rockledge Elementary School, the school with the lowest percentage of black students in the county, in order to try to keep Rockledge from dropping below 10% black.

Other examples of conscious efforts by the Board to avoid resegregation in reassigning students from closed schools are numerous. The predominantly black "off area" of Ager Road Elementary School was not reassigned to its closest school, Beaver Heights, as such reassignment would have significantly raised the percentage of black students in that school (57% in September 1976). Instead, the "off area" went to Cheverly-Tuxedo Elementary School, which was only 26.7% black in 1976 and went to 39.6% black in 1977 following the transfer. That same pattern was followed with the assignment of College Park Elementary's black "off area" to Berwyn Heights Elementary School, which rose from 22.7% black in September 1976 to 28.2% black in September 1977 following the change, rather than to nearby Seat Pleasant, which was historically a majority black elementary school. The black "off areas" assigned to two Bowie elementary schools, Fox Hill and Somerset, which were closed in 1977, were not transferred to a school within walking distance of the "off areas," since that school was over 50% black. Rather, the Board chose to continue busing the children from Fox Hill and Somerset to another Bowie school, Kenilworth Elementary, to further desegregation. Following the transfer, the percentage of black students at Kenilworth rose from 15.4% to 27.1%. Again, a typical pattern was to consolidate one school which was closed with another. When that occurred, contiguous and noncontiguous areas were transferred together, and the option of sending students from the noncontiguous area back to closer schools was rejected. For example, Hollywood Elementary received all of Holly Park Elementary's attendance area when the latter school closed, including an "off area" which was over thirty minutes by bus from Hollywood. That change prevented Hollywood

from remaining below 10% black. Instead, Hollywood rose to 11.9% from 9.2% black on receiving the Holly Park students.

Sometimes, an existing "off area" of a school which was being closed was added as a new "off area" to another receiving school, in order to improve racial balance. When Kent Junior High School closed in 1979, its predominantly white noncontiguous area was transferred as a noncontiguous area to Charles Carroll Junior High, which had the highest percentage of black students of the schools which received students from Kent. Charles Carroll had been experiencing a steady growth in its black population. As a result of the change, Charles Carroll dropped from 58.9% black to 55.3% black. The assignment of a group of 198 students, the majority of whom were black, from Randolph Village Elementary School to Kettering Elementary School in 1979 is also illustrative of how integrative alternatives were chosen when schools were closed, even though other schools were geographically closer to the students reassigned. In that case, the Board chose to transport those black students a considerable distance, rather than to assign them to closer, majority black schools because of concern for the effect on racial percentages. Kettering's racial average improved from 29.6% to 45.6% black as a result.

However, considerations of racial balance were not always controlling in the determination of reassignments. In some cases, the Board apparently gave weight to assignment of students to the closest school with space, thus maximizing walkers, and either ignored, minimized or miscalculated the racial impact. The closing of Panorama Elementary in 1979 is one such example. Eighty-six students, predominantly black, were transferred to Green Valley Elementary, already a school over 80% black. The black percentage of Green Valley subsequently rose from 81.7% in 1978 to 86.0% in 1979, the year of the exchange. Green Valley was 94.3% black in 1982. Upon the closing of Panorama, 101 predominantly black students were also sent to Hillcrest Heights Elementary School, which was already 77.7% black. Mr. Peterson testified that other alternatives might have been feasible for those students at the time of the closing of Panorama, but that the primary consideration of the school system was to enable the reassigned students to walk to Green Valley and Hillcrest Heights. One of the alternatives called for sending some of the predominantly black students to Allenwood Elementary School outside of the Beltway. Allenwood has an "off area" which was even farther away than the Panorama area and was only 40.3% black the year before Panorama closed. Other less black schools to which Panorama students seemingly might have been transferred were J. Frank Dent (46.5% black in the year before the closing) and Samuel Chase (38.5% black the year before the closing). (Tr. at 3395–99).

With regard to John Carroll and Oakcrest Elementary Schools, the Board's own projections showed that those racially disproportionate schools would tip by 4 or 5% as a result of reassignments in connection with school closings. In fact, the tipping was generally greater than predicted. When Greenbelt North End Elementary School was closed in 1981, 62 black students were sent back to already majority-black John Carroll Elementary, cancelling part of the 1973 desegregation plan. The percentage of black students at Carroll rose 6.5% in that year to 81.3%. Mr. Peterson stated that those students might have been bused to other schools closer to their homes than Greenbelt North End was—to schools which were racially balanced. (Tr. at 3399–3402). Oakcrest Elementary, which had been 99.3% black in 1972 before implementation of the 1973 desegregation plan, was the recipient of 144 black students upon the closing of Ritchie Elementary School, climbing to 83.4% black. Again, the school system's rationale was that Oakcrest was the closest school with available space. Plaintiffs point out that the school system might have avoided raising the black percentage at Oakcrest by transferring 50 of Ritchie's black students to Pointer Ridge Elementary School, only 17.8%

black in 1980, and 102 of Ritchie's black students to Tall Oaks Elementary School, 27.4% black in 1980. Defendants counter that Tall Oaks, which is in need of repair, is scheduled to be closed. (Tr. at 3329–30).

The same pattern is discernible with some majority white schools, which received blocks of white students from school closings. In 1979, Riverdale Elementary School decreased to 22.7% from 26.1% black upon receipt of 171 majority white students from the closing of another school. Rockledge Elementary, which as of September 1981 was below 10% black and in September 1982, barely over 10%, received 87 predominantly white students on the closing of Whitehall Elementary School in 1977 and 182 white students on the closing of Meadowbrook Elementary School in 1981. With Whitehall's closing, Meadowbrook received 158 predominantly white students and dipped from 13% black to 9.9%. Mr. Peterson commented that that choice was based on maximizing walkers in the area. (Tr. at 2682).

The majority of reassignments made in connection with school closings furthered integration, but there were certain notable exceptions which, while they do not indicate any purposeful discrimination by defendants, once again do reveal that defendants did less than could have been done to wipe out all of the pre-1973 segregation.

## XI. POST–1975 MISCELLANEOUS CHANGES

After 1973, the Board made a small number of boundary changes for a variety of reasons other than the major causes for boundary adjustments, *i.e.,* overcrowding, secondary reorganization and school openings and closings. Two of those changes are especially significant in this litigation because they were the fruit of a demographic study undertaken by the Board in 1976 to examine changing housing patterns in the county with a view possibly to eliminating the "off areas" ordered by this court's 1973 desegregation plan. Those changes took place with respect to Seabrook and Yorktown Elementary Schools,

and James McHenry and High Bridge Elementary Schools, effective September 1977. The James McHenry change, which was implemented because the area in question was within walking distance of High Bridge, apparently had a minimal effect on the racial balance at McHenry. (In 1977, McHenry also received a predominantly white group of students, 142 in number, from the closing of Glenn Dale and 53 predominantly black students from the closing of Lanham.) Pursuant to the demographic study, McHenry sent a predominantly white group of students, 105 in number, to High Bridge, causing the percentage of black students at High Bridge to decrease approximately seven percentage points from 29.9% to 22.9%.

The rationale for the Seabrook to Yorktown change was that the area had been assigned to Seabrook in 1973 with the implementation of the desegregation plan in order to make room at Yorktown for black students who were being transported to that school. With the decline in enrollment, both generally and specifically at Yorktown, the Board determined that it could return a group of 81 predominantly white students from Seabrook to Yorktown, the school closest to their residences. The return of those 81 students to Yorktown caused Seabrook to have a racial average of 45.6% black, 3% above the then countywide black student average of 42.6% in the elementary schools. Seabrook in 1981 was still less than 10% above the systemwide elementary school racial average.

Part of the attendance area of Andrews Air Force Base was reassigned to Thomas Claggett and Edgar Allen Poe Elementary Schools in 1975 with the opening of new housing on the base. A group of predominantly white students, 180 in number, from the area of that new housing were assigned to Claggett, causing Claggett's racial percentage to drop almost 5% and approach the systemwide average. Defendants point out that that change was significantly desegregative in that Claggett would have been 93.0% black instead of

73.3% black in 1981 without that action. Poe's black population increased in spite of receiving 200 predominantly white students from the new housing.

The only change made by the school authorities, since this court relinquished jurisdiction in 1975, intentionally and *solely* and apparently for no other reason except to further integration in the schools was an exchange of students in September 1975 which caused Montpelier Elementary's percentage of black students to rise above 10%. Montpelier received 47 majority black students from Samuel F.B. Morse Elementary and sent 132 predominantly white students to Deerfield Run Elementary, which opened in that year. That resulted in Montpelier going from 8.0% to 12.5% black. As part of the effort to improve the racial balance at Montpelier, part of James Harrison Elementary School's attendance area was assigned to Morse. Harrison's black racial percentage increased six points to 18.4%. Morse itself overshot the countywide elementary school racial average of 35.4% black for that year by approximately 9% as a result of those changes. Morse was closed in 1980 at 58.0% black.

The last group of post-1975 miscellaneous changes were made so as to align feeder patterns which channel students from the junior highs to senior high schools. A handful of students were changed so that they might be kept together with their group when moving to the senior high level. In September 1975, a group of eight predominantly black students were sent from Beltsville Junior High School to Martin Luther King Junior High. In September 1979, twelve black students were transferred from Central High School to Largo Senior High School, so that all students from Kettering Junior High might go to Largo.

In all, the post-1975 miscellaneous attendance changes affected only a few schools. In sum total, those miscellaneous changes did not significantly affect racial balance.

## XII. 1980 ELEMENTARY SCHOOL BUSING CHANGES

In November 1979, the Board formed a Citizens' Advisory Committee on Busing to study the elimination of what the Board stated was unnecessary busing. The official Board resolution which created the Advisory Committee set forth as its overall objective the need to reduce the amount of busing and the average distances pupils were transported. (Tr. at 2881; Plaintiffs' Exh. 185). The Committee was charged with examining noncontiguous areas to determine if some of them could be eliminated without "significantly" altering the racial makeup of individual schools. However, the word "significantly" was never defined. (Tr. at 2786–87). The Board's decision to create the Citizens' Committee originated from questions asked by parents as to why children were being transported from integrated neighborhoods to other neighborhoods with, in fact, little impact on the racial balance at the receiving schools. (Tr. at 2873–74). Black parents, as well as white, raised such concerns. The resolution called for each Board member to appoint three representatives to sit on the Committee. The only elected black Board member, Ms. Bonnie Johns, refused to do so for a number of reasons, one of which was the fact that she believed that the school staff was quite capable of establishing, on its own, plans to eliminate "nondesegregative busing." (Plaintiffs' Exh. 211, Attachment 1). The Committee was composed of 27 persons, 8 black and 19 white. The Committee held public meetings at which expert and lay witnesses testified. At one point, it requested the Board to provide staff assistance to help develop a revised busing plan to reduce busing while maintaining a 25–75% range of black student enrollment in each of the schools. (Plaintiffs' Exh. 109). That request was ignored by the Board. Subsequently, the Committee completed a report based largely on school staff input recommending numerous busing cancellations in the elementary schools.

The functioning of the Committee was described as follows by Mr. Jon Peterson:

[T]he Citizens' group that was appointed by the Board to look at the situation and to be given the information by the staff and their deliberations, they began—the Committee was appointed in October. They began their work in November and they worked very long and very hard. They made a report to the Board and the Board did not make any decision until May, so there was plenty of time for discussion, deliberation, understanding, input from staff, Board members, from all kinds of communities, from the parents involved. There was public hearing. This wasn't some clandestine meeting taking place two nights a week in somebody's back room somewhere. This was out in the open and before the public, and everybody understood what was going on. There was an attempt to communicate. It was an attempt to address the issue of the day, and simply it was are we taking black students to a black school in effect. Things had changed in Prince George's County. We all knew it. We all recognized it. It wasn't just me. It wasn't just the Board president. It was parents and students. Now, what happened with all of this, even though there are lots of groups, we are not talking about that many students that actually ended up being changed. I believe, and I would characterize the changes as being reasonable adjustments that were made in the attendance areas of the elementary schools. The committee felt that they could not go on and look at the secondary because there really wasn't enough time for them to look at it at that time, so it strictly dealt with the elementary school.

(Tr. at 2879–80).

Although the Committee studied every "off" or noncontiguous area in the county associated with the 1973 desegregation plan, in fact, only 73 elementary schools were affected by the 1980 busing changes. The Committee's charge, as testified to by Mr. Peterson, did not include the achievement of better racial balance within any of the schools in Prince George's County. (Tr. at 2822–23). The Committee's goal was, rather, to eliminate such busing as was no longer serving desegregation purposes. The dwindling number of students being bused and certain changes in the racial makeup of some sending or receiving schools were cited as the primary reasons for eliminating busing. Such unnecessary busing was characterized by the Committee as "nonsense" busing. (Tr. at 2874).

As certain neighborhoods in Prince George's County became more integrated, a particular school, which once was primarily of one race before the 1973 desegregation plan took effect, might have changed in 1980 to the point where busing students of the other race into that school could well have become senseless. Also, the composition of the group being bused might have changed so much that the busing had little impact, or even a negative impact, on the racial balance of the receiving school. The race of the children on the bus, being sent to a school with a high percentage of black students, in fact, had sometimes shifted from majority white to majority black. In effect, one concern of the Citizens' Advisory Committee was that black students were being bused to black schools. The school staff projected racial impact in each case, both on the sending and receiving schools, which would result if busing were cancelled, and changes were to be made only when staff judgment was that no significant racial impact would occur. As previously noted, the word "significant" was not defined. However, Mr. Peterson testified that any change over 5% probably would have been deemed significant. (Tr. at 3195). The worksheet of the Citizens' Advisory Committee illustrates each busing change made, the projected 1980 racial percentages and the actual 1980 enrollment figures at schools affected. (Defendants' Exh. 363, included as Appendix J hereto).

What the Board and the Committee considered "nonsense" busing was explained by Mr. Peterson during his trial testimony with regard to each case in which a busing reversal occurred. For example, the county in 1979 was busing a group of 67% black students living across the street from Bla-

densburg Elementary to Oakcrest Elementary. Oakcrest was then 68% black. In 1973, less than 10% of the students being bused to Oakcrest had been black. (Tr. at 2806–07).

In the case of Deerfield Run which was 17.2% black in September 1979, an original group of 45–50 majority black students had dwindled to ten students, six of whom were black. The reason for the diminution of the number of students on the bus was that a federal apartment development had encountered housing code violations and had been abandoned. (Tr. at 2833–34). Therefore, a pool of once-available students had largely dried up.

Only six black students were being bused five miles to Montpelier Elementary in Laurel. (Tr. at 2837–38). Plaintiffs argue that additional black children could have been added to the six black students being transported to Montpelier in order to have improved the racial average of that school which was only 12.9% black in September 1979. Defendants respond by stating that the school system was not looking to increase the busing of children. Furthermore, with the closing of Samuel F.B. Morse Elementary School in 1981, the Board succeeded in bringing the racial average at Montpelier up to 34.3% black. (Tr. at 2844–49).

In the 1973 desegregation plan, Beacon Heights Elementary had been given an "off area" which was predominantly black, since the school was at that time only 4% black. However, Beacon Heights had steadily climbed in black percentage and by the fall of 1979 was 62.5% black. Yet, 37 black students were then being bused to Beacon Heights, when they could have walked to Matthew Henson Elementary School, which was 63% black. (Tr. at 2991–92).[90]

Although the Advisory Committee's charge was to eliminate nondesegregative busing, the cancellation, in 1980, of the busing of a few students of one race or of a racially mixed group sometimes had foreseeable, sometimes unforeseeable, resegregative effects. By removing even a small number of the remaining white students from a racially disproportionate black school, that school was tipped even further toward becoming one race. Thus, the growing racial imbalance within the school system, which occurred between 1973 and 1981 almost entirely because of demographic changes, were aggravated by certain of the small percentage shifts in 1980. For example, when the busing between Oakcrest and Bladensburg Elementary Schools was cancelled, negative racial effects were observable. Oakcrest lost 130 black students to Bladensburg, but also lost 63 white students out of a total school population of 148 whites in 1979. Oakcrest tipped to 74.4% black. The School Board had projected that Oakcrest's black percentage would rise by only 1.4%, but it rose 6.1%. By September 1982, the black population of Oakcrest was 85.8% and Oakcrest was advancing toward becoming a one-race school.[91]

The busing changes at Kentland Elementary removed 26 white students out of a total school population of 70 whites in 1979, or over one-third, and also 55 black students. The changes were projected by the Board in 1980 to increase Kentland from 84.4% black to 88.3% black. Actually, Kentland changed to 90.6% black in 1980, and in 1982 was at 93.3%.

Another factor in the 1980 changes which precipitated tipping was the return of black students to predominantly black schools. When 89 black students were returned to Barnaby Manor Elementary School from Tayac Elementary School in

---

90. Plaintiffs complain that Matthew Henson, a historically black school, was "tipped" by the 1980 busing changes and was 25% above the countywide racial average in 1981. (Tr. at 2994).

91. Mr. Peterson testified that the Board did not split up residential areas and make assignments by individual racial identifications, as this would have echoed the era of segregation when one school bus came down the street to pick up the white students and another to pick up the black students. (Tr. at 2976–77).

September 1980, Barnaby Manor went from 79.1% black to 87.0% black. The Board had projected a 1% increase. If no changes had been made, the staff estimated that the black percentage at Barnaby Manor would have only increased to 84.3%. In September 1982, Barnaby Manor was 92.4% black. The rationale for the reassignment was that the black students had been shifted to Tayac in 1976 due to overcrowding at Barnaby Manor. In 1976, Tayac was only 33.7% black. With Tayac at 51.8% in September 1979 and Barnaby Manor no longer overcrowded, the Board believed it was reasonable to shift this block of students back again. Other predominantly black schools where significant numbers of black students were added by the 1980 changes are: 67 black students added to Hillcrest Heights, which tipped from 78.7% to 86.4%; 51 added to Bradbury Heights, which tipped from 78.5% to 83.2%; and 101 added to Capitol Heights, which tipped from 66.6% to 77.4%.

Some schools were made whiter by the 1980 busing cancellations. Pointer Ridge Elementary was a majority white school which was affected by a combination of changes, losing 12 blacks and gaining 172 whites with the 1980 busing shifts, and dropping in 1980 from 25.9% to 17.8% black. When 46 black students out of a total enrollment of 156 in September 1979 were removed from Francis T. Evans Elementary School, the school system predicted that Evans would drop from 30.8% to 26.2% black. Without any change, Evans was projected to have become 32.1% black. Evans actually dropped to 24.2% black in 1980.

Sometimes, a combination of busing changes, made in relation to one school, cumulatively had a racially negative impact. For example, John Bayne Elementary, a historically black school, had lost 206 majority white students in 1976 when they were transferred to Phyllis E. Williams Elementary School when the latter opened. In September 1980, four Citizens' Advisory changes occurred at John Bayne. The net effect was to transfer 36 blacks to other schools, along with 41 of Bayne's pool of 147 white students. The white population of Bayne was halved when school opened in September 1980. The rationale for those changes was that the white "off area" students at John Bayne had changed to majority black, with 61 black students and 41 white students. However, the return of the 41 white students to Woodmore Elementary School, dismantling part of the 1973 desegregation plan, helped to accelerate tipping at Bayne. Bayne rose from 70.9% black to 82.6% black in September 1980. In September 1982, it was a one-race school at 91.6% black, with only 32 white students remaining. If there had been no busing committee change in 1980, Bayne was then projected to become only 72.4% black.

On at least one occasion, the Committee's changes did not appreciably reduce busing time and yet sacrificed racial balance. From Phyllis E. Williams, which had opened in 1976 at 52.1% black, 63 black students and 63 white students were sent in 1980 to Kettering. As a result, those new Kettering students were bused one and one-half miles rather than four miles to Phyllis E. Williams. However, upon the removal of about one-third of the white enrollment from Williams, the school went up 5.5% to 74.8% black. School staff had estimated that Williams would go up six percentage points from what it would have been without any changes in 1980. Thus, the Board was willing to risk the tipping of that school which had opened outside of this Court's 1973 guidelines for the saving of two and one-half miles of busing. (Tr. at 3064–65). Another serious concern with the 1980 changes was that some schools, which the school staff predicted would actually become less segregated if left alone, were tipped. Thus, Flintstone Elementary was projected to decrease over two percentage points in 1980, if there had been no boundary changes. Yet, the Board made busing changes which were predicted to raise the black percentage at Flintstone from 69.9% to 75.7%, a rise of 6%. The actual increase in the black percentage was 7%. Hillcrest Heights Elementary School

was predicted to decline to 77.8% black from 78.7% if no busing changes were made, but, with the addition of 67 black students, it increased to 86.4% in September 1980. Forest Heights Elementary School, without the busing change, was projected to decrease to 69.9% from 71.4%. With the change, 20 white students were removed and 16 black students added, and in September 1982, the school was 85.2% black.

On the other hand, some busing cancellations involved schools which were racially balanced and remained so. Thus, when areas which had been exchanged between Arrowhead and Melwood Elementary Schools in 1973 were returned to their schools of origin in 1980, the racial percentages of those two schools remained well within plus or minus 20% guidelines. In 1979, Arrowhead was 42.7% black and Melwood, 38.8%. Black students were being bused in both directions over narrow, winding roads for 15–20 minute bus rides. (Tr. at 3109–10). With the 1980 changes, Arrowhead went to 50.5% black and Melwood dropped to 35.3% black, and unnecessary busing was eliminated.

■ Out of a total elementary school population of 58,684, only 3,629 students were affected by the 1980 changes. Of the 73 schools affected, 21 were already racially identifiable as black in relation to the plaintiffs' plus or minus 20% standard. Of those 21 schools, 16 increased their percentage of black students following the 1980 changes. Out of 5 schools which were racially identifiable as white by plaintiffs' standard, 3 decreased their black percentage at the time of the 1980 changes. In sum, most of the 1980 changes were predicted in advance to have, and did in fact produce, adverse effect upon racial balances within a significant number of elementary schools. The Board was willing to sacrifice some racial balance in order to achieve the elimination of some busing ordered by this court in 1973, busing which was originally, and remained in 1980, within the thirty-five minute transportation time limitation. Defendants contend that none of the adverse impacts on racial balance in 1980 was significant. This court disagrees. Those changes which were made in 1980 solely to eliminate busing existing within the transportation guideline, and which were predicted to bring about (and in fact did bring about) some adverse racial balance, should not, in contravention of this court's 1973 decree, have taken place with relation to any school which was already in 1980, or then becoming, heavily black or white. While it is probably true that some of those changes did not in fact cause more adverse racial effect than demographic factors were bringing about, others of those changes did bring about increased racial imbalance. No such type of deliberate resegregative change should have been made in the context of the racial makeup of Prince George's County and its school system in 1980, certainly not without an order of this court. Whether or not the 1980 changes, or any of the other acts discussed in prior parts of this opinion, constitute purposeful discrimination in violation of 42 U.S.C. § 1983, or a violation of the duties of defendants to eliminate all vestiges of the pre-1973 system, is discussed *infra* in Parts XIII and XV. But they did constitute changes in the busing provisions of the 1973 desegregation plan and thus changes in an order of this court outstanding in 1980 when those changes were made, without any prior approval of this court ever being sought by defendants.

## XIII. UNITARY SYSTEM

In *Columbus Board of Education v. Penick*, Justice White wrote:

*Where a racially discriminatory school system has been found to exist, Brown II imposes the duty on local school boards to "effectuate a transition to a racially nondiscriminatory school system," [Brown v. Board of Education ], 349 U.S. [294] at 301 [75 S.Ct. 753 at 756, 99 L.Ed. 1083]. "Brown II was a call for the dismantling of well-entrenched dual systems," and school boards operating such systems were*

"clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be *eliminated root and branch." Green v. County School Board,* 391 U.S. 430, 437–38 [88 S.Ct. 1689, 1694, 20 L.Ed.2d 716]. *Each instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment.*

443 U.S. 449, 458–459, 99 S.Ct. 2941, 2947, 61 L.Ed.2d 666 (1979) (emphasis added).

Plaintiffs contend that defendants have failed to dismantle the dual school system found to exist in 1972, have at no time brought about stable desegregation in the county's schools, and therefore have never achieved a unitary system. Arguing that the current racial disproportion in the schools is evidence of defendants' failure to meet constitutional standards, plaintiffs point to a pattern of actions and inactions on the part of the Prince George's County School Board with respect to student assignments since this court relinquished jurisdiction in March, 1975. Plaintiffs claim that that pattern has perpetuated and aggravated segregation and led to resegregation, that the school system is operating under an "unsatisfied duty to liquidate a dual system," *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) (*Dayton II*), and that this court accordingly has jurisdiction and should exercise it so as to grant supplemental relief in *Vaughns.*

Defendants, taking a position diametrically opposed to that of plaintiffs, rely upon the principles enunciated by the Supreme Court in *Swann* and in *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). In *Swann,* Chief Justice Burger wrote:

It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.

402 U.S. at 31–32, 91 S.Ct. at 1283–1284.

In *Pasadena,* the school board unsuccessfully sought to obtain relief in the district court from a four-year old desegregation order of that court which required that " 'there shall be no school in the District, elementary or junior high or senior high school, with a majority of any minority students.' " 427 U.S. at 428, 96 S.Ct. at 2701 (*quoting Spangler v. Pasadena City Board of Education,* 311 F.Supp. 501, 505 (C.D.Cal.1970)). Referring to the first two sentences of the language quoted *supra* in *Swann,* Justice Rehnquist wrote:

In this case the District Court approved a plan designed to obtain racial neutrality in the attendance of students at Pasadena's public schools. *No one disputes that the initial implementation of this plan accomplished that objective.* That being the case, the District Court was not entitled to require the PUSD [Pasadena Unified School District] to rearrange its attendance zones each year so as to ensure that the racial mix desired by the court was maintained in perpetuity. For having once implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violations on the part of the defendants, the District Court had fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns.

*Id.* at 436–37, 96 S.Ct. at 2705 (emphasis added).

Earlier in the opinion the Justice stated that the demographic changes which had caused some Pasadena schools to exceed the "no majority of any minority" rule were not in any sense "caused by segregative actions chargeable" to the Board. *Id.* at 435, 96 S.Ct. at 2704.

Whether the result in *Pasadena* is required in the within litigation depends upon whether this litigation "is in the pre-compliance rather than the post-compliance stage of *Pasadena.*" *Haycraft v. Board of Education of Jefferson County, Kentucky,* 560 F.2d 755, 756 (6th Cir.1977). In *Martin v. Charlotte-Mecklenburg Board of Education,* 475 F.Supp. 1318, 1340 (W.D.N.C. 1979), Judge McMillan wrote:

> The record ... wholly fails to support a finding ... on the first essential element of a claim under the *Pasadena* decision—prior, complete implementation of a judicial remedy relating to a separable component of school administration— here, pupil assignment. The facts are to the contrary. "Racially neutral attendance patterns" have never been achieved.

■ The record in this litigation requires the conclusion that a unitary system or a racially neutral student assignment pattern had not been firmly established when this court relinquished active jurisdiction in *Vaughns* in November 1974 and March 1975. Additionally, specific acts of defendants since 1975 have caused at least some resegregation in a number of instances, particularly in connection with the 1980 busing changes.

Defendants contend that this court made a finding that a unitary system had been achieved when, during a hearing on March 4, 1975, this court indicated that defendants' implementation of the 1973 desegregation plan was meeting constitutional standards. In that hearing this court stated:

> The time has to come when a Court relinquishes jurisdiction and should relinquish jurisdiction, and the time really for a Federal Court to relinquish jurisdiction is when the Federal Court comes to the conclusion that federal constitutional standards are being met.

> * * * * * *

> Mr. McPherson [attorney for Dresden Green community] has pointed out to this Court certain changes that have been made in plans in effect in other communities, including the changes Judge McMillan has made in the Charlotte plan in the Swann case.

> But that is a different situation because Judge McMillan, at least in his latest published pronouncements, has not ever said that the plan was meeting constitutional standards in terms of its day-by-day operation.

> In this case, the Court has said that the Prince George's County plan is meeting those constitutional obligations and standards.

(Tr. of 3/4/75 hearing at 68–69). These comments must be read in context. So read, they indicate only that defendants were in 1975 doing what they could at that time to try to meet "constitutional obligations and standards."

But even if this court had concluded in March 1975, after a full evidentiary hearing—which did not in fact take place—that a unitary system was then in place, that finding would not be binding upon this court if and when evidence was presented to it demonstrating that such prior finding was erroneous at the time at which it was made. In *Valley v. Rapides Parish School Board,* 646 F.2d 925, 937 (5th Cir.1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982), Judge Garza put it as follows:

> We conclude that the district court correctly applied the appropriate legal standards in finding further relief to be necessary. In its 1970 opinion, *Valley v. Rapides Parish School Board,* [434 F.2d 144 (5th Cir.1970)], this court made no express or implied finding that any portion of the system was unitary; it merely affirmed those portions of the plan appealed from insofar as they did not deal with pupil transfers in the Alexandria wards. *See* 434 F.2d at 144 and 145. If

the district court later held other areas of the parish unitary under a plan not appealed from, that finding binds neither this court nor the court below. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1 [91 S.Ct. 1267, 28 L.Ed.2d 554] (1971), firmly established that the duty to eliminate *all* vestiges of state imposed segregation is *continuing.* A plan which gives promise of establishing a unitary system cannot foreclose further relief if it does not in fact abolish the evidences of segregation. In any case, only time will tell.

(Emphasis in original).

Thus, even if this court had, on March 4, 1975, concluded that a unitary system had been achieved, this court presently, under the facts of this case, would be under a duty to reexamine any such 1975 determination. For reasons discussed in this opinion, such reexamination compels the conclusion that a unitary system does not exist today and has never existed at any time since January 1973.

Insofar as the March 4, 1975 hearing statements by this court are concerned, that hearing was in no sense a detailed factual inquiry into the status of desegregation in county schools. While plaintiffs' counsel were not in attendance, it is true that they were notified and asked whether they wanted to participate. (Tr. of 3/4/75 hearing at 60). The reason for holding the hearing concerned the objection of the residents of the Prince George's County community of Dresden Green to the school assignments mandated by the plan for the children of that community. At the March 1975 hearing, this court concluded that it was not at that time necessary for it to continue to act "as a super school board" (*id.* at 68) because the "federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs consistent with the Constitution." *Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977). The defendants had indicated, prior to March 1975, in four status reports submitted to this court

a firm willingness to continue to make modifications to the plan as individual schools slipped out of the racial guidelines established by the decree. It is true that this court did not explicitly impose, when this court relinquished active supervision over the Prince George's County school system in November 1974 and March 1975, any duty upon defendants to take steps to counter future tipping and/or resegregation or even any duty not to take steps to aggravate or increase tipping or resegregation. However, the tipping problem was apparent in March 1975 to all concerned. In the course of the March 3, 1975 hearing, this court and others stated:

> [THE COURT] The problem of tipping is known to all of us. Certain schools are dangerously and will continue dangerously near the tipping line. We tried to avoid that with as many schools as possible, but it just was not possible to send children to schools on a sensible basis, in terms of distance and time and other factors, and be able to avoid all the tipping problems.
>
> As a matter of fact, as I recall it, at one point when we tried to just concentrate on the tipping problem, if we had forgotten everything else, we could not have avoided the problem of tipping at a number of schools.
>
> Isn't that correct?
>
> MR. NUSSBAUM: Yes, Your Honor.
>
> MR. WENDORF: Yes, sir.

(Tr. of 3/4/75 hearing at 72–73). Thus, it was recognized in March 1975 that all tipping could not be avoided but that the utmost diligence on the part of defendants was needed in order to avoid engaging in acts which would increase tipping. In line with this court's stated concern about tipping, the parties were informed during that hearing that they could, at any time, ask this court to retake jurisdiction in this case if further developments disclosed that need, as "time goes on." *Id.* at 81.

In *Felder v. Harnett County Board of Education,* 409 F.2d 1070, 1075 (4th Cir. 1969), Judge Craven quoted the general proposition:

"[The] District Courts 'should retain jurisdiction in school segregation cases to insure (1) that a constitutionally acceptable plan is adopted, and (2) that it is operated in a constitutionally permissible fashion so that the goal of a desegregated, non-racially operated school system is rapidly and *finally achieved.*' *Kelley v. Altheimer* [8 Cir.1967] 378 F.2d 483, 489. *See also Kemp v. Beasley* [8 Cir.1968] 389 F.2d 178." *Raney v. Board of Education,* [391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968) ].

(Emphasis added). Apparently, only the Fifth Circuit has established a hard and fast rule as to how long a district court should exercise jurisdiction over the administration of a desegregation plan. The Fourth Circuit, in a decision rendered shortly after the Supreme Court's landmark *Swann* decision, considered the Richmond school system to be unitary after it had been operating for only a year under a revised court-approved desegregation plan. *Bradley v. School Board of the City of Richmond, Virginia,* 462 F.2d 1058, 1061, 1069–70 (4th Cir.1972), *aff'd per curiam, School Board of City of Richmond v. State Board of Education of the Commonwealth of Virginia,* 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973). *See also Chambers v. Iredell County Board of Education,* 423 F.2d 613, 615 (4th Cir.1970), in which the latest HEW-approved plan had been in force only approximately one year when Judge Craven held (at 618) that the "plan works sufficiently well *now* to deserve the label of a unitary system" (emphasis in original). The history of school desegregation litigation has repeatedly demonstrated that, although a plan might promise a racially balanced system, the *final* achievement of that goal might not be realized. Because of the dangers of non-fulfillment of the goal of effective desegregation, the Fifth Circuit has directed that the district courts in that circuit retain jurisdiction in school desegregation cases for a minimum period of three school years to assure transition to unitary systems; require semi-annual reports during that period; and before closing such cases, notify plaintiffs and hold "a hearing providing plaintiffs an opportunity to show cause why dismissal should be further delayed." *United States v. Texas Education Agency,* 647 F.2d 504, 508–09 (5th Cir.1981). *See United States v. State of Texas,* 509 F.2d 192, 194 (5th Cir.1975); *Youngblood v. Board of Public Instruction of Bay County,* 448 F.2d 770, 771 (5th Cir.1971) (per curiam). *Vaughns* was, therefore, under Fifth Circuit standards, dismissed prematurely if this court's November 1974 and March 1975 orders are viewed as final relinquishment of jurisdiction. However, those orders do not in this court's opinion add up to such final relinquishment but only to cessation of active supervision, subject to resumption of jurisdiction as and when requested by plaintiffs or defendants or as and when deemed appropriate by this court.

In November 1974 and March 1975 this court desired to do everything possible to encourage those charged with the operation of the Prince George's County school system to continue to assume in good faith and diligence—as they had since January 1973—full responsibility for constitutional operation of that county's schools. But there was no intimation by this court in November 1974 or March 1975, or at any other time, that the job of removing all traces of pre-1973 discrimination had been completed. Unfortunately, this court did not either state that such vestiges remained or explicitly establish guidelines for defendants to follow in November 1974 or in March 1975. From the point of view of hindsight, it would have been far better for this court so to have done and to have spelled out what this court believes in any event the record herein establishes, namely, that all this court was doing in November 1974 and March 1975 was to relieve defendants of the need to submit periodic compliance reports, and to permit defendants to continue affirmatively to move toward total elimination of pre-1973 vestiges of segregation. That lack of direction by this court may, at least to some extent, be justifiably seized upon by defendants to

explain some of their actions and non-actions since March 1975 (although it is to be noted that defendants herein could have returned to this court at any time after March 1975 to seek clarification). That lack of direction may also support defendants' position and this court's holdings in Part XV, *infra*, with regard to lack of intentional wrongdoing by defendants. But that lack of direction by this court does not answer the question of whether all vestiges of pre-1973 segregation have at this date been wiped out. Thus, there is need to analyze whether all such vestiges have disappeared, or whether they remain.

In its first opinion in *Vaughns* in 1972, this court noted that black migration from Washington, D.C. was then a recognized trend:

> At the same time, this Court recognizes that the increased and continuing movement of blacks in recent years from the District of Columbia into Prince George's County has produced a growing and changing societal pattern in the latter jurisdiction.

355 F.Supp. 1034, 1037 (D.Md.1972). The black influx into the county, dubbed "black flight" by a T.V. documentary (Tr. at 1654), was seemingly accelerated by the December 1972 decree itself, and combined with white flight following the implementation of the plan, created a highly unstable demographic situation. The letters submitted to this court by plaintiffs in response to defendants' four status reports reveal that plaintiffs understood that defendants had a "legal obligation to maintain stability in their plan." (Plaintiffs' Exh. 159, Letter from Plaintiffs' Counsel of June 20, 1974). Plaintiffs expressed concern about the tipping of a number of schools at the extremes of the 10–50% guidelines as early as June 1973:

> [A] prime requisite of any desegregation plan is stability. A plan which bears within it the seed of resegregation is not an acceptable plan and should be modified so as to preclude the possibility of resegregation for an indefinite period, else desegregation would amount to little

more than a futile exercise in statistics and map making.

> It is with this perspective that our comments on the following schools is made. That is, our concern with most of the schools about which we express concern is not so much a matter of present unacceptability as a matter of concern over potential resegregation exhibited by these schools.
>
> . . . .
>
> Expectably, most of our concern over potential resegregation exists at the elementary school level. Here there are quite a number of schools which are experiencing, even in the short time since January, such an upward increase in black concentration that we have serious reservations about the effectiveness of the desegregation plan in achieving actual desegregation. More specifically, it may be that the use of sectors leaves so [m]any areas racially disproportionate that the plan, in operation, will prove to be inherently unstable and therefore ineffective. Time, obviously, will be necessary to evaluate the plan's effectiveness in practice.
>
> . . . .
>
> From the foregoing, it should be obvious that plaintiffs place a great deal of faith in the staff's representations and, based thereon, concur in their recommendations. However, we must emphasize that our concern is that the plan be proven to be so designed as to achieve effective, i.e., stable desegregation. Obviously, only time will enable us to determine if the plan was, in fact and in operation, an effective one. It is our position, as it has been throughout, that no particular percentage figure or ratio is necessary or desirable so long as the overall plan is so designed, and is to be modified from time to time, as to assure meaningful desegregation for an indefinite period of time.

(Plaintiffs' Exh. 154, Plaintiffs' Letter of June 15, 1973 in Response to the Second Report to the Court). It is well, in this context, to bear in mind that the 1973 desegregation plan utilized a geographic sec-

tor system rather than cross-district busing for the elementary schools. Eleven sectors were carved out in order not to transport any student more than thirty-five minutes one way. Thus, no student within a sector was to attend a school outside that sector. Sectors, however, were allowed to vary in their overall racial percentages from a low of 11.3% black in Sector A to a high of 35.8% black in Sector G. No school, elementary or other, was to vary from a low of 10% black to a high of 50% black except for a very few schools which generally were located in the extreme north and the extreme south of the county, and to which few black students were able to travel within the thirty-five minute one-way transportation guideline.

By January 1974, the parties were in disagreement as to defendants' legal obligation to make adjustments to guard against resegregation:

> [T]here is a substantial disagreement among the parties as to the extent to which the defendants are required to make adjustments to correct their resegregation, even though, in our opinion, many of these problems were caused by inaccuracies in the defendant's future population projections upon which the original plan was based. Despite that disagreement, the parties do agree that before any motions for further relief or similar motions are filed in this case, the parties will attempt to reach agreement on specific problem areas.
>
> . . . .
>
> In summary, plaintiffs' response to the third report is that it does contain evidence of serious resegregation in at least some of the schools of the county school system, that much of this resegregation appears to be due to errors in design of the original plan, and that future modifications will be, and are legally necessary if that plan is to amount to more than a futile exercise in map making and statistics.

(Plaintiffs' Exh. 157, Plaintiffs' Letter of January 25, 1974 in Response to the Third Report to the Court).

Thus, unlike *Pasadena,* this is not a situation in which "[n]o one disputes that the initial implementation" of the plan achieved racial neutrality in student attendance. 427 U.S. at 436, 96 S.Ct. at 2705. Further, the events (a) surrounding the formulation of the December 1972 *Vaughns* decree, (b) occurring in 1973 and up to November 1974 and (c) surrounding the November 1974 and March 1975 relinquishment of jurisdiction reveal that, unlike the situation in *Pasadena,* "specific revisions of the attendance zones for particular schools [were contemplated as late as March 1975 along with] later appraisal of whether such discrete individual modifications had achieved the 'unitary system.'" *Id.* at 435, 96 S.Ct. at 2704. Mr. Charles Wendorf testified that in 1972–73:

> THE WITNESS: . . . . We analyzed all choices of reassignment for the students, keeping in mind trying to get children to schools that were in close proximity to their home, we looked at the actual racial composition of each of the areas and communities and what we knew of the trends that were in the area. As we deliberated, we looked at what could occur in the following years and as it was indicated in our plea to the court at that time, that we would like to make modifications as we went along in case something didn't work as we had originally planned or there were some changes that took place.
>
> THE COURT: That was the plea made to the court?
>
> THE WITNESS: Yes.
>
> THE COURT: What was the response?
>
> THE WITNESS: The understanding was—by plaintiffs' counsel and Your Honor—was that we could submit modifications to the plan as needed and were expected to make modifications.
>
> THE COURT: Was there or was there not also an ongoing obligation to make what modifications were needed in order to stay within the framework?

**1344**

THE WITNESS: Yes, sir, at that time. (Tr. at 1446–47).

This court, as stated *supra*, did not provide defendants with "remedial criteria of sufficient specificity" when in 1975 it relinquished active jurisdiction. *Swann*, 402 U.S. at 26, 91 S.Ct. at 1281. Defendants state that they never understood that after March 1975 they had any continuing duty to adjust the guidelines under the decree in a flexible manner so as to maintain a reasonable racial balance in the schools. Defendants so state despite their recognition of the changing racial composition of many parts of the county and despite the stress upon those developments by defendants in their own 1973–74 reports to this court and by plaintiffs' in their comments with regard thereto. This court accepts the fact that defendants make such statements, concerning such lack of understanding, in good faith. However, this court never intended the 10–50% guidelines in the decree to establish any inflexible racial quota, as plaintiffs' comments and this court's lack of action between January 1973 and March 1975 when a number of schools went outside the 50% guideline demonstrate. Thus, there never was a rigid requirement imposed by this court in *Vaughns* like the "no majority of any minority" rule disapproved in *Pasadena*. This court at no time deviated from the approach set forth by it on December 13, 1972 in *Vaughns*.

But this Court has repeatedly sought a flexible approach, not keyed to or restricted by any foreordained mathematical formula, and has called attention to Mr. Chief Justice Burger's words in *Swann* (at 24 of 402 U.S., at 1280 of 91 S.Ct.):

If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.

355 F.Supp. at 1049. The 10–50% guidelines in the December 1972 *Vaughns* decree were approximations, starting points in the process of shaping a remedy and establishing guideposts for measuring the effectiveness of that remedy. They were never meant to be maintained in perpetuity. "The racial ingredients of schools cannot be prescribed with such certainty of a correct optimum result as might be found in a gourmet cook book specifying the proper portions for a de luxe casserole." *Brewer v. School Board of City of Norfolk, Virginia*, 456 F.2d 943, 945 (4th Cir.1972), *cert. denied*, 406 U.S. 933, 92 S.Ct. 1778, 32 L.Ed.2d 136 (*quoting Norwalk Core v. Norwalk Board of Education*, 423 F.2d 121, 122 (2d Cir.1970)).

But, on the other hand, that approach in no way meant that the guidelines incorporated in this court's pre-1975 orders in *Vaughns* were to be ignored or to disappear once this court ceased active supervision. That much was understood, at least to some extent, by plaintiffs and also by defendants. Thus, for example, the February 20, 1974 consent order dealing with personnel hiring, promotional practices and school construction contains the specific command to maintain "all schools … on a desegregated basis" with "respect to policies relating to the construction of public schools." *See* Appendix A. That comports with the approach underlying Judge McMillan's order with reference to the Charlotte-Mecklenburg public schools:

"That the defendants maintain a continuing control over the race of children in each school, just as was done for many decades before *Brown v. Board of Education*, and maintain the racial make-up of each school (including any new and any re-opened schools) to prevent any school from becoming racially identifiable."

*Martin v. Charlotte-Mecklenburg Board of Education, supra*, 475 F.Supp. at 1326. At no time after March 1975, or before, have defendants asked this court to relieve them of *any* of their obligations under the

1973 decree, or any order in *Vaughns,* as did the school board in *Pasadena.* If defendants had so done, plaintiffs would have had the opportunity to ask this court to consider, and this court in any event could have considered *sua sponte,* the fact that a number of schools identified by plaintiffs in 1973 as tipping problems (*see* Plaintiffs' Exh. 154, June 15, 1973 Letter in Response to the Second Report to the Court, at 3–4) later became predominantly one-race schools. Prior to November 1974 and March 1975, defendants themselves recognized those problems and undertook to attempt to cope with them. Those continuing obligations were not wiped out by this court's March 1975 relinquishment of active supervision. In any event, if defendants had any question as to the extent of their continuing obligations, they could have availed themselves of the opportunity, specifically afforded to them in the March 1975 order, to seek clarification from this court.

Examples of schools identified before March 1975 as in danger of tipping are John Carroll, Kentland, Kenmoor, Capitol Heights, Concord, Bradbury Heights, Glassmanor and Green Valley, all historically black elementary schools. The record discloses no stabilizing changes taken by defendants after 1975 designed to cope with their respective tipping problems. Additionally, as to six of those eight schools, their problems were enhanced by 1980 busing reversals which increased their black percentages. Those schools are all over 80% black today. · As for the predominantly white schools in the system, this court wrote at the time the January 1973 plan was promulgated that schools remaining more than 90% white were "expected to become a lesser percentage white as new school construction and expected demographic changes occur." *Vaughns,* 355 F.Supp. at 1054. Between 1973 and 1975, several predictions were made by the Board with reference to some of those predominantly white schools, namely, Laurel, Bond Mill, Margaret Edmonston and Chapel Forge. (Plaintiffs' Exh. 158, Fourth Report to the Court, Exh. B at 4). Contrary to those expectations, after new school construction, the number of black students at Margaret Edmonston actually decreased to 5.9% in September 1974 and Bond Mill remained below 10% black in that year. All of those schools are barely over 10% black today.

Shortly after this court relinquished jurisdiction, Dr. Hassel, the Superintendent of Schools, requested the Board to advise him and his staff as to what action should be taken concerning schools not within the court's guidelines. (Plaintiffs' Exh. 192, Item for Board Meeting Agenda Submitted for Meeting of April 28, 1975, at 1). The Board refused to act in response to that request, despite the fact that Dr. Hassell pointed out to the Board that there was no Board direction as to how to deal with the guidelines in the court order. (Plaintiffs' Exh. 146D, Transcript of April 28, 1975 Board Meeting, at 4):

DR. HASSEL: The guidelines that were presented to the staff were presented by Judge Kaufmann [sic] in a court order. You are not now under a court order. We have no direction from the Board of Education, so with due respect I must take—.

MR. CHAIRMAN: That is entirely true, Dr. Hassel. You have no direction—

MRS. MILLS: Now, wait a minute. We are still assigning children under that court order.

MR. CHAIRMAN: There is no direction. The Board has taken no action. It stops right there.

MRS. MILLS: That wasn't your answer to me, Mr. Chairman. We are still assigning children to schools because of the court order. If the court order no longer stands, then I'd send all the kids back to school. Does it stand or does it not stand? Do we operate under the court order or do we not? Since we chose not to change the way we were operating, we're going to continue to operate under the court order. That's my understanding.

MR. CHAIRMAN: It can't be different, Mrs. Mills. I've explained that before. There has been no action by this Board. Nothing has happened. The status quo has not changed.

MRS. MILLS: Or the methods of operation are not changed.

MR. CHAIRMAN: Neither one is changed.

DR. HASSEL: Sir, I hate to bother you, but I don't want to be left with a misunderstanding that we are expected—

MR. CHAIRMAN: Your understanding, Dr. Hassel, and I'm going to shut you off right now, your understanding is this Board has taken no action today. It obviously is not going to take an action. Do what you want with it. We're doing nothing about it. The next order of business.

At the following Board meeting, the Board adopted the Warr-Steinecke resolution which dealt exclusively with the issue of school openings, of which there have been only five since 1975:

WHEREAS, in an order dated March 13, 1975, the United States District Court relinquished jurisdiction over the Prince George's County public schools, and

WHEREAS, it is in the best interests of the people of Prince George's County that local control thus returned be maintained and exercised, and

WHEREAS, the major concern of the Board of Education is providing quality education, equality of opportunity and stability of school assignment for all the children of our county, and

WHEREAS, the latest Coleman report points out the racially isolating consequences of white flight, a condition which may exist in our county, together with such other factors that result in an apparent continuing increase in black pupil population, and

WHEREAS, the Board sees no advantages per se in rigid percentages of blacks and whites in each school; therefore,

BE IT RESOLVED, that

. . . .

3. The Board directs that no new school will open below 10% or above 50% black *or be permitted to go outside these guidelines* during the first full year of its operation, nor will the opening of any new school be permitted to tip other schools beyond those percentages.

(Plaintiffs' Exh. 87, Minutes of May 26, 1975 Bd. Mtg., at 6 (emphasis added)). Thus, at least during the first year of the operation of a newly opened school, the Board itself, after March 4, 1975, undertook the affirmative obligation to do what it could do, in the face of whatever occurred, whether by demographic change or otherwise, to prevent tipping outside of the 10–50% guidelines.

The attitude of at least one board member with regard to the Board's duty to maintain racial balance in county schools under the December 1972 decree is expressed in the following statement during the May 26, 1975 Board meeting:

In other words, the governmentally and judicially imposed racial integration of our schools, the attempt to distroy [sic] our neighborhood school concept, and the mechanistic reliance on statistical racial quotas in Prince George's County, has been a dismal failure rather than the touted success alleged by some.

And it wasn't necessary to wait for Professor Coleman to belatedly point out to us that white flight are the consequences of forced integration, and that racial isolation and neighborhood instability are the consequences of white flight.

. . . .

Although the Federal court's bussing order of 1973 has caused me to lose some faith in our judicial system, I can't imagine any Federal judge today forcing us to again redistrict our neighborhoods and increase our busing in order to keep pace with voluntary population shifts.

(Plaintiffs' Exh. 87, Statement of Mr. A. James Golato).

Former Director of Pupil Accounting and School Boundaries, Mr. Charles Wendorf,

one of the key architects of the January 1973 plan and a man who has at all times affirmatively attempted to aid and direct the school system in the efficient and fair discharge of its responsibilities under law, testified during the trial in 1982 that as the Board failed to authorize any action regarding schools outside the guidelines, other than the Warr-Steinecke resolution, the staff did not formulate and follow any procedure to flag schools outside the guidelines or to try to correct them as time went on. (Tr. at 1730–31). Thus, because requisite attention was not paid to stability and modifications in the plan at an early enough point, no attempt was made to stabilize the school system on a plateau of constitutional compliance. The position most often taken by the Board after 1975 was that expressed by the Board's attorney:

> [I]t is my opinion that pending any further decision from the United States District Court that this Board of Education is under no legal duty per se to do anything toward changing racial balances in its public schools where the imbalance presently existing is not the result of Board or other governmental type of action.

(Plaintiffs' Exh. 146G, Transcript of Board Meeting of April 7, 1976, at 26). However, the Board attorney did add a caveat:

> At the same time I have to be perfectly candid with you and all the members of the Board and say to you that this question of did you or did you not at one time before really successfully and affirmatively desegregate is a decision that is pretty much left to the discretion of each and every district court judge and each and every situation where it is presented.

*Id.* at 26–27.

It is true that plaintiffs have not, other than in connection with the 1980 busing changes, and in a relatively few other instances discussed elsewhere in this opinion, brought to this court's attention any actions which defendants, since March 1975, could have taken, or could have refrained from taking, in order to have moved toward improved racial balances. Perhaps there was not a great deal more that defendants could have done in the years following 1975 than they did, other than to have refrained from their 1980 actions. But if defendants had kept up front at all times the factor of racial balance in the schools as *one* of the factors to be considered by them with regard to *all* developments, then *perhaps* some significant reductions in the growing pattern of racial imbalances could have been achieved, despite the extreme demographic changes and pressures. Unfortunately, none of us will ever know whether any such accomplishments could have been obtained. But what is clear is that between January 1973 and March 1975 and thereafter up to the present time there has been no achievement of stability of racial balance within the student population of the Prince George's County school system.

Since 1975, a group of schools have tipped to the point where they are virtually one race today. Defendants point to demographic changes in the residential population of the county, which leapt from 13.9% black in 1970 to 37.3% black in 1981, and in the school population, which leapt from 28.5% black in September 1973 to 53.9% black in September 1982, as the causes of all of the current racial imbalances in those schools. Those demographic changes may well account for most of those leaps. But in the face of such lack of stability, "[n]ot until all vestiges of the dual system are eradicated can demographic changes constitute legal cause for racial imbalance in the schools." *Lee v. Macon County Board of Education,* 616 F.2d 805, 810 (5th Cir. 1980); *see Valley v. Rapides Parish School Board,* 646 F.2d 925, 939 (5th Cir. 1981).

In *Keyes v. School District No. 1,* 413 U.S. 189, 211, 93 S.Ct. 2686, 2698, 37 L.Ed.2d 548 (1973), Justice Brennan wrote:

> In *Swann,* we suggested that at some point in time the relationship between past segregative acts and present segregation may become so attenuated as to be incapable of supporting a finding of

de jure segregation warranting judicial intervention. 402 U.S., at 31–32 [91 S.Ct., at 1283–84].... We made it clear, however, that a connection between past segregative acts and present segregation may be present even when not apparent and that close examination is required before concluding that the connection does not exist. Intentional school segregation in the past may have been a factor in creating a natural environment for the growth of further segregation.

Justice Brennan also wrote in *Keyes:*

[P]laintiffs in a school desegregation case are not required to prove "cause" in the sense of "non-attenuation." That is a factor which becomes relevant only after past intentional actions resulting in segregation have been established. At that stage, the burden becomes the school authorities' to show that the current segregation is *in no way* the result of those past segregative actions.

*Id.* at 211 n. 17, 93 S.Ct. at 2699 n. 17 (emphasis added). *See Tasby v. Wright,* 520 F.Supp. 683, 704 (N.D.Tex.1981) (Sanders, J.).

In *Pasadena,* Justice Rehnquist wrote:

There was also no showing in this case that those post-1971 changes in the racial mix of some Pasadena schools which were focused upon by the lower courts were in any manner caused by segregative actions chargeable to the defendants. The District Court rejected petitioners' assertion that the movement was caused by so-called "white flight" traceable to the decree itself. It stated that the "trends evidenced in Pasadena closely approximate the state-wide trends in California schools, both segregated and desegregated." 375 F.Supp., at 1306. The fact that black student enrollment at five out of 32 of the regular Pasadena schools came to exceed 50% during the 4-year period from 1970 to 1974 apparently resulted from people randomly moving into, out of, and around the PUSD area. This quite normal pattern of human migration resulted in some changes in the demographics of Pasade-

na's residential patterns, with resultant shifts in the racial makeup of some of the schools. But as these shifts were not attributed to any segregative actions on the part of the petitioners, we think this case comes squarely within the sort of situation foreseen in Swann ....

427 U.S. at 435–36, 96 S.Ct. at 2704.

The record in this litigation reveals that there has been more than insubstantial withdrawal of white students from the Prince George's County schools because of this Court's January 1973 decree. That decree was made necessary by pre-1973 segregative actions of the Board. At least in significant part, such withdrawal is attributable to pre-1973 racial discriminatory practices followed by defendants.

Defendants' demographics expert, Mr. George Grier, testified as follows:

Q. Do you know why the white population declined during this period?
. . . .

THE WITNESS: I do have an opinion. I can qualify it as such. Yes. The white population decline in the county was probably due to a number of things....

. . . .

I think it is that there is some evidence that during the early part of the 1970's there was a precipitous loss of whites from the schools, and just for a couple of years in there, a year or so, you can see it in the chart—let me see where that is. That is on chart—Exhibit 371. If you will notice around about '72 to '73 a very sharp drop and it levels off again. It doesn't get level by any means, but right in that period, and I think that probably had to do with publicity surrounding the desegregation plan and some whites who did not want their children to be in desegregated situations, and getting out of the county. It did recover somewhat, but it did happen in that period. I think that has been characterized as white flight....

THE COURT: Have you been able to correlate at all any of the so-called white flight with the implementation of the desegregation plan in September of '73?

THE WITNESS: Your Honor, there is a coincidence in time that suggests it, but I would not necessarily relate it to the implementation of the plan or in fact to the plan itself. There was a lot of publicity that Prince George's County schools were being desegregated, and that publicity started earlier and then the plan was announced. Realistically if you have a certain population among the whites who are anti-desegregation who are bigot and who are afraid of having the kids attend a desegregated school, this is when I would expect them to leave, and the line does suggest that....

Q. In the same time period when the white population was declining, there were areas in the county where the number of whites, in fact, increased?

A. You mean—what period is this?

Q. During 1970 and 80 when the county was losing white population, there was in fact areas of the county where the white population increased; isn't that right?

A. I think there were. Let me see what the CCA figures show. I have got to find it. Yes, I think there were a few of those outlying CCA, census comparable areas, I am sorry, in which there was some white population increase....

....

Q. ... Bowie is in fact one of the areas where the number of whites increased?

A. Yes, it sure looks like that, up in the Laurel area and down in some of the other parts of the county.

Q. You just testified that Laurel was another one of the areas?

A. Yes, way up on the three CCA's up there surrounding Laurel.

....

Q. Mr. Grier, did you study where the areas of white growth surrounded schools which were ten percent or less black as of January 29, 1973?

A. I didn't look specifically at the question where the areas of white growth surrounded schools that were of that racial percentage as of January 29, 1973, no, sir. If you told me they were in fact related, it wouldn't surprise me.

Tr. at 3623–29.

Two of the areas in which schools have been opened in Prince George's county since 1973 have been areas of white growth. It thus appears that, in addition to the fact that significant numbers of whites may, after 1973, have left the county, a significant number of whites moved to outlying white areas such as Laurel or Bowie from areas adjacent to historically black schools in order, partially at least, to avoid having their children attend those schools.[92] The establishment of private religious schools in the wake of the plan is also identified in the status reports filed with this Court in 1973 and 1974 as a cause of the tipping of several schools. *See* Plaintiff's Exh. 156, Third Report to the Court, at 6, 7. "White flight," resulting from a court decree issued to eliminate segregative practices, can often be related, rather than unrelated, to past discrimination and is a vestige of the same. In *Kelley v. Metropolitan County Board of Education,* 479 F.Supp. 120, 122 (M.D. Tenn.1979), *aff'd in part, rev'd in part,* 687 F.2d 814 (6th Cir.1982), the court found that substantial white flight under the 1971 busing remedy had occurred and that as a result of "the combined effect of the order and the flight therefrom, either to suburban public schools or to private schools," inner city schools had "become progressively resegregated.... The resegregation, resulting at least in part, from the nonetheless good faith efforts of the School Board in implementation of the Court's order,

---

**92.** As all of the historically black elementary schools are located inside the Beltway near the District of Columbia line, it is noteworthy that the area of Prince George's County inside the Beltway lost nearly one half of its white population in the decade of the 1970's. (Plaintiffs'

Exh. 236, 1980 Census Information Bulletin # 2, Maryland National Capital Park and Planning Commission, Prince George's County Planning Department, Racial Composition of the Population of Prince George's County, 1970 to 1980, July 1981, at 3).

amounts to a *de jure* segregation." *Id.* at 122–23.

In *Valley v. Rapides Parish School Board,* Judge Garza stated:

We must also reject the school board argument that the existence of these schools is justified by demographic facts .... Only last year, in *Lee v. Macon County Board of Education,* 616 F.2d 805 (5 Cir.1980), we held that "[N]ot until all vestiges of the dual system are eradicated can demographic changes constitute legal cause for racial imbalance in the schools." [Citations omitted.] As the figures ... reveal, these schools have never been desegregated. In the same sense, their composition may not be justified by pointing to "white flight" as a permissible causative to continued imbalance. If such a factor renders a plan unworkable, the district court may attempt another solution, but we will not allow desegregation to be thwarted by extra-legal action.

646 F.2d at 937. " 'White flight' is one expression of resistance to integration, but the Supreme Court has held over and over that courts must not permit community hostility to intrude on the application of constitutional principles." *Brunson v. Board of Trustees of School District No. 1 of Clarendon County, S.C.,* 429 F.2d 820, 827 (4th Cir.1970) (Sobeloff, J., concurring).

In this court's view, the exodus of whites from certain areas within Prince George's County is traceable, at least in part, to the 1972 decree. But white flight was not the only demographic change traceable to that decree. As defendants' demographics expert explained upon questioning by counsel for plaintiffs:

Q. On Friday you testified there were two reasons for black movement into Prince George's County, and those two reasons were houses and schools; is that correct?

A. That is the best evidence. That is, again, whatever we can deduce from the data we have. It is scattered and fragmentary, but it supports that.

. . . .

Q. Of the two factors you isolated, houses and schools, which factor was more important in your view?

A. Oh, boy. I don't know, I don't know. Both of them in many cases—you had a $6,000 differential, Prince George's being $6,000 cheaper than the District, and as I have testified, this is based upon observation which anybody who wants to go out there can confirm that you have excellent housing out there. You have the same people who have one kid looking for the cheaper housing, good housing than cheap housing. I don't know which is more important, but I would say both in combination they would be very powerful.

Q. Do you recall testifying on Friday that desegregated schools were a major reason for black movement into the county?

. . . .

A. That is just what I just said, Sir, that for blacks wanting to make sure that the kids would indeed be treated decently I would think that would be an important factor.

Tr. at 3633–37. But such black movement into Prince George's County, while dramatic, seemingly occurred in concurrence with white flight. Indeed, it is apparently impossible to determine with any certainty whether, and the extent to which, either caused the other.[93] In any event, both occurred in the wake of the 1973 desegregation plan which was necessitated by then existing segregative practices on the part of the Board.

Independent of "white flight," other vestiges of the pre-1973 segregative condition of the Prince George's County schools may

---

**93.** The Prince George's County school system experienced a loss of approximately 66,000 white students from 1970 to 1980 while the number of black students who entered the Prince George's County system after previously attending school in the District of Columbia totalled 28,000 between 1974 and 1982. (Defendants' Exh. 194, Entries from District of Columbia).

well remain. Past acts of *de jure* segregation, such as existed in the Prince George's County system prior to 1973, " 'may have a profound reciprocal effect on the racial composition of residential neighborhoods within a metropolitan area, thereby causing further racial concentration within the schools.' " *Keyes v. School District No. 1*, 413 U.S. at 202, 93 S.Ct. at 2694 (*citing and quoting* from *Swann*, 402 U.S. at 20–21, 91 S.Ct. at 1278). *See also* the trial testimony of plaintiffs' demographics expert, Dr. Taeuber:

Q. Turning to another area, in your writings, have you analyzed the issue of the interrelationship, if any, between a school board's actions or failures to act and housing segregation?

A. Yes.

Q. And what have you found in general concerning the relationship between school board actions or school board failures to act and housing segregation?

A. School administrative actions have an influence on residential segregation largely because school neighborhoods are linked and help identify each other. The school that serves a neighborhood is a major feature of the neighborhood for people who live there and for people who are thinking about living there. Knowledge that the school has an identifiable racial composition, either black or white, is a factor considered by many people in the housing market as they decide whether to remain in a neighborhood or to seek out a particular neighborhood or to avoid a particular neighborhood. New developers are aware of this in changing neighborhoods, the school changing racial composition often leads to changing residential composition. The perceived likelihood of stability in school assignments or in the racial composition of a neighborhood affects where people move and where they send their children to school. The closing of an integrated school may affect the behavior of the real estate market in that neighborhood.

. . . .

Q. You just testified concerning school board actions and their effect on housing segregation. My question to you is: Can school board inactions also contribute to housing decisions?

A. Yes, one of the problems in the area undergoing school desegregation is the need to combat reestablishment of racial identifiability of schools, that there is a tendency for the historical identification of a school to persist in the public mind and to influence the real estate market even after the desegregation plan and it is necessary to overcome this vicious circle from the past in order to try and combat continuing renewed racial turnover which would then tend to undo the school desegregation.

(Tr. at 4553–55).

The Prince George's County schools which are currently 80% or more black are generally inside the Beltway and are still in or adjacent to the predominantly black residential area which was in existence in 1973 and before 1973. Schools which are currently more than 80% white are generally found in outlying areas of the county which historically have been white and remain white. The data shows that the inner Beltway area received nearly three quarters of the total black population increase from 1970 to 1980. In 1970, 76% of the total black county population resided inside the Beltway, while in 1980, 74% of the total black population was still inside the Beltway. (Plaintiffs' Exh. 236, Racial Composition of the Population of Prince George's County 1970–1980, at 8). On the other hand, whites comprised 75% of the population outside the Beltway in 1980. *Id.* at 3.

Plaintiffs' standard for determining the racial identifiability of schools is a plus or minus 20% test, meaning that any school with a percentage of black students within twenty percentage points above or below the countywide school average of black pupils in a given year is racially balanced; any school which has a black population in excess of that range is racially identifiable as black; and any school with a black population less than that range is racially identifiable as white. By plaintiffs' standard,

the percentage of racially identifiable schools in Prince George's County, adjusted for changes in the county school population, increased as follows:

| Date | % of Black Students in System | Number of Racially Identifiable Schools | Percentage of Racially Identifiable Schools |
|---|---|---|---|
| Sept. 1974 | 30.8 | 43 | 18.5 |
| Sept. 1975 | 33.7 | 51 | 21.9 |
| Sept. 1976 | 37.1 | 63 | 26.9 |
| Sept. 1977 | 40.7 | 68 | 30.1 |
| Sept. 1978 | 44.0 | 77 | 34.1 |
| Sept. 1979 | 47.4 | 88 | 40.6 |
| Sept. 1980 | 49.9 | 97 | 44.9 |
| Sept. 1981 | 52.1 | 87 | 44.8 |

(Plaintiffs' Exh. 198, Segregation in Prince George's County Schools, 1972–1980). Plaintiffs point out that the Supreme Court in *Columbus, supra,* tacitly approved of the use of a percentage test of racial identifiability espoused by plaintiffs' expert in that case and in this case, Dr. Gordon Foster. In *Columbus,* Judge Duncan had made use of a plus or minus 15% statistical variation from the countywide racial average of black pupils in the school system in determining what schools were racially identifiable and in shaping a remedy. *Penick v. Columbus Board of Education,* 429 F.Supp. 229, 240, 268–69 (S.D.Ohio 1977). However, the Sixth Circuit, in affirming the district court's finding of liability and in endorsing "the ratios used by the District Judge" and "finding them to have been properly employed under the standards of *Swann v. Charlotte-Mecklenburg Board of Education,*" emphasized that the district judge had found that over 70% of the students in the Columbus school system attended schools which were over 80% black or white. *Penick v. Columbus Board of Education,* 583 F.2d 787, 800 (6th Cir.1978). In the majority opinion of the Supreme Court, Justice White noted that half of all the schools in the Columbus system "were 90% black or 90% white," 443 U.S. at 452, 99 S.Ct. at 2943, and commented that there was "no misuse of mathematical ratios" by the district court under the standards established by *Swann.* 402 U.S. at 22–25, 91 S.Ct. at 1279–80.

In *Price v. Denison Independent School District,* 694 F.2d 334 (5th Cir.1982), the Fifth Circuit explicitly disapproved of a plus or minus 5% test of racial imbalance based upon the approach of Dr. Foster, which the district court had used as "an essentially inflexible rule of law of general application" in determining that the racial compositions of several elementary schools represented an unconstitutional vestige of "de jure" educational segregation. *Id.* at 350, 356, 364. Judge Sanders, in *Tasby v. Wright,* 520 F.Supp. 683, 711 (N.D.Tex. 1981), a case in which Dr. Foster also appeared as an expert witness called by plaintiffs, refused to adopt a 10% hard-and-fast formula.

The Sixth Circuit in *Kelley v. Metropolitan County Board of Education of Nashville and Davidson County, Tenn.,* 687 F.2d 814 (6th Cir.1982), rejected the district judge's selection of an arbitrary 15% either race starting point for fashioning a desegregation remedy in a school system with a 68% white and 32% black population. The 15% figure was chosen by the district court judge as " 'a reasonable attempt to provide intercultural and interracial contact as a foundation for social harmony.' " *Id.* at 818. Instead, the Sixth Circuit suggested that the district court in fashioning a remedy use "a 15% plus or minus deviation from the 68–32% white-black ratio for all students in the school system." *Id.* at 819 (footnote omitted). In the continuing litigation over the desegregation of the Boston

schools, Judge Campbell upheld the district court's right to use a 25% [94] deviation from the racial balance of the school district as the standard for achieving and measuring progress towards a unitary system. *Morgan v. McDonough*, 689 F.2d 265, 274 (1st Cir.1982). Finally, the United States Department of Education has utilized a plus or minus 20% statistical deviation from the district-wide racial ratio as an initial measure of the racial identifiability of schools. In *Adams v. Richardson*, 356 F.Supp. 92 (D.D.C.1973), in the course of requiring the Secretary of HEW to take specified actions with regard to school districts receiving certain federal funds, the district court considered schools with a 20% disproportion between the percentage of minority pupils in those schools and the percentage in the entire school district to be "substantially disproportionate" in their racial composition as that term was used in *Swann. Id.* at 96–97.

In the present case, this court does not adopt plaintiffs' proposed 20% variation formula and instead adopts as a guideline an upper limit of 80%, *i.e.*, nearly 30% above the black student population percentage existing in 1982. In the nine years after this court's desegregation decree, the percentage of black pupils in the Prince George's County school system rose sharply. The systemwide average of students in September 1972 was 23.9% black. In September 1982, it was 53.9% black, an increase of 30 percentage points. When the desegregation plan was designed in 1972, this court established an upper racial guideline of 50% which was approximately 25% above the then existing countywide average of black students and a lower limit

of 10%. The 50% and 10% figures were utilized as guidelines in order to reach a fair accommodation between the need to achieve racial balance and the need to limit round-trip transportation time. As of this date, it seems reasonable to adjust the 50% black upper guideline to accord with the 30% rise in black school population since the implementation of the decree.

The 10% minimum of black students required in any school under the 1973 decree was not arrived at scientifically. It was a compromise between geographical factors on the one hand and the desirability of obtaining a minimum black presence in outlying white schools to the extent transportation distances made the same practically possible. A number of white areas of the county were, in 1972, remote, in terms of transportation time, from black or substantially integrated areas. Although road improvements and other changes since 1972 may have made some of those areas presently less remote, a minimum presence of 10% of black students in county schools still appears reasonable, since the record in this litigation does not demonstrate that it is now feasible to transport additional black students to those schools which continue to hover around 10% black.[95]

A look at the Prince George's County schools which were more than 80% black in September 1982 discloses that substantial progress has been made since the implementation of the 1973 desegregation plan. Before the 1973 decree, 40% of black students in the county attended schools which were more than 80% black. *Vaughns*, 355 F.Supp. at 1036. In September 1982, 23.2% of black students attended schools more than 80% black. However, 23 out of 121

---

94. Under the plan, a community district school was supposed to reflect, within a margin of error of 25 percent up or down, the racial balance of the district. Thus, for example, if the district were 50 percent white and 50 percent minority, the district school could be as much as 62.5 percent (50 percent times 25 percent with the product added to 50 percent) white or minority.

*Morgan v. McDonough*, 689 F.2d at 274 n. 16 (*quoting Morgan v. Kerrigan*, 401 F.Supp. at 241).

95. That is true even though it may be desirable to have at least a 20% minority presence in any particular school. *See Tasby v. Wright*, 520 F.Supp. 683, 712 (N.D.Tex.1981):

Research by various experts indicates that for effective participation and healthy interpersonal interaction among students, an ethnic or racial group in the numerical minority should ordinarily comprise at least 20% of the student body....

(Footnote omitted).

elementary schools, or almost one-fifth of all regular elementary schools[96] had become more than 80% black by 1982. Three out of 20 county senior highs (15%) containing 23.7% of black senior high school students[97] and 3 out of 32 junior high and middle schools (9%) containing 15% of black junior high and middle school students were also more than 80% black. "Although the existence of 'some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system which still practices segregation by law,' *Swann*, 402 U.S. at 26, 91 S.Ct. at 1281, both the school authority and the district judge must nevertheless be concerned with the elimination of one-race schools." *Adams v. School District No. 5, Orangeburg County, S.C.*, 444 F.2d 99, 101 (4th Cir.1971). Further, "[w]hile racial ratios are not the prescribed measure of equal educational opportunity, they are certainly a relevant factor. Schools which are racially isolated with minority student populations tend to become stigmatized and inadequate." *Keyes v. School District No. 1, Denver, Colo.*, 540 F.Supp. 399, 402 (D.Colo.1982).

Looking back in the within litigation to 1973, it is noted that the Board implemented in good faith the plan ordered by this court and, in so doing, brought the racial percentages of all Prince George's County schools within the 10–50% guidelines established by that order, except for those far-flung schools which the court permitted them to remain less than 10% black. By January 31, 1975, 41 schools were outside the 10–50% guidelines by varying, though in many instances, relatively minor, amounts. By September 1976, 20 schools had become over 63% black and were outside of this court's 50% guideline even as adjusted by the amount of the black school population increase in the county since September 1972, *i.e.*, 13.2%. Thus, by September 1976, a not insignificant number of schools had bulged over the 50% guideline even if so adjusted.

 It is true that "a district court walks a narrow line between deciding whether unitary status has or has not been attained," *United States v. Texas Education Agency*, 647 F.2d 504, 507–08 (5th Cir.1981), and that it is often difficult to determine presence or lack of unitary status. However, the following factors, *inter alia*, require this court to conclude that the Prince George's County school system is not unitary at this time and has not previously achieved unitary status:

1. A majority of the 23 elementary schools more than 80% black in 1982 were more than 50% black in 1972 before the plan was established. The identities of those schools as black schools (when compared to the countywide student racial percentages) has never been eradicated.

2. In September 1982, two senior high schools, five junior high and middle schools and fifteen elementary schools were between 70–80% black. The history of "tipping" in the county school system strongly suggests that those schools are at this time in imminent danger of joining the ranks of schools with populations over 80% black, unless attention is paid to the need to maintain racial stability. There are already nine schools more than 90% black. The number of such schools will almost certainly increase, as ten schools were between 85–90% black in September 1982.

3. Through certain student assignment changes since 1975, and particularly through the 1980 cancellation of parts of the busing plan ordered by the 1973 desegregation decree, defendants have aggravated, even though not greatly, the resegregation of many predominantly black schools.[98]

96. Excluding special education centers.

97. Figures exclude vocational schools.

98. The chart set forth in Appendix K illustrates the racial percentages prior to the desegregation plan of schools which are currently over 80% black; the racial balances of those schools approximately three years after the plan went into effect; and student attendance changes made by the Board which may have caused at least some discernible increased racial imbalances. (Ap-

The 1973 desegregation plan itself was tailored to prevent busing of more than thirty-five minutes each way. *Vaughns*, 355 F.Supp. at 1056. Defendants' original proposals in late 1972, which envisaged the need for more busing (than this court in the end ordered) so as to achieve elimination of pre-1973 segregation, were rejected by this court because of transportation distances and times. In that context, the occasional pre-1980 backward steps and the specific steps backward taken in 1980, even if small steps, cannot be countenanced. The busing called for in 1973 was honed to the bare bones and in fact caused a school system, already 48% on wheels in 1972–73, to put on wheels only an additional 8% of the school population, *Vaughns*, 355 F.Supp. at 1058. That school system remained at that time precariously close to a segregated system. That status has at no time changed. Under those circumstances, there existed from and after 1975 a "responsibility of the boards of education [*i.e.*, in this case, the Prince George's County Board] and the district courts [in this case, this court] to prevent the reestablishment of ... [dual] school systems." *Graves v. Walton County Board of Education*, 686 F.2d 1135, 1143 (5th Cir.1982) (*citing Swann*). In *Graves*, Judge Fay approved the district judge's refusal to alter an attendance zone in a Georgia county *thirteen* years after the court's desegregation order establishing the zone. The alteration would have transferred students from one school system to another [98A] and would have caused one of those systems to change from a 54% white and 46% black student body to a 38% white and 62% black student body, (a 16% change), that is "from a white majority to an overwhelmingly black majority." Judge Fay agreed with the district court that although "desegregation has worked well under the existing zones ... [and] a good education is being provided for all students in both systems ... [i]t is entirely too soon as against the showing made to authorize the change ...." *Id.* at 1144 (*quoting Graves v. Walton County Board of Education*, 91 F.R.D. at 482). The *Vaughns* decree is still in force and effect. In this court's view, a continuing need for the 1973 decree exists because a unitary school system has not been achieved, and because, in any event, at all times since 1973, there would have been within the Prince George's County school system significantly increased racial imbalances than presently exist, without the impact of the provisions of that decree. But even if unitary status had been achieved before 1980 within the school system, the existing orders of this court should not have been unilaterally disregarded in 1980 by defendants.

## XIV. VIOLATION OF THE OUTSTANDING DECREE OF THIS COURT

Before the 1980 changes were implemented, defendants were aware that increased black student percentages would result from many of those changes and were advised by their attorney that they might be violating this court's decree by effectuating them. They neither sought nor obtained in 1980 modification of this court's outstanding orders. In *Pasadena*, Justice Rehnquist wrote that there is a "well-established insistence that those who are subject to the commands of an injunctive order must obey those commands, notwithstanding eminently reasonable and proper objections to the order, until it is modified or reversed." 427 U.S. at 439–40, 96 S.Ct. at 2706. Previously, the Justice cited to *United States v. United Mine Workers of America*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947) and quoted the following statement from *Howat v. Kansas*, 258 U.S. 181, 190, 42 S.Ct. 277, 281, 66 L.Ed. 550 (1922):

pendix K was deleted for purposes of publication.)

**98A.** The two school systems entered into a contract in 1953 pursuant to which one of the systems would educate county children residing in certain defined areas of the county. The two school systems subsequently agreed upon a desegregation plan embodying that contractual agreement, which was approved by the court in 1968. *Graves v. Walton County Board of Education*, 91 F.R.D. 457, 470–71 (M.D.Ga.1981).

"It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected . . . ."

*Id.*

■ Defendants' position that their obligations under the decree disappeared after this court relinquished jurisdiction in *Vaughns* is apparently based upon defendants' view that the Prince George's County school system had achieved unitary status by March 1975 or at some time thereafter and that the moment it so did, this court automatically lost jurisdiction in *Vaughns* and this court's orders in *Vaughns* became null and void. That position is not legally tenable in light of *Pasadena*. It is also not factually tenable herein, in view of defendants' own actions and statements before and after 1975 which reflect at least some recognition by defendants that this court's orders in *Vaughns* continued in force and effect. Each status report filed by defendants before March 1975, including the fourth and final report filed on May 31, 1974, contained the representation:

That as in the past, the Pupil Accounting staff of Defendant will continue to closely scrutinize the attendance and enrollment data pertaining to each of the public schools of Prince George's County to make certain that the operation of the previously ordered Desegregation Plan *will continue to be effective and stabilized* within the heretofore stated Guidelines of Desegregation.

(Emphasis added; Plaintiffs' Exh. 158, Fourth Report to the Court, at 3). While it is true that considerable confusion is indicated in the minutes of Board meetings after March 1975 concerning the force and effect of the *Vaughns* desegregation decree and the Board's duties under it, there are repeated references in those minutes to the continuing viability of that decree. Thus, in 1976, the Board's attorney, Paul Nussbaum, Esq. stated:

MR. NUSSBAUM: Mrs. Mills. Let's go back to what I said maybe 20 minutes ago. I said that this Board of Education is under no obligation to cause any changes in pupil attendance areas solely or based solely upon an imbalance of pupil population in any given school unless such imbalance is the result of Board or other similar governmental action. This is what I said at the very beginning. Now if you move kids from School A to School B and as a result of that move School B still stays 10–50, you have no problem in School B. And as . . .

MRS. MILLS: How about School A?

MR. NUSSBAUM: . . . a result of that move School A all of a sudden moves out of that perimeter of 10–50, you got a whale of a problem.

MRS. MILLS: Suppose the school is already out of that?

MR. SAUNDERS: It's still not our fault.

MRS. [MILLS]: If you further increase it, you might have a problem.

MR. NUSSBAUM: I think if you further increased substantially then you have a serious problem.

(Plaintiffs' Exh. 146G, Transcript of April 7, 1976 Board Meeting, at 30).

At the October 14, 1976 meeting, the Board rejected the transfer applications of white students at the Fairmont Heights Senior High School who desired to attend the newly opened Eleanor Roosevelt School because "to accept the applications . . . could be construed as a governmental act having the effect of resegregating" Fairmont Heights. (Fairmont Heights was 51.4% black in September 1976). (Plaintiffs' Exh. 146K, Tape 1 at 2). Questioning the possibility of legal action and "another massive bussing change," Board member Saunders stated "that this Board of Education should concern itself with further diminishing of white students at Fairmont Heights through an act further compounding tipping . . . ." *Id.* Tape 3 at 7. In May 1979, the Board considered an attendance change relative to the Kettering Elementary School, a predominantly white school.

The Board chose the alternative which would not "substantially decrease the present racial balance at Kettering at the expense of a substantial increase to the minority enrollment at these other schools," because, in the words of the Board's attorney, if the rejected alternative had been chosen, "this Board may have a problem." (Plaintiffs' Exh. 146R, May 10, 1979 Transcript, Tape 2 at 12).

When in 1979 defendants considered the revision of the busing plan established by the desegregation decree, they were conscious that they would be violating this court's order by deliberately creating a number of one-race schools. Then Board Chairman Saunders attempted to get the agreement of the *Vaughns* plaintiffs and the Prince George's County chapter of the N.A.A.C.P. to a Memorandum of Principles and Understanding which concluded as follows:

> IT IS FURTHERMORE UNDER-STOOD AND EXPRESSLY AGREED between the parties hereto that if, as a result of any such reassignment of pupils to a closer school, the school to which such pupils were formerly assigned becomes a one-race school, such Board action shall not be deemed to be a resegregative act, as long as the Board maintains the same identical educational opportunities, programs and benefits for the pupils continuing to be enrolled at such one-race school, irrespective of the decreased enrollment resulting from such reassignment. . . .
>
> IT IS FURTHER provided that upon full execution, an executed copy of this Memorandum be submitted to the Clerk, United States District Court for the District of Maryland for filing in C.A. 72–325–K, as aforesaid.

(Defendants' Exh. 161, Memorandum of Principles and Understanding (Martin/Saunders Agreement), at 4). The procedure contemplated by that memorandum apparently rested on the belief that the Board could revise the guidelines in the

decree by agreement of the parties, without prior approval of this court, so long as this court was notified.[99] At the August 23, 1979 Board meeting, Board member Bieniasz introduced a resolution for "An Orderly Comprehensive Approach to Consideration of Realignment of School Attendance Boundaries." The resolution, *inter alia*, asked the Board attorney to "explore the ramifications" of a Federal Rule 60 motion requesting relief from the order of this court and to "report back to the Board of Education ... on the relevence [sic] of use of this motion to advance the purpose of this resolution." (Plaintiffs' Exh. 210, Minutes of August 23, 1979 Board Meeting, at 4). The Board chose not to request the permission of this court to proceed with the 1980 busing changes, although the Board's attorney explicitly warned:

> If, however, you start arbitrarily to unilaterally redraw pupil attendance zones, then I do feel that unless you're mighty careful in how you go about doing it, taking into consideration at all times the racial balances that would result, you could ask for a brand new desegregation plan, meaning bussing, solely for the purpose of attaining racial balance.

> . . . . .

> MR. CASTELLI: Paul, during your discussion there, you couched your language in terms of if we were arbitrary and we unilaterally did it and we were not careful. Assuming that we were not arbitrary, and we unilaterally did it and we were very careful, isn't it possible that this Board can unilaterally make a decision to come to grips with the bussing problem and *still fall within the court decisions as they now stand*, maintaining that one premise that we will throughout have quality education and ensure it by some means?

> MR. NUSSBAUM: Mr. Castelli. It's yes and no in my opinion. Yes, if you're talking about a countywide scheme with countywide standards that are estab-

---

**99.** While that procedure would hardly appear valid, even that procedure which did include

notification to this court, was not followed when the 1980 changes were made.

lished as a result of one new revised formula. No, if you're talking about an isolated situation here or an isolated situation there. That's my opinion.

(Plaintiffs' Exh. 146R, Transcript of May 10, 1979 Board Meeting, Tape 3 at 13, 15 (emphasis added)).

In the face of that opinion, the Board nevertheless proceeded with the 1980 one-by-one changes which were not part of any countywide plan. That the cancellation in 1980 of certain parts of the busing plan and the consequent anticipated tipping of certain schools would be violative of the Board's legal duty under the decree was recognized in advance of those changes by Board member Saunders:

> The whole essential issue that we are faced with today of all the discussions that we have had is hung up on one qualifying statement—what happens if a one-race school occurs. For instance, as a specific example, two examples would have been cited. Randolph Village, of course, is pending. The other example would have been Owens Road Elementary School and what the upshot of that would be if that school is tipped. Upon advice from not only learned counsel, but all of the other attorneys that have sat in conference over the last three months, the final analysis and the final conclusion boils down to one simplistic thing. . . . If the Board of Education unilaterally brings about any changes or tipping of racial balance, we are then by a direct resegregative act in violation of the Kaufman edict as it was passed down in 1973.

*Id.* at 27–28.

The Board's solution was to create a Citizens Advisory Committee on Busing so that the Board could not be accused of "unilateral action." When the Chairman of that Committee asked the Board to allow the school staff to devise a revised busing plan with a 25–75% racial mix, the Board's attorney advised the Board against pursuing the endeavor on the grounds that "a United States District Court or an original plaintiff" might "say that this ratio is so

completely out of line with the original 10–50 percent concept that resulted in the January 29 desegregation plan . . . that you have in fact resegregated a public school system." (Plaintiffs' Exh. 146X, Transcript of January 31, 1980 Board Meeting, Tape 2 at 24). The viability of the guidelines of racial balance inherent in the 1973 desegregation plan was also reaffirmed when the Board considered the proposals of the Citizens Advisory Group. An amendment to the Citizens Advisory recommendations which would have raised the racial percentage at John Bayne, over 70% black before the change, was rejected by the Board on the attorney's advice:

> NUSSBAUM: I must take the position that this change would have a tremendous impact. I would like to explain to the members of the Board what I base this concept on. You are going to finish this school year with 13 schools that are in excess of 80% black pupil population. I don't think I need to go into any lengthy monologue on the potentiality of a school reaching more than 80% by virtue of your own action becoming a situation that may be subject to review. Based upon your projected enrollment for 1980–81, nine of these 13 schools that will be in excess of 80% black are already in excess of being 80% black and have been in excess of 80% black for over a year. Of the other four schools that are projected to go into that range for school year 1980–81 your [sic] talking about increased from 79.1%, 78.5%, 78.7% and 79.5% presently black this year. The proposal takes a school that is presently 70.9% black and I think the change contemplated would take the school way above what I believe to be legally permissible changes without being resegregated in any manner.

(Plaintiffs' Exh. 146W, Transcript of May 8, 1980 Board Meeting, Tape 2, Side 2 at 4–5).

After the Citizens Advisory changes had been carried out in 1980, the Board's attorney sent a letter to the United States Department of Education appealing that De-

partment's denial of the school system's application for Emergency School Aid Act funding, a denial action which that Department had taken, in part, on the grounds that defendants were no longer obligated to implement this court's order in *Vaughns.* The attorney's response is, at least in terms of his opinion in 1980, the most direct refutation of the position which defendants have taken in this litigation, namely, that this court's orders in *Vaughns* were lacking in effect after March 1975:

> In light of all of the above, I do believe that the Board of Education of Prince George's County, still being under an Order to maintain a desegregated, unitary educational system, eminently qualifies for Emergency School Aid Act (ESAA) funding under 34 CFR 280.42; to wit: the maintenance of the desegregated, unitary educational system pursuant to a "final Order issued by a Court of the United States." ...

> ....

> ... Accordingly, your assertion that the Prince George's County Public School System is dismissed from "any ensuing obligation" to comply with the various Orders of the *Vaughns* proceedings, is, I most respectfully submit, *a totally incorrect characterization of the status of the Board of Education of Prince George's County insofar as its duty to maintain a desegregated, unitary educational system is concerned.*

(Plaintiffs' Exh. 123, Letter of Paul M. Nussbaum to Shirley D. McCune, March 12, 1981, at 3–4 (emphasis added)).

During the trial testimony of Dr. Feeney, there were several recognitions of the binding effect of this court's decree. Dr. Feeney testified that in the first demographic study, undertaken in 1976, which analyzed what would happen if students were returned to their former or closer schools, proposed reassignments were carefully constructed so as not to cause a school to exceed the 50% guideline of this court. Dr. Feeney stated that the Board did not want to take any action which would cause a

school to go over 50% black. Thus, two years after this court relinquished jurisdiction in *Vaughns,* the 10–50% parameters were still guiding defendants. (Tr. at 4360–62). Further, Dr. Feeney testified that he understood that from March 1975 until the beginning of this litigation, defendants were under a legal obligation *not* to make any change which would cause a "substantial" increase in the black population of a school which was already more than 50% black. (Tr. 4378). Dr. Feeney defined "substantial" as more than 10%. If a school board action did increase the racial percentage at a school over 50% black "substantially," Dr. Feeney noted that defendants would consider that a legal problem and "an unlawful act." (Tr. at 4369).

Dr. Feeney also expressed his understanding that defendants were bound to carry through with this court's desegregation plan and "were not in any way [to] dismantle" it. (Tr. at 4404). In fact, if the demographic studies undertaken by the staff had been changed from studies into a plan, Dr. Feeney considered that a return to this court for approval would have been compelled, because the studies envisaged the elimination of noncontiguous areas created by the desegregation plan and the creation of a number of one-race schools. (Tr. 4241–42).

In spite of the recognition of the duty to maintain a desegregated unitary educational system, defendants disregarded this court's decree, making themselves the "judge of the validity of orders which have been issued" and attempting by their acts to "set them aside." *United States v. United Mine Workers of America,* 330 U.S. 258, 290 n. 56, 67 S.Ct. 677, 694, n. 56, 91 L.Ed. 884 (1946) (*quoting Gompers v. Bucks Stone & Range Co.,* 221 U.S. 418, 450, 31 S.Ct. 492, 501, 55 L.Ed. 797 (1911). That defendants had no right to do, even if, as was the case in *Mine Workers,* the orders of this court were for some reason invalid.

## XV. INTENTIONAL DISCRIMINATION

For the reasons stated *supra* and *infra,* this court finds and holds that defendants have not intentionally discriminated on racial grounds in connection with faculty hiring,[100] faculty assignments,[101] special education,[102] TAG,[103] discipline [104] or classroom assignments.[105] There is present in this case the question of whether defendants have intentionally discriminated on racial grounds in connection with one or more, or the totality of, overcrowding changes,[106] secondary school reorganization,[107] openings of schools,[108] school closings,[109] post-1975 miscellaneous changes [110] and the 1980 changes.[111] Each of those areas is, in effect, a subset of the larger area of student assignments to schools.

In *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), Justice White held that the racially disproportionate impact of a law or official action is insufficient to support a finding of a violation of the equal protection clause of the fourteenth amendment. Rather, a racially discriminatory purpose must be found to make out such a constitutional violation. *Id.* at 239, 96 S.Ct. at 2047. While an "invidious discriminatory purpose may often be inferred from the totality of relevant facts," including disproportionate impact, "[d]isproportionate impact ... is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." *Id.* at 242, 96 S.Ct. at 2049. Justice Stevens, in his concurrence, described the type of evidence which he believed was relevant to a judicial inquiry into segregative intent:

Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation. It is unrealistic, on the one hand, to require the victim of alleged discrimination to uncover the actual subjective intent of the decisionmaker or, *conversely, to invalidate otherwise legitimate action simply because an improper motive affected the deliberation of a participant in the decisional process. A law conscripting clerics should not be invalidated because an atheist voted for it.*

*Id.* at 253, 96 S.Ct. at 2054 (emphasis added).

In *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1979), Justice Powell wrote that *"Davis* does not require a plaintiff to prove that the challenged action rested *solely* on racially discriminatory purposes ... or even that a particular purpose was the 'dominant' or 'primary' one." *Id.* at 265, 97 S.Ct. at 563. Rather, all that is required for a finding of unconstitutional conduct is "proof that *a* discriminatory purpose has been a motivating factor in the decision." *Id.* at 265–66, 97 S.Ct. at 563 (emphasis added). In order to ascertain whether invidious discriminatory purpose was a motivating factor, district courts are instructed to conduct "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266, 97 S.Ct. at 564. After stating that "[t]he impact of the official action ... may provide an im-

**100.** Part I.

**101.** Part II.

**102.** Part III(A).

**103.** Part III(B).

**104.** Part III(C).

**105.** Part IV.

**106.** Part VII.

**107.** Part VIII.

**108.** Part IX.

**109.** Part X.

**110.** Part XI.

**111.** Part XII.

portant starting point," Justice Powell discussed the factors which should be examined in the course of an evidentiary inquiry into the existence or nonexistence of discriminatory purpose:

(1) "The historical background of the decision ..., particularly if it reveals a series of official actions taken for invidious purposes."

(2) "The specific sequence of events leading up to the challenged decision."

(3) "Departures from the normal procedural sequence" (as well as "[s]ubstantive departures ... [from] factors usually considered important by the decisionmaker").

(4) "The legislative or administrative history ... especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 267–68, 97 S.Ct. at 564–65.

In *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), Justice Stewart, writing for the majority, dealt with the issue of discriminatory intent in the context of alleged statutory gender discrimination. In so doing, the Justice wrote: "If the impact of this statute could not be plausibly explained on a neutral ground, impact itself would signal that the real classification made by the law was in fact not neutral." *Id.* at 275, 99 S.Ct. at 2294.

After concluding that "this is not a law that can plausibly be explained only as a gender-based classification," Justice Stewart wrote:

Just as there are cases in which impact alone can unmask an invidious classification, cf. *Yick Wo v. Hopkins*, 118 U.S. 356, there are others, in which—notwithstanding impact—the legitimate noninvidious purposes of a law cannot be missed. This is one. The distinction made by ch. 31, § 23, is, as it seems to be, quite simply between veterans and nonveterans, not between men and women.

Id. at 275, 99 S.Ct. at 2294.

Subsequently, in his opinion, the Justice commented:

The appellee's ultimate argument rests upon the presumption, common to the criminal and civil law, that a person intends the natural and foreseeable consequences of his voluntary actions. ...

. . . . .

"Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences. [Citations omitted.] [24] It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group. [25]

---

[24] Proof of discriminatory intent must necessarily usually rely on objective factors, several of which were outlined in *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 [97 S.Ct. 555, 563, 50 L.Ed.2d 450]. The inquiry is practical. What a legislature or any official entity is "up to" may be plain from the results its actions achieve, or the results they avoid. Often it is made clear from what has been called, in a different context, "the give and take of the situation." *Cramer v. United States*, 325 U.S. 1, 32–33 [65 S.Ct. 918, 933–34, 89 L.Ed. 1441] (Jackson, J.).

[25] This is not to say that the inevitability or foreseeability of consequences of a neutral rule has no bearing upon the existence of discriminatory intent. Certainly, when the adverse consequences of a law upon an identifiable group are as inevitable as the gender-based consequences of ch. 31, § 23, a strong inference that the adverse effects were desired can reasonably be drawn. But in this inquiry—made as it is under the Constitution—an inference is a working tool, not a synonym for proof. When as here, the impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate, and when, as here, the statutory history and all of the available evidence affirmatively demonstrate the opposite, the inference simply fails to ripen into proof.

*Id.* at 278–79, 99 S.Ct. at 2295–96.

Thereafter, the Supreme Court discussed discriminatory intent in two school desegregation cases decided on the same day, *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979), and *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979), both cited *supra* in

other contexts. Justice White, after reviewing the findings and conclusions of the courts below, wrote in *Columbus:*

> Against this background, we cannot fault the conclusion of the District Court and the Court of Appeals that at the time of trial there was systemwide segregation in the Columbus schools that was the result of recent and remote intentionally segregative actions of the Columbus Board.

443 U.S. at 463–64, 99 S.Ct. at 2949. The Justice, citing to *Davis, Arlington Heights* and *Feeney,* held that the district court had stayed within the requirements of the Supreme Court's opinions in those cases in the course of making its findings of segregative intent and had correctly utilized foreseeability of impact "as one of the several kinds of proofs from which an inference of segregative intent may be properly drawn." 443 U.S. at 465, 99 S.Ct. at 2950 (*quoting from* Judge Duncan's opinion in the district court, 429 F.Supp. at 255).

In *Dayton,* which also involved the de jure segregation of a school system which had never been effectively dismantled, Justice White discussed the burden of proving intentional discrimination by a school board:

> We have never held that as a general proposition the foreseeability of segregative consequences makes out a prima facie case of purposeful racial discrimination and shifts the burden of producing evidence to the defendants if they are to escape judgment; and even more clearly there is no warrant in our cases for holding that such foreseeability routinely shifts the burden of persuasion to the defendants. Of course, as we hold in *Columbus* today, ante, at 464–465 [99 S.Ct. at 2950], proof of foreseeable consequences is one type of quite relevant evidence of racially discriminatory purpose, and it may itself show a failure to fulfill the duty to eradicate the consequences of prior purposefully discriminatory conduct.

443 U.S. at 536 n. 9, 99 S.Ct. at 2978 n. 9.

In *Lora v. Board of Education of the City of New York,* 623 F.2d 248 (2d Cir.

1980), a case involving alleged racial discrimination in New York City's school program for emotionally handicapped children, Judge Pollack, sitting by designation, held that the district court had "applied standards falling short of those announced by the Supreme Court" in *Dayton* and *Columbus. Id.* at 250. After also citing to *Arlington Heights* and *Feeney,* Judge Pollack wrote:

> It is the function of the District Judge to make findings from objective evidence of the presence or absence of discriminatory purpose; inferences from evidence of discriminatory impact will not substitute sufficiently for a finding of actual motivation in concluding that constitutional violation has occurred. The burden of proof remains with the plaintiffs on this issue. *Washington v. Davis,* 426 U.S. 229 [96 S.Ct. 2040, 48 L.Ed.2d 597] (1976).

*Id.* at 251.

Thus, the determination of whether, as plaintiffs claim, defendants were motivated in part by a racially discriminatory purpose in taking or not taking any action from and after March 1975, including actions taken in connection with the 1980 busing changes, requires examination of the facts in terms of the five factors identified by the Supreme Court in *Arlington Heights* and of the standards set forth in *Davis* and *Feeney.* With regard to the steps taken by the School Board in connection with overcrowding, secondary school reorganization, school openings and closings, and post-1975 miscellaneous changes, this court is satisfied, for reasons discussed *supra* in connection with each of them, that none of them were taken because of any desire or intent on the part of defendants to resegregate or to discriminate against the members of any race.

The 1980 busing changes, however, require more detailed analysis. Unquestionably, those 1980 changes had some incremental segregative effect. That this effect was, in most cases, foreseeable is demon-

strated by the worksheet developed by the Citizens Advisory Committee on Busing and incorporated into their report to the School Board. (Plaintiffs' Exh. 185). The largest percentage increase in a racially identifiable school projected by the Committee was 7.3%. In fact, actual percentage shifts were generally greater than predicted. Whether the lack of accurate prediction resulted from the failure of the staff to include in its projections the rate of annual demographic changes which were occurring, or whether the busing cancellations accelerated the process of racial change, is not clear though it is rather apparent that some resegregative impacts were the product of reversals of provisions of the 1973 desegregation plan, and not of demographic changes alone. Hence, in most schools which were racially identifiable by plaintiffs' standards in 1979 and which were affected by the 1980 changes, the rate of racial change between the 1979–80 school year and the 1980–81 school year was greater than the rate of change between the immediately preceding two school years. For example, at John Bayne, the black percentage had risen 6.3% between September 1978 and September 1979, but went up 11.7% in September 1980 from what it had been in September 1979. The black percentage at Oakcrest rose only 2.3% between September 1978 and September 1979 but climbed 6.1% with the implementation of one of the September 1980 changes. Capitol Heights had actually decreased from 67.0% black to 66.6% black in 1978–79, but rose to 77.4% black, a 10.8% jump, with the busing reversal of 1980. On the other hand, Tall Oaks, an identifiably white school by plaintiffs' standards, improved its racial percentage from 11.9% black to 27.4% black as a result of one of the 1980 changes. Riverdale Elementary also improved from 22.7% black to 25.8% black, and Riverdale Hills went from 33.0% black to 38.5% black, following the 1980 changes. The staff report had predicted that all of those schools would become more integrated as a result of the busing changes, and that the percentage of black students at Overlook, Cooper Lane and Dis-

trict Heights, largely black elementary schools, would decrease. The black percentages at those schools in fact did decrease.

 The degree of impact caused by any act is not irrelevant to the calculus of assessing the presence or lack of discriminatory intent. *See Feeney,* 442 U.S. at 276 n. 23, 99 S.Ct. at 2295 n. 23. Although every "off area" in the county was examined by the Citizens Advisory Committee in 1980, only 73 out of a total of 144 elementary schools were actually affected by the changes. After the 1980 changes, there were still 175 "off areas," serving 182 schools, as of September 1981. Some of the schools which had "off areas" involved in the 1980 busing reversals had other "off areas" which were not touched in 1980. A Staff Report prepared in 1979 for the Citizens Advisory Committee on Busing (Plaintiffs' Exh. 178) analyzed the proximity of student population to existing elementary schools, and projected what the composition of the county's elementary schools would be if all students were returned to their closest neighborhood schools, within the limits of enrollment capacities. That study predicted that if all desegregative busing in the county should be eliminated in September 1980, nineteen schools could have been expected to become 90% black or more; in fact there was only one school which actually became over 90% black in September 1980. The study predicted that fifteen schools would become less than 10% black; in fact one actually was less than 10% black in September 1980. The study predicted that eight schools would become more than 97% black whereas in fact none became 97% black in 1980 or thereafter. The care exercised by the school authorities with relationship to racial factors in connection with the 1980 changes is evident. On the other hand, in a school system with a history of de jure segregation and in a school system operating under the 1973 desegregation plan in which desegregative steps were kept to a minimum to prevent unduly lengthy transportation of students, resegregative changes, such as

those which occurred in Prince George's County, with their "incremental impact," cannot be discounted, *see Columbus*, 443 U.S. at 464 n. 13, 99 S.Ct. at 2950 n. 13, both with relationship to discriminatory intent (discussed in this Part XV) and with relationship to elimination of all vestiges of pre-1973 segregation (*see* Part XIII, *supra* ). As the Supreme Court noted in *Feeney*, "[i]nvidious discrimination does not become less so because the discrimination accomplished is of lesser magnitude." 442 U.S. at 277, 99 S.Ct. at 2295.

The realignment of student attendance in 1980 must be viewed against the historical background of a de jure segregated school system and the implementation by that system of a busing plan ordered by this court in 1973, a few parts of which were reversed by the 1980 realignments. Numerous alterations in student assignments were quite appropriately effected by the school system after 1975 without any consultation with this court or plaintiffs, due to legitimate requirements, such as alleviating overcrowding, the reorganization of secondary schools, and school openings and closings called for by increasing or declining enrollments. As discussed *supra*, the record demonstrates that the majority of such changes were integrative rather than segregative in their impacts, although there were individual exceptions. There is, on the other hand, a discernible pattern in the record and, indeed, a direct admission by defendants that they purposefully did not, except perhaps in a very few instances, take any affirmative actions after March 1975 aimed solely at improving racial balances or at preventing increasing racial imbalance. Defendants believed and the Board was advised by its attorney that there was no constitutional duty to take any such affirmative steps. Such inaction does not, however, in this case constitute either intentional discrimination or a violation of any specific order of this court—the latter because this court did not explicitly set forth guidelines to be followed by the Board when this court relinquished active supervision over the school system in March 1975.

In *Evans v. Buchanan*, 512 F.Supp. 839, 856–57 (D.Del.1981), Judge Schwartz concluded:

> Past constitutional violations of the State Board and its default in the face of its duty to dismantle the dual school system are relevant considerations in deciding whether the present plan was adopted with an invidious purpose. *See Arlington Heights, supra,* 429 U.S. at 267 [97 S.Ct. at 564]. Those past wrongs, however, do not permit the Court to presume that all subsequent actions of the State Board are unconstitutionally motivated.

That conclusion is similarly required in the within litigation.

The idea of cutting back on the busing ordered by this court's 1973 decree did not originate with the 1980 changes. In 1976, a demographic study was made to determine what the racial percentage at each county school would be if students were returned to their pre-1973 schools. A further demographic study was undertaken the following year. However, those studies were not implemented and no countywide actions were taken before 1980 with respect to returning students to the pre-1973 schools. Although plaintiffs point to the purpose for conducting the studies, *i.e.,* to reverse some parts of the 1973 desegregation plan, as indicative of segregative intent, the Superintendent's explanation on December 15, 1977 to the Board of the purposes of the demographic studies reflects the absence of racial animus:

> [W]e are frankly raising the prospect that as a unitary school district it may be that natural integration is now so pervasive, that an alternative which capitalizes on that fact, should not be held to be a deliberately resegregative action. Since 1971—the percentage of black minority population has risen in this county from 18% to an estimate of at least 28%. Since 1973 the percentage of elementary black minority students in the school system has risen from 26.2% to 42.6%. And, as this study would appear to support, the distribution of that minority popula-

tion has become quite widespread and generalized. To be sure, there are some locales wherein the percentage of minority population is still relatively small viz a viz the over-all percentage county-wide. There are some locales wherein the percentage of minority population is relatively large viz a viz that over-all percentage. Yet these are examples of extremes, as it does appear that true integration is naturally occurring throughout the rest of the county. It is not the purpose of the public schools per se to either foster nor prevent such naturally occurring demographic factors. But it may not be unreasonable to pose, now, the question of whether or not the schools may essentially reflect those factors. That question, raised by this study, may be amplified thus: Having in good faith taken steps to desegregate the public schools; having in good faith taken steps to assure a high quality instructional program in *all* of our schools; having achieved far greater continuity and structure in our educational program throughout the county; and noting the widespread and naturally occurring racial integration of the county itself, can—as the attorney has suggested—sufficient general support be developed *and court sanction obtained* for the alternative elementary attendance areas the study postulates? The question is very complex. The answer or answers will not be simple.

(Plaintiffs' Exh. 112 at 7 (emphasis added)). Again, in connection with this court's conclusions as set forth in Part XIV, *supra,* the Superintendent's reference to the possible obtainment of court sanction is important.

If certain of the demographic attendance alternatives posed in the 1977–78 demographic study had been implemented, it was predicted that certain schools would have increased in racial disproportion, but that the overall number of schools with a population greater than 50% black would have declined from 62 to 48. *Id.* at 4. What Dr. Feeney described as adverse reaction was received to the first draft of the

1977–78 study. That reaction was based upon the projected creation of a number of one-race schools. To avoid that result certain adjustments were made in the revised version of the study in order to reduce extremes of racial composition. (Plaintiffs' Exh. 115 at 3, 4). The demographic study was eventually tabled by the Board after public hearings, at least in part because of unfavorable reaction to the proposal contained in the study to close eleven schools. The Superintendent foreshadowed the creation of the Citizens Advisory Committee on Busing in 1979 by the following comment concerning the need for developing public support for any realignment of attendance zones which would undo busing ordered by this court:

The attorney has already advised you that in this instance, sound legal reasons compel the development of wide and general support for the implementation of any action based as an outgrowth of this study. I am sure he is prepared to elaborate on those reasons. This is, moreover, one of those situations where the legal requisites match closely the general and real need for support that such action would require to be successfully undertaken.

(Plaintiffs' Exh. 112 at 9).

There were other efforts by individual Board members to reduce busing prior to the 1980 changes. On February 27, 1979 then Board Chairman Saunders obtained the signature of Mr. William R. Martin, at that time the President of the Prince George's County Branch of the N.A.A.C.P., to a Memorandum of Principles and Understanding. The memorandum proposed, on application to the Superintendent of Schools by parents of at least 50% of the pupils in any integrated neighborhood, that the Board set up a task force composed of school staff, parents from the integrated community as well as the area contiguous to the school to which students were being bused, and members of the Executive Committee of the N.A.A.C.P. Such task force would study the feasibility of returning the students being bused from integrated

neighborhoods to closer schools. An integrated community was defined as a geographically identifiable residential community with an elementary school population between 30 and 70% black and with at least 60 pupils enrolled in public elementary school. The task force's proposals would be submitted for approval to the Board of Education and would be the subject of public hearings.

The memorandum was approved neither by the Board of Education nor by the N.A.A.C.P. chapter of Prince George's County. In fact, it appears that the School Board Chairman never had specific authorization from the Board to enter into the understandings set forth in the memorandum. Mr. Saunders explains the genesis of the memorandum as an attempt "to try to reduce some of the transportation costs and to try to bring about a way to bring children closer to their neighborhood schools." (Deposition of Norman Saunders at 17). He made a further effort to gather support for the memorandum by inviting fifteen community leaders, including the original plaintiffs in *Vaughns,* to meet with him at a Washington restaurant. As a result of that meeting, several individuals signed a petition on May 8, 1979, endorsing the memorandum and urging the Board unilaterally to establish a task force to study the termination of busing of pupils from integrated neighborhoods. (Defendants' Exh. 161). There are allegations in the record that Mr. Saunders offered a job to one plaintiff in *Vaughns* and a "bet" of $100 to another in connection with efforts to obtain approval of the memorandum by the original plaintiffs in *Vaughns. See* Saunders Deposition at 30–32. Although Mr. Saunders succeeded in obtaining neither the support of the N.A.A.C.P. nor the *Vaughns* plaintiffs, his efforts arguably demonstrate a desire to build a biracial concensus for the reduction of busing.

At the Board meeting of May 10, 1979, two separate resolutions were introduced dealing with realignment of student attendance zones in order to reduce busing. The first of those, introduced by Board members Golato, Castelli and Bieniasz, stated as its objective the reassignment of students to neighborhood schools. The resolution limited the number of "one-race" schools which might be created by any such realignment to 10 in number or 5% of the total number of schools (whichever was greater), proposed the creation of magnet schools, especially for "one-race" schools, and set an 85/15% racial mix of either race as the upper and lower parameters for the county schools for the first year after the realignment. That resolution also called for an oversight committee of parents which would be established as "[p]arents must feel that their children, whoever their classmates, or wherever they attend school, have the highest quality education." (Plaintiffs' Exh. 227 at 12). In introducing the resolution, Board Member Golato made the following remarks:

My resolution directs the superintendent of schools to try to develop a constitutionally permissable, [sic] countywide plan to return students to their neighborhood schools.

The resolution sets no specific criteria for the superintendent to follow, but if [sic] offers some suggestions covering school boundary changes, special magnet schools,

And a special oversight system to instill and enhance public confidence in the fact that all students have equal resources and opportunity for high quality education no matter which school they attend.

The housing patterns in our county have changed since the 1973 busing court order. In many cases, ironically, the buses now transport black children to mostly black schools.

I am convinced we must reduce the busing of students away from their neighborhood schools if we are to preserve the racial balance and prevent an exodus of middle class blacks—and curtail further white flight—from our schools and county.

(Plaintiffs' Exh. 227).

The genesis of the Citizens Advisory Committee was in the second resolution

offered by Board Member Saunders. The Saunders resolution stressed the existence of numerous integrated communities throughout Prince George's County, the desirability of permitting students residing in such integrated communities to attend neighborhood schools, and the need to ensure the retention of educational opportunities at any "one-race" schools which might be created by attendance realignments. Because of the latter concerns, the resolution called for the Board to establish a Citizens Advisory Committee consisting of persons appointed by Board members and representatives from various organizations, including the N.A.A.C.P., the A.C.L.U., the County Council of P.T.A.'s, and the Black Coalition Against Unnecessary Busing. (Plaintiff's Exh. 227 at 13). As finally constituted, the Advisory Committee consisted of 27 members, three persons appointed by each Board member from each school district except for District 6 and three at-large student members. The vice-chairman and a total of eight Advisory Committee members were black. Serving on the Committee were the president of the Prince George's County Council of P.T.A.'s and the president of the Black Coalition Against Unnecessary Busing. Ms. Bonnie Johns, the sole elected black member of the Prince George's County Board of Education, refused to appoint any representatives, criticizing the "hit or miss structure of the Advisory Committee" which "orchestrates against an open participatory role for citizens." Board Member Johns also objected to the goal of the Committee, stating:

> The charges to the advisory committee on the one dimensional issue of busing is a disservice to our need to deal with the many critical elements of equal access to educational opportunity and achievement. Concentration on busing becomes a smokescreen directing attention away from the *problems* of desegregation as well as successful ways of desegregating. These topics are manageable.

(Plaintiffs' Exh. 211, Attachment #1 (emphasis in original)).

Plaintiffs note the appointment of the Citizens Advisory Committee on Busing as a departure from procedural norms and thus as evidence of segregative intent by the Board under one of the standards set forth in *Arlington Heights*. The N.A.A.C.P. refused to participate in the Citizens Advisory Committee and issued a statement accusing the Board of creating a "hoax" and a "smoke screen to accomplish the hidden agenda of some members of the Board of Education." (Plaintiffs' Exh. 228). One basis of the N.A.A.C.P.'s criticism was the failure of the Board to establish clear guidelines, objectives and procedures for appointments to the Committee and for its functioning. Plaintiffs contend that not only was the Committee a subterfuge for concealing unconstitutional conduct, but that defendants bypassed the approval of this court before instituting the changes recommended by the Committee. Whether in 1980 the fact that defendants did not seek approval of this court before cancelling or altering parts of the 1973 decree of this court is or is not a violation of this court's said decree poses a question dealt with *supra* in Part XIV. In any event, those actions without approval of this court are themselves not conclusive on the issue of segregative intent,[112] though they are relevant with regard thereto.

Also relevant to the issue of defendants' intent is the Board's refusal to allow the school staff to provide the Citizens Committee in 1979 with data for a plan which would have sought to eliminate unnecessary busing while bringing county schools within the range of 25% to 75% black, plus or minus 5%, with a maximum one-way transportation time of 30 minutes. Such a request was made to the Board by Mr. Emerson Markham, Chairman of the Citizens Committee, and discussed at the Board meeting of January 31, 1980. Plaintiffs contend that defendants' inaction on

---

**112.** At a May 8, 1980 Board meeting, the Board's attorney, in answer to a question, stated his opinion that neither the 1980 Citizens Advisory plan nor the concept had to be submitted to the court. (Plaintiffs' Exh. 146W).

that request constitutes a deliberate ignoring of less segregative alternatives and thus is probative of discriminatory intent. The minutes of the meeting reflect, however, several plausible explanations for the Board's inaction. First, Dr. Felegy pointed out to the Board that a 25–75% plan might involve school closings and additional busing of students to achieve racial balance. (Plaintiffs' Exh. 146X at 5). Several members expressed concern that the Committee's request had gone far beyond the scope of their charge. *Id.* at 6, 8.[113]

The Board's lawyer, Paul Nussbaum, Esq., pointed out that the Board had rescinded all authorizations for previous advisory committees to study school closings and that the thirty-minute time factor might be impracticable. He also strongly discouraged the Board from accepting new racial ratios "which to the best of my knowledge ... the courts have never exacted from school districts." *Id.* at 10–11. The Board failed to act on the request, although not all Board members agreed that it should be rejected in its entirety. The Board's emphasis in this instance was on reduction of busing and increase in neighborhood schools.

On May 8, 1980, the Citizens Advisory Committee on Busing published its report. Its findings were as follows:

FINDINGS: Our review shows that:

(1) Regardless of legal implications, the plan adopted in 1973 is obsolete. At present, 74 elementary schools fall above the 50% guidelines established in the original plan. Furthermore, recent trends indicate that more schools will soon exceed those guidelines.

(2) It is not possible to eliminate all busing, (i.e., to return to neighborhood schools) without significantly resegregating the school system.

(3) There is no one method, or approach, which will maximize a reduction in busing without simultaneously causing a resegregation of schools throughout the county.

(4) Nevertheless, by eliminating busing altogether in some areas, and by reducing busing from non-contiguous areas in other cases, it should be possible for almost 3,772 students to attend schools nearer their homes. Over 1,440 of these can be taken off buses and be permitted to walk to neighborhood schools.

This can be done without significantly altering the racial composition of the schools affected.

The Committee noted, with concern, that three elementary schools have enrollments of 6.4%, 9.5% and 9.6% black students. However, the low percentage of black students in these schools exists today and could not be changed without additional busing and major disruptions in surrounding schools.

(Plaintiffs' Exh. 185 at 7).

The report was discussed at the May 8, 1980 Board meeting. A proposed revision to the report by Board Member Golato was rejected because it would have had a substantial resegregative impact on John Bayne, increasing the black percentage at that elementary school by almost 15% to 85.2%. (Plaintiffs' Exh. 146W at 5–7, 17). In the course of the John Bayne discussion, the Board's attorney emphasized that the impact of the busing change on John Bayne which was proposed by the Citizens Committee was consistent with the annual increase in black student percentage which that school had been experiencing over the previous three years. He pointed out that an increase substantially above the demo-

---

**113.** The official charge to the Committee was as follows:

The Board of Education's Advisory Committee shall review the present "busing" policies, procedures and practices of the Prince George's County public schools, with the overall objective of reducing the amount of busing, and the average distances pupils are transported ....

A report shall be made to the membership of the School Board no later than February 1st. The major objective of the Advisory Committee's function shall be to recommend a means by which "busing for desegregation" can be reduced without simultaneously causing a resegregation of the public schools of Prince George's County.

graphic track record of that school would be a resegregative act. *Id.*

The Board adopted a resolution accepting the Citizens report. Board Member Johns voted against it, largely for the same reasons she had stated when she opposed the formation of the Committee. Ms. JoAnn Bell, Chairman of the Board of Education at the time of the adoption of the resolutions on the 1980 busing changes, explained the Board's motive:

> Let me explain to you what happened. Okay, a community would come and say we moved here, we want our children to go to school there. Some of them were black. Sometimes they were white.
>
> We said in effect let's get a committee and go see if that can happen, if these people can come back to their neighborhood so their kids can walk to school, and if it doesn't greatly alter the existing racial composition of that school so that it would be interpreted as a deliberate act of resegregating the school system for Prince George's County, let's see if we can do it.

(Deposition of JoAnn Bell at 32–33).

Based on the evidence in the record, the racially neutral explanation for the 1980 busing changes advanced by defendants is highly plausible. In *Diaz v. San Jose Unified School District*, 518 F.Supp. 622 (N.D. Cal.1981), Chief Judge Peckham, despite, *inter alia*, the existence of racial imbalance in the vast majority of schools in the district, the opposition of the Board to busing for the purpose of achieving integration, and the existence of a neighborhood school policy, found an absence of discriminatory conduct on the part of the San Jose Unified School District, where statutory segregation had not existed at the time of *Brown I. Id.* at 630, 637, 642.

In the within litigation, while a majority of the schools are not presently significantly racially imbalanced, a number of them are. Also, in the within litigation, at least one board member has noted his continued

opposition to the use of busing to improve integration. Additionally herein, there exists preference among at least some, and perhaps all, of the Board members and top staff for neighborhood schools. But all of that does not add up to evidence of discriminatory intent in the face of the total record, including the good faith efforts of top staff. As to neighborhood schools, Judge Wisdom's following comment is to be noted:

> We are well aware that some official actions on which a plaintiff hinges an allegation of unconstitutional discrimination have historically been motivated by racially and ethnically neutral *bona fide* concerns, such as the desire to have children attend the school closest to their home, and no showing is made that those concerns were actually subordinate to, or a subterfuge for, unconstitutional discrimination. In those circumstances, that a discriminatory result was the natural and foreseeable consequence of the actions is insufficient to infuse the challenged acts with the type of discriminatory intent required by *Washington v. Davis* and *Arlington Heights* ....[9]

_____

[9] As this Court recognized in *United States v. Jefferson County Board of Education*, 5 Cir. 1966, 372 F.2d 836, *aff'd en banc*, 1967, 380 F.2d 385, *cert. denied*, 1967, 389 U.S. 840 [88 S.Ct. 77, 19 L.Ed.2d 104], "The neighborhood school system is rooted deeply in American culture." In *Deal v. Cincinnati Board of Education*, 6 Cir.1966, 369 F.2d 55, 60, the Sixth Circuit summarized the sound policy reasons for the adoption and maintenance of a neighborhood school system.

*United States v. Texas Education Agency,* 564 F.2d 162, 168 (5th Cir.1977).[114]

However, the acceptance by this court of the Board's explanation for the 1980 changes does not imply approval for the Board's actions in 1980. The sound policy reasons for a neighborhood school system do not permit a school board, which has an unliquidated obligation to stamp out the vestiges of a prior dual system, to eliminate, unilaterally, busing ordered by a

_____

**114.** *See also* this court's November 29, 1972 statement: "No one has ever suggested that the neighborhood school concept is not attractive, and all other things being equal, preferable to any other guiding concept." *Vaughns*, 355 F.Supp. at 1057.

federal court or, in any event, to violate the court's order. All of that, however, does not in and of itself necessarily add up to discriminatory intent.

■ In sum, under the principles of *Davis, Arlington Heights* and *Feeney,* plaintiffs have not met their burden of proving that defendants acted with a racially discriminatory purpose in implementing the 1980 busing reversals. Although the natural and foreseeable consequences of the 1980 actions included limited resegregative impacts on certain schools, the Board, in each instance, attempted to hold those impacts to a few percentage points above the racial changes which were expected in any event to occur because of population movements. The objective evidence in the within litigation, including the historical background of the Board's 1980 decisions, the specific sequence of events leading up to the same, the procedures utilized, and the contemporaneous statements of Board and school officials, fails to demonstrate that the defendants implemented the 1980 changes because of a desire to separate the races or that impermissible considerations of race were a factor in that decision. Rather, the evidence demonstrates that it is more likely that the Board implemented those changes *in spite of* their resegregative impact.

The record in this case might entitle plaintiffs to findings that one or more individuals participating in the decision-making process of the Prince George's County school system in 1979–80 may have been motivated by constitutionally impermissible racial concerns. However, the apt observations of former Chief Judge Swygert are relevant in that regard:

> [I]t is clear ... that the *Davis* requirement of discriminatory purpose is not *scienter* (as known in the criminal law) and *is not the subjective motives of individual state officials, be they legislators or members of a local school or zoning board.* Such a test would pose an impenetrable evidentiary barrier for plaintiffs, for in an age when it is unfashionable for state officials to openly express racial hostility, direct evidence of overt bigotry will be impossible to find. Because a subjective test fails to measure the presence of discriminatory purpose when officials act discreetly, it is an outdated tool in the enforcement of the Equal Protection Clause.

. . . . .

> It is [also] clear ... that discriminatory purpose for constitutional analysis is to be gleaned not from individual officials but from the relevant governmental institutions. As a subjective test would be impossible to apply in such circumstances, the courts are driven to adopt an objective criterion in determining whether the challenged state action is imbued with a segregative intent or purpose. Such a criterion must include an examination of the institutional policy that underlies the action. (By "policy" we mean a deliberate course of action, selected among alternatives, that is deemed advantageous or expedient.)

*United States v. Board of School Commissioners of Indianapolis, Indiana,* 573 F.2d 400, 412–13 (7th Cir.1978) (footnotes omitted) (emphasis added). Earlier, in 1970, Judge Craven wrote in *Allen v. Asheville City Board of Education,* 434 F.2d 902, 906 (4th Cir.1970):

> The motivation of individual members of a governing entity is not the same as administrative intent. Members may vote a good measure for bad reasons and vice versa.... [T]he school board's overriding intent was to achieve a unitary school system. It should not be thwarted by mere conjecture that some or even a majority of its members may have entertained unpleasant thoughts about placing white children in a black neighborhood.

The observations of Judge Craven in *Allen* and Judge Swygert in the Indianapolis case comport with the meaning of Justice Stevens' concurring remark in *Davis* that "[a] law conscripting clerics should not be invalidated because an atheist voted for it." 426 U.S. at 253, 96 S.Ct. at 2054.

Since *Vaughns* was instituted in 1972, and particularly during the fall and winter months preceding the January 1973 decree, this court had the opportunity to work with, to observe and to weigh the statements, positions, attitudes and motivations of, the Superintendent, and one or more other top staff members of the Prince George's County school system, as well as its counsel, not only in the courtroom but in numerous chambers conferences which were held under the circumstances and for the reasons set forth in Part XVI, *infra.* This court, in late 1972 and 1973, and at all times since then, has come to have the highest regard for the sincerity and the integrity of those persons. As the factfinder in this litigation, this court has no difficulty whatsoever in concluding that each and every one of the persons within that staff-counsel group did not intentionally take any action or fail to take any action, for the purpose of discriminating on racial grounds, or for the purpose of attempting to reimpose segregation. In addition, this court's assessment of those persons is that they would have refused to implement any programs, steps or actions which they believed would have constituted discrimination on racial grounds. Thus, even if any of the individual Board members or others within the decision-making process of the school system had discriminatory or resegregative motivations or intentions, those persons did not cause any such motivation or intention to take effect. Therefore, plaintiffs are entitled to no relief on the grounds that defendants have acted with purposeful intent to discriminate on racial grounds or to cause resegregation. But, despite that conclusion, plaintiffs are entitled to relief in this litigation because defendants have not acted as required by law to eliminate all vestiges of the pre-1973 segregation which this court's January 1973 decree was intended to eliminate, and

also because defendants violated outstanding orders of this court in *Vaughns.*

## XVI. DISQUALIFICATION

Defendants have moved to disqualify this court pursuant to 28 U.S.C. § 455(b)(1) because the court allegedly has "personal knowledge of disputed evidentiary *facts*" concerning this litigation.[115] (Emphasis added). Those so-called "disputed evidentiary facts" are seemingly two in number: (1) "The Court has indicated that it believes that the Defendants were intended by its Decrees to maintain the racial composition of the schools in Prince George's County within some sort of percentage guidelines, whether flexible, sliding or otherwise, after the Court relinquished jurisdiction"; (2) "Another factual issue involving the Court concerns the crucial issue about whether constitutional standards were met before the Court relinquished jurisdiction in November of 1974." (Defendants' Memorandum in Support of Motion for Disqualification, Document 345 at 1, 3).

During the trial of these cases in May 1982, this court expressed the recollection that in 1974 "everybody keyed in on ... the kind of flexible approach, the sliding kind of approach that the plan permitted ...." (Tr. at 1716). Paul Nussbaum, Esq., defendants' principal attorney in the 1972–75 period, and one of the leading defense counsel at this time, who was present at most, if not all, of the numerous off-the-record chambers conferences during which the desegregation plan was formulated and evaluated in its early stages, stated:

Your Honor, in your honest invitation to counsel's advice to the court when counsel's recollection is different as to any facts related by the court as to matters not of record, I would like to advise the court it is my recollection that the basis of the 10 to 50 percent guideline was to establish a means of desegregating the public schools on January 29,

---

115. 28 U.S.C. § 455(b)(1) (Supp.1982) provides that a judge "shall disqualify himself ... [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the pro-

ceeding ...." Defendants have stated (Tr. at 1918–19) that their challenge is not based on "personal bias or prejudice concerning a party ...."

1973 and was not as a sliding guideline. I understood from Your Honor this morning you stated your recollection was they were intended to be sliding guidelines to fluctuate with the change in percentage of student population over a period of time, and I respectfully submit that is completely contrary to my recollection and I believe contrary to the facts in this case.

(Tr. of May 14, 1982 at 1741–42).

All of the events which form the basis for this court's recollection are not a matter of record. Perhaps, from the point of view of hindsight, it would have been preferable for all discussions beginning in 1972 to have been held on the record, even if on a sealed basis. However, in late 1972 and early 1973, a period of considerable turbulence in Prince George's County with regard to the *Vaughns* case, it was agreed among counsel, and one or more of top staff of the school system, that certain discussions could take place more naturally and comfortably if they were off the record. There was a fear that participants in those conferences might not be totally candid if they were held other than in chambers on a nonpublic, off-the-record, basis.[116]

▇▇▇▇▇ Regardless of the legal sufficiency or insufficiency of defendants' disqualification motion, this court,[117] with the full approval of plaintiffs' counsel,[118] stated during the trial that no recollections of this court in which defendants do not concur would be used by this court as a basis for decision in this litigation and that this court would proceed in this litigation on the basis that there were no understandings among court and counsel, prior to this court's relinquishing active supervision in March 1975, that the 50% guideline was to be adjusted upwards or that there was to be any post-March 1975 continuance of any guidelines. This court stated on the record during the trial that it never explicitly directed defendants to adjust the 50% guideline upward, but that this was what the court had in mind when it reviewed defendants' Fourth and final Report in late 1974. Accordingly, this court continues to proceed herein on those factual bases. That does not mean that, as a matter of law, the 50% guideline should not have been adjusted upwards, from and after 1973, in accordance with the black student population increase within the Prince George's County school system. Nor does it mean that this court did not have that legal requirement in mind before May 1981 and did not recall the same during trial in May 1982. But the present recollection of what a judge thought at an earlier date was legally required is not a question of fact and is not a basis for disqualification. Views concerning the law are not a basis for disqualification of a judge. *Cole v. Loew's Inc.*, 76 F.Supp. 872, 877 (S.D.Cal.1948). "Prejudgment as to the law, of course, is manifestly insufficient [as a basis for disqualification] by reason of the fact that every judge presumably knows his legal premises before the evidence comes in, and if he is in error the remedy is by appeal." *Bradley v. School Board of Richmond, VA.*, 324 F.Supp. 439, 445 (E.D.Va.1971) (Merhige, J.).

---

116. *See* Tr. of May 14, 1982 at 1713–14:

MR. P. NUSSBAUM: Your Honor, I would like to suggest that one of the reasons there were no reporters was because it was generally agreed that the discussions could take place in their most natural setting where they would be off the record with give and take amongst all parties.

THE COURT: I think that that comment was made, Mr. Nussbaum, as I think about it. I don't think anybody would have been the slightest bit inhibited whether we were on a record or off the record.... I think what has gone on in this courtroom in the last week or so shows that. But I do accept your comment.

*See also* Tr. of May 17, 1982 at 1832.

[THE COURT:] I think Mr. Nussbaum put his finger on what was perhaps the basic reason; that it was felt that certain persons would participate in those discussions on a much more frank, candid, helpful basis if those discussions were held not only in chambers but off the record.

117. *See, e.g.*, Tr. at 1745, 1748, 1827, 1834–35, 1898–99.

118. *See, e.g.*, Tr. at 1820, 1904–05.

It is to be noted that before defendants objected to this court's comments concerning upward adjustment of the 50% guideline, there was considerable discussion among the court, Mr. Wendorf and Mr. Nussbaum concerning the origin in 1972 and the implementation between 1973 and 1975 of the 10% guideline, with expressions of substantial agreement among all participants in that discussion and with no objection by any of counsel to this court's allusions as to what had occurred or been stated in chambers, off the record. (Tr. at 1717–18, 1799–1800).

With regard to the second alleged factual dispute, defendants' position is that this court had knowledge of certain facts based on the same off-the-record conversations when it said at a hearing on March 4, 1975 that "the Prince George's County plan is meeting ... constitutional obligations and standards." (Tr. of March 4, 1975 at 69). However, this court has no knowledge other than what is in the record on that issue. Plaintiffs assert that this court made an error in prematurely relinquishing jurisdiction and in even suggesting that constitutional standards were being met in 1975. The question of whether a constitutional plateau was in fact reached at any time after 1972 poses issues of law. It might well also pose issues of fact if there were any disputed relevant or material areas of fact in that regard, but there are no such disputed areas of fact in this litigation. In any event, this court is not foreclosed from reexamining its earlier stated views when changed conditions are presented to it— conditions which put in issue whether the vestiges of state-imposed segregation had been completely removed. *See Valley v. Rapides Parish School Board,* 646 F.2d at 937. Defendants assert that this court may not act as an appellate court over any of its previous determinations. But when a case enters a further phase before a judge or there is a remand to a judge, he is not sitting as an appellate judge, even though he sometimes must necessarily reconstruct what previously occurred.

■ Even if the two areas identified by defendants do involve any disputed evidentiary facts, defendants' motion for disqualification is without merit.

Section 455(b)(1) may alternatively require recusal in situations wherein the judge has pre-trial knowledge of the facts of a case, independent of any possible bias or partiality. In such instances, however, recusal is appropriate only when the information is derived from an extra-judicial source. Knowledge obtained in the course of earlier participation in the same case does not require that a judge recuse himself. *United States v. Grinnel,* 384 U.S. 563, 583 [86 S.Ct. 1698, 1710, 16 L.Ed.2d 778] (1966); *United States v. Carignan,* 600 F.2d 762, 763 (9th Cir.1979); *United States v. Azhocar,* 581 F.2d 735, 739 (9th Cir.1978), *cert. denied,* 440 U.S. 907 [99 S.Ct. 1213, 59 L.Ed.2d 454] (1979); *In re Webster,* 382 F.2d 79, 84 (9th Cir.1967); *Lyons v. United States,* 325 F.2d 370, 376 (9th Cir. 1963), *cert. denied,* 377 U.S. 969 [84 S.Ct. 1650, 12 L.Ed.2d 738] (1964).

*United States v. Winston,* 613 F.2d 221, 223 (9th Cir.1980). *See also In re Corrugated Container Anti-trust Litigation,* 614 F.2d 958, 967 (5th Cir.1980); *United States v. Bernstein,* 533 F.2d 775, 785 (2d Cir.1976). The fact that the proceedings on which this court's alleged "personal" knowledge is based were not on the record by request of counsel does not make them "extra-judicial" or mandate disqualification. In *United States v. State of Washington,* 459 F.Supp. 1020 (W.D.Wash.1978) (Boldt, J.), the trial judge was alleged to have gained personal knowledge of disputed evidentiary facts during the course of six inspection trips to properties involved in a lawsuit concerning off-reservation Indian treaty fishing rights. Those site visits were made in anticipation of a subsequent phase of the litigation. After noting that a representative of the party filing for disqualification, the State of Washington, participated in every inspection trip and that no comments made during those trips by tribal, state, or federal representatives were given any weight as evidence, the

trial judge concluded that the trips were conducted "as a proper judicial function in the course of a massive and diverse litigation" and that there was no basis for his disqualification. *Id.* at 1095.[119]

Defendants rely in part upon *United States v. C.B.S., Inc.*, 497 F.2d 107 (5th Cir.1974), in which the Fifth Circuit deemed it inappropriate for a trial judge to preside at a criminal contempt hearing based on violation of his own oral, off-the-record orders, which were held to be unconstitutional. In *C.B.S.*, there was no dispute of fact as to what the judge's orders had been and the case did not mention 28 U.S.C. § 455 nor rest its decision on the statute's proscription of "personal knowledge of disputed evidentiary facts." Judge Dyer commented:

> We are faced with the unusual setting of a judge trying a case in which he was a principal actor in the factual issues to be determined. Essential to the proof of the prosecution's case were acts committed by the judge himself, *i.e.* the verbal, unrecorded orders. The judge had to determine whether what he said was said was really said. He obviously could not be a witness and a judge in the same proceeding. To prove what the judge must have thought he already knew, his secretary, his law clerk and a local reporter were called as prosecution witnesses.
>
> A criminal contempt action for violation of a court order is somewhat different than other criminal proceedings. The judge whose orders were allegedly violated has a keener interest in the outcome, especially if those orders are outside of the judicial mainstream. Although contempt proceedings may be initiated by a judge on his own motion, the prosecution, taken over by Government attorneys, nevertheless must prove a charge of criminal contempt beyond a reasonable doubt. [Citations omitted.]
> . . .

> The recondite niceties of contempt law coupled with the strange milieu of a judge passing on the clarity of his own orders, which had to be substantiated largely by his own legal staff, should make us particularly sensitive to the demands of justice, and more particularly, to the appearance of justice. The guarantee to the defendants of a totally fair and impartial tribunal, and the protection of the integrity and dignity of the judicial process from any hint or appearance of bias is the palladium of our judicial system. [Citations omitted.]

*Id.* at 109. The "recondite niceties" of criminal contempt law do not present themselves in this case. In addition, this court, as do plaintiffs, accepts the position of defendants that this court did not, prior to or after March 1975, state, on or off the record, to counsel for the parties that the guidelines would slide upward in accordance with the black student population increase or otherwise.

Defendants also rely upon *Rice v. McKenzie*, 581 F.2d 1114 (4th Cir.1978). In *Rice*, the "question" presented was "whether a federal district judge must recuse himself in a federal habeas corpus case when, as chief justice of the state, he had participated in the state supreme court's adjudication of the same claims." *Id.* at 1115. Chief Judge Haynsworth stated: "We do not hold that the judge was disqualified by anything contained in subsection (b)" of 28 U.S.C. § 455, although the judge had presided, while Chief Justice of the West Virginia Supreme Court, over a probation revocation hearing following a criminal conviction which was now attacked in a federal habeas corpus petition. *Id.* Rather, Judge Haynsworth wrote that "[T]he principle that the source of the bias or partiality must be extra-judicial ... has always had limitations" and that one of those limitations is that "a judge may not sit on appeal in review of his decisions as a trial judge." *Id.* at 1118.

---

**119.** In *United States v. Mitchell,* 377 F.Supp. 1312 (D.D.C.1974), Chief Judge Sirica concluded that there was no basis for recusal because his prior contact with the case had not been extra-judicial.

As discussed *supra,* this court was not in any sense sitting in May 1982 or at any other time as an appeals judge or court in connection with any prior determination made by it in this litigation. In sum, this court hereby restates its mid-trial holding that defendants' disqualification motion must be denied.

## XVII. RELIEF

For the reasons discussed *supra* in Parts XIII and XIV, this court hereby determines that it has jurisdiction in both *Vaughns* and *N.A.A.C.P.* and that plaintiffs are entitled to judgment in both cases because defendants have not eliminated all vestiges of the pre-1973 segregation within the Prince George's County school system. Plaintiffs are also entitled to judgment in *Vaughns* because defendants have violated certain parts of outstanding orders of this court in that case. As noted *supra* at page 11, the issues of liability and relief have previously been bifurcated for discovery and trial in the within litigation. Accordingly, both sides are entitled to present, without repetition of evidence presented during the liability phase, further evidence relevant and material to relief. Counsel for plaintiffs are hereby afforded the opportunity to inform this Court, in writing, on or before July 15, 1983, of their proposed desires in that connection and of their suggested schedule in connection therewith. Thereafter, this court will seek to learn the views of defendants in those regards. Counsel on both sides are encouraged to confer among themselves with regard to the same prior to the above-referred-to submission by plaintiffs on or before July 15, 1983.

Because at least a substantial part of the evidence which will be relevant and material with regard to relief seemingly has already been presented in this case, it would appear to this court that it might be helpful for it to state at this time its *tentative* views as to relief. Subject to the further presentation of evidence by both sides and subject to having the benefit of written and/or oral argument with regard to relief, this court, as of this date, tentatively believes that it should file a further order in this case, which order should include, *inter alia,* the following:

(1) This Court should resume jurisdiction in *Vaughns* and exercise jurisdiction in the consolidated *Vaughns-N.A.A.C.P.* litigation.

(2) The 10% guideline should continue as such, subject to the obligation of the School Board to attempt to move that percentage guideline upward with regard to each school to which it is applicable, as and when practical.

(3) The 50% guideline should be changed to 80%.

(4) The 35-minute one-way transportation time guideline should continue.

(5) All guidelines should be recognized only as such and should be flexibly administered by the School Board and by this court, as and when required.

(6) The need to achieve unitary status should be *one* of the factors to be considered by the School Board and school staff in connection with the making of *all* decisions.

(7) None of the school assignment changes discussed in this opinion, and made by defendants since March 1975, including the 1980 changes (whether those changes should or should not have been made), should be reversed unless there are current affirmative reasons for so doing, because those changes, while incrementally unsound, have become embodied in the system and their reversal may undesirably negative stability in the assignments of students to schools.

(8) The School Board should be required to file semiannual reports with this court, but otherwise should be left free to operate the school system without this court acting as a super-School Board and with this court available, as and when needed, to receive petitions from plaintiffs and/or the School Board and/or to act *sua sponte* after appropriate presentations and/or hearings as and when necessary. This court has full confidence that defendants, once continu-

ing guidelines and duties are fully understood by them and all concerned, will in good faith comply with the orders of this court. Accordingly, the Board should not be required to return to this court for advance approval of each action which affects racial balance unless such action would violate any outstanding order of this court, particularly since the factor of race, pursuant to (6) *supra*, will be considered in connection with *all* decisions.

(9) As of this date, it is not possible to determine how long this court's resumption of jurisdiction should continue. Hopefully, as of some date not too far distant, this court will be able either to conclude that the Prince George's County school system has achieved unitary status or that the school system, even if unitary status has not been achieved, can operate under well-understood guidelines and duties without any active supervision by this court.

Those views as to relief are, as stated, only *tentative*. They will in any case require refinement and amplification and perhaps change.

### ORDER

(1) Reference is hereby made to this court's opinion filed June 20, 1983. Since then, counsel have presented their views with regard to substance and form of this Order.

(2) This court hereby resumes jurisdiction in *Vaughns* and exercises jurisdiction in this consolidated litigation, including both Civil Nos. 72–325–K (*Vaughns*) and K–81–2597 (*N.A.A.C.P.*).

(3) Defendants resist the formal entry of judgments in these cases; plaintiffs seek the same. Whether plaintiffs in *N.A.A. C.P.* are entitled to relief as this Court indicated at pages 228–29 of its said June 20, 1983 opinion may depend upon whether, if *Vaughns* had never been instituted, plaintiffs in *N.A.A.C.P.*, absent a determination of intentional racial discrimination, could obtain relief because the school system has not attained unitary status. That is a question which, because relief is being granted in *Vaughns*, need not be determined at this time. Accordingly, the first two sentences in Part XVII of this court's said June 20, 1983 opinion are hereby revised to read as follows:

For the reasons discussed *supra* in Parts XIII and XIV, this court hereby determines that it has jurisdiction in both *Vaughns* and *N.A.A.C.P.* and that whether or not plaintiffs in *N.A.A.C.P.* are entitled to relief in that case because defendants therein have not eliminated all vestiges of the pre-1973 segregation within the Prince George's County school system, plaintiffs in *Vaughns* are entitled to relief in that case for that reason and also because defendants therein have violated certain parts of outstanding orders of this court in that case.

Those views in no way indicate that this court is by any means convinced that plaintiffs in *N.A.A.C.P.* are not entitled to relief or that judgments should not be entered for plaintiffs in both cases. Rather, this court, under the circumstances, will grant in *Vaughns* all the relief which this court believes should in any event be granted in either case or both cases and deems it irrelevant whether judgments are or are not entered at this time in either or both cases.

(4) In *Vaughns*, defendants are adjudged to have violated this court's outstanding orders in *Vaughns*.

(5) Further, in *Vaughns*, this court finds and holds that unitary status has not been achieved.

(6) The guideline figure set forth in the desegregation plan implemented by this court's Order of December 29, 1972, that no school shall have a black pupil population of less than 10%, shall continue as such, subject to the obligation of defendants to attempt to move that percentage guideline upward with regard to each school to which it is applicable, as and when practical.

(7) The 50% guideline figure set forth in the desegregation plan implemented by this court's Order of December 29, 1972 is hereby changed to a guideline that no school

shall have a black pupil population of more than 80%, subject to the obligation of defendants to attempt to move that percentage guideline downward with regard to each school to which it is applicable, as and when practical.

(8) The transportation time guideline shall continue to be 35 minutes each way.

(9) All guidelines set forth in this Order shall be recognized only as such, shall be flexibly administered by defendants and this court, and from time to time may be adjusted by this court after affording to the parties the opportunity to be heard.

(10) The need for defendants to achieve unitary status as quickly as reasonably possible shall be one of the factors to be considered by defendants in connection with the making of *all* decisions by defendants, including decisions by defendants which may relate to school assignments made since March 1975. However, none of the school assignment changes made by defendants since March 1975 need be reversed at this time or at a later date unless otherwise required by subsequent Order of this court although those changes may be reversed in whole or in part by defendants in accordance with the preceding sentence hereof as and when required. As part of defendants' said duty under this paragraph (10), all formal memorializations of defendants' decisions with respect to school openings and closings, student attendance areas, and conversions to middle schools or like reorganizations shall state the impact of such decisions on the racial composition of the schools in question.

(11) Defendants shall prepare and file with this court an annual report of the Prince George's County school system with regard to the racial composition of each school based on official September enrollment figures as soon as such figures are available, beginning forthwith. In addition, defendants shall prepare and file semiannual reports with the court beginning not later than April 1, 1984. Such semiannual reports shall state as to each school outside the guidelines: (1) what steps have been taken, or are proposed to be taken in order to bring or to maintain each such school within the guidelines; and (2) in each case where defendants have neither made nor planned student reassignments with respect to any school outside the guidelines, descriptions of any student reassignment actions which could reasonably be taken and which would promote the achievement of unitary status, and the reasons why such actions are not being taken or proposed to be taken.

(12) Defendants are not required to return to this court for advance approval of each action or lack of action on their part, including any action or lack of action which affects racial balance, though of course defendants are required to obey all outstanding Orders of this court unless and until defendants are relieved of such obligation in whole or in part by further Order of this court. Any party in *Vaughns* may from time to time apply to this court for change or amplification in any outstanding Order of this court in that case.

(13) This court's Order dated October 29, 1981 enjoining defendants from taking certain actions is hereby dissolved. There would appear to be no need for this court to require the unused former school buildings, subject as of this date to that Order, to be retained by defendants for possible future school use, in view of the fact that no showing to date has been made by plaintiffs or others of any need for the same in order for compliance with this court's Orders, including the within Order, to take place.

(14) It is so ORDERED, this 20th day of September, 1983.

## APPENDIX A

### ORDER

The parties hereto, having agreed to the passage by this Court of an Order establishing policies and practices to be adhered to by the Defendants in conjunction with personnel hiring, promotional practices, and construction of public schools, it is, this 20th day of February, 1974, by the United

States District Court for the District of Maryland,

ORDERED, that with respect to the personnel hiring and promotional practices of defendants:

1. All hiring, promotion practices and other conditions of employment shall be maintained and conducted in a manner which does not discriminate on the basis of race, color, sex, religion or national origin in violation of the Constitution of the United States or of Title VII of the Civil Rights Act of 1964. The Defendants will utilize only such testing as is clearly job related.

2. All facilities on the Defendants' premises and property shall be available in accordance with existing rules and regulations related thereto for the use of any employee without regard to race, color, religion or national origin; that there shall be no discrimination against any employee on said grounds with respect to the use of facilities.

3. There shall be no discrimination or retaliation of any kind against any person because of opposition to any practice declared unlawful under the Constitution and laws of the United States and the State of Maryland or because of a charge, giving of testimony or assistance, or participation in any manner in any investigation, proceedings or hearing under the Constitution and laws of the United States and the State of Maryland.

4. The Defendants will report in writing to this Court the status of the undertakings outlined in the following paragraphs of this Decree. The report will describe the manner in which these undertakings were carried out, and will contain copies of all documents pertaining to said undertakings. The report shall be filed with the Court on or before August 1, 1974.

5. The Defendant school system's goal is to employ a percentage of blacks in all job categories which is generally reflective of the percentage of the black population of Prince George's County, or, generally, not less than 19%. For purposes of judging whether or not the Defendants have reached this goal, the Defendants shall report to this Court, on or before August 1, 1974, the percentage of blacks employed at all employment levels in the school system. Reports shall thereafter be made as ordered by this Court. Such reports shall specify, in detail, the number of blacks in each job category as set forth in the administrative and employment organization charts of the school system at the time of reporting. In general, the reporting categories shall include the following types of job classifications:

a. Professional Levels of Employment

(1) "In school" Teaching Staff
 (a) teachers
 (b) librarians
 (c) counselors
 (d) other "in-school" professional staff

(2) "In school" Administrative Staff
 (a) principals
 (b) assistant principals
 (c) administrative assistants

(3) Area and Central Staff Administrative Levels
 (a) Area and Central Staff Administrators
 (b) Executive Administrators
 (i) Area Directors
 (ii) Assistant Superintendents
 (iii) Superintendents
 (iv) Administrative Assistants to (ii) and (iii)
 (v) Functional Officers

b. Non-Professional Levels of Employment

6. Defendants will, for two years succeeding this Decree, maintain, by race, a record of all applicants interviewed for positions with Defendant school system. (This shall not apply to such situations where applications are made directly to the local public school for either clerical, cafeteria, or custodian positions, and no employment is offered to applicant by said local school.)

7. If the Report of August 1, 1974 indicates that the Defendants' goals have not been met in spite of a good faith effort to

achieve said goals in all the employment categories, the Defendants will re-evaluate their progress to identify the reasons for their inability to attain said goals.

8. It is expressly understood that no persons shall be terminated or replaced as a result of the Defendants' announced efforts to attain their goal and that said goal is not to be implemented in any way which will result in the lowering of valid standards for employment or promotion or in any manner which would result in unlawful discrimination prohibited by the Constitution or by Title VII of the Civil Rights Act of 1964.

9. The specific means to achieve the goals set forth are left to the good faith determination of the Defendants. However, Defendants will consider and utilize where appropriate the following procedures to attain their goals:

 a. Defendants, in an effort to actively recruit black employees with an aim toward obtaining black representation in all job classifications which are generally reflective of the black population of Prince George's County, will utilize such media and/or sources as are referred to in the Guidelines adopted by the Board of Education of Prince George's County on March 25, 1971, pursuant to Bylaw 236 of the State Department of Education.

 b. All of the referral sources set out in the above paragraph will be notified in writing that qualified applicants will be considered for all job categories without regard to race, color, religion, sex or national origin.

 c. When necessary, job openings will be communicated to one or more of the referral sources as referred to in paragraph (a) above.

 d. The Defendants will carefully scrutinize job applications from black applicants' interests, experience, skills and other qualifications, regardless of the positions for which the applicants have applied.

 e. All specific educational requirements indicated on job requisition forms, or any type of job order, will be directly related to the job function which the employee will be expected and required to perform.

10. All new employees will have the school system's equal employment opportunity policy emphasized during the initial employment indoctrinations and that said policy will be emphasized in supervisory training.

11. All qualified employees will be notified in writing that they are encouraged to fully participate in school system sponsored education, training, recreation and social activities, without regard to race, religion, color, sex or national origin.

FURTHER ORDERED that, with respect to policies relating to the construction of public schools:

 1. To the extent feasible, all new schools shall be constructed in racially neutral areas.

 2. All schools shall be maintained on a desegregated basis.

 3. There shall be no disproportionate amount of transportation of Black to White pupils measured in either time or distance traveled.

 4. Notification will be given to Plaintiffs of all projected school construction at the time an architect has been appointed for same, which notice shall include an anticipated pupil assignment by race, together with an approximation of the attendance area to be served by said school upon completion.

FURTHER ORDERED that this Order shall become effective only at such time as the Supreme Court of the United States either denies the Application for Writ of Certiorari, which is presently contemplated to be filed by Defendants, on or before June 22, 1973 or if said Application is granted and upon a hearing by said Supreme Court of the United States, the judgment of the lower court is affirmed.

FURTHER ORDERED that it is further understood and agreed that this Consent Decree, being based upon present standards of desegregation, shall not survive any validly enacted Amendment to the Con-

stitution of the United States, Act of Congress, or Decision of the Supreme Court of the United States, related to the desegregation of the public schools or to the transportation of public school students thereto, as such Amendment, Act, or Supreme Court Decisions affect the standards of desegregation applied by this Court in its original findings of July 25, 1972.

FURTHER ORDERED that this Consent Decree does not constitute an admission by Defendants of any violation of any provision of the Constitution or laws of the United States or of the State of Maryland.

/s/ Frank A. Kaufman
Judge

Seen and Approved:

/s/ Paul M. Nussbaum
Paul M. Nussbaum, on behalf of the Defendants

/s/ Richard V. Falcon
Richard V. Falcon, on behalf of the Plaintiffs

Samuel H. DePew, on behalf of Intervenors/Plaintiffs

## APPENDIX B

### MEMORANDUM AND ORDER

The defendants have filed in this case a petition to relinquish jurisdiction and to close the file in these proceedings. After consideration of the same and after conference with counsel of record in this case, as well as with Donald P. McPherson, III, Esq. who has raised questions on behalf his clients relating to the Dresden Green school, and also after conferences with counsel of record to date in *Towler v. LePine,* Civil No. K–74–808 and with counsel in *Davis v. Board of Education of Prince George's County,* Civil No. K–74–1212, this Court has determined that it will relinquish its jurisdiction over defendants in this case and hereby so does, subject to the following exceptions and provisos:

(1) This Court retains jurisdiction in this case with regard to any and all matters which relate to the Dresden Green school.

(2) This Court retains jurisdiction in this case with regard to any matters which are related to the allegations set forth in Civil Nos. K–74–808 and Civil No. K–74–1212.

(3) Further, this Court will entertain at any time a request from any one or more of the plaintiffs or defendants in this case to assume jurisdiction over any and all aspects of this case and of the decree and decrees set forth herein, and in connection with consideration of any such request and the determination of any of the issues raised therein, will consider and determine whether to reopen this case in its entirety or in part and to assume jurisdiction in full or in part over the subject matter of this case and the parties thereto at such time. However, pending any further Order by this Court, this Court retains jurisdiction in this case from and after the date hereof only for the limited purposes set forth in connection with the two exceptions and provisos which appear in paragraphs (1) and (2) hereinabove.

The Clerk is directed to send copies of this Memorandum and Order to counsel in this case including Mr. McPherson and to counsel of record in Civil Nos. K–74–808 and K–74–1212.

It is so ORDERED, this 27th day of November, 1974.

/s/ Frank A. Kaufman
United States District Judge

## APPENDIX C

### MEMORANDUM AND ORDER

Reference is hereby made to this Court's Memoranda and Orders filed November 27, 1974 and March 4, 1975. In both of those Memoranda and Orders, this Court referred to matters relating to the Dresden Green School. In view of this Court's Memorandum and Order filed March 4, 1975, there is no continuing need for this Court to retain jurisdiction in this case with regard to such matters.

The aforementioned November 27, 1974 Memorandum and Order also refers to Civil No. K–74–808 and Civil No. K–74–1212. In view of developments which have taken place in those cases, there is no longer any need for this Court to retain jurisdiction in this case with regard to those matters.

As provided in paragraph (3) of the aforementioned November 27, 1974 Memorandum and Order, this Court will entertain a request from any one or more of plaintiffs or defendants in this case, or by counsel representing the petitioners in connection with the Dresden Green School matter, to assume jurisdiction over any and all aspects of this case and of the decree and decrees set forth herein and in connection with consideration of any such request and the determination of any of the issues raised therein, will consider and determine whether to reopen this case in its entirety or in part and to assume jurisdiction in full or in part over the subject matter of this case and the parties thereto at such time.

The Clerk is directed to send copies of this Memorandum and Order to counsel in this case including Donald P. McPherson, III, Esq., and to counsel of record in Civil Nos. K–74–808 and K–74–1212, and to close the file in this case. It is so ORDERED, this 13th day of March, 1975.

/s/ Frank A. Kaufman
United States District Judge

